# EXHIBIT C

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## TITLE IX



**January 2001**

**U.S. Department of Education**
**Office for Civil Rights**

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the <u>Federal Register</u> "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance. It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  <u>Gebser v. Lago Vista Independent School District</u> (<u>Gebser</u>), 524 U.S. 274 (1998), and <u>Davis v. Monroe County Board of Education</u> (<u>Davis</u>), 526 U.S. 629 (1999). The Court held in <u>Gebser</u> that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages.  See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639.  The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages.  See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding.  The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092).  A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance.  In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale ), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance.  In these areas, no changes in the guidance were necessary. A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.

## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being.  Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn.  As with the 1997 guidance, the revised guidance applies to students at every level of education.  School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well- publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2] Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

### Harassment by Teachers and Other School Personnel

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees. These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students. The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students. In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing. We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services." However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment.  We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping.  Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways.  The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program.  Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists.  We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created.  We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages.  We disagree.  First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -- that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.  In determining whether harassment is actionable, both Davis and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing Oncale)), and the Davis Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action.  A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students.  Other commenters, by contrast, commended OCR for recognizing that Gebser and Davis did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point.  While Gebser and Davis made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the Davis Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

**Effective Response**

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools.  We disagree.  Effectiveness has always been the measure of an adequate response under Title IX.  This does not mean a school must overreact out of fear of being judged inadequate.  Effectiveness is measured based on a reasonableness standard.  Schools do not have to know beforehand that their response will be effective. However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.


# The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX.  The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent). Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record. Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser. This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim. It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation. In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4] The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. The Department is in the process of developing a consistent approach and specific factors for implementing this provision. OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

---

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d). A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients). The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record.  The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges.  The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion.  They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process.  They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations.  We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

# REVISED SEXUAL HARASSMENT GUIDANCE:
# HARASSMENT OF STUDENTS[1]
# BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A.  Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

# I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2]  The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3]  This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding.  It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

# II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6]  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct.  For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7]  Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment.  However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment.  For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

# III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities.  The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions.  The "education program or activity" of a school includes all of the school's operations.[8]  This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

3

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]   A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]  The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

## V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered.  The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex.  If it does, the second issue is the nature of the school's responsibility to address that conduct.  As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

### A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as <u>quid pro quo</u> harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34]  Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct.  Harassment of this type is generally referred to as hostile environment harassment.[36]  This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment.  Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex.  OCR considers the conduct from both a subjective[38] and objective[39] perspective.  In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40]  Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- <u>The degree to which the conduct affected one or more students' education.</u>  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program. For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- <u>The type, frequency, and duration of the conduct.</u>  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46] Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- <u>The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.</u>  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

and relationship between the alleged harasser and the subject or subjects of the harassment.  For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- The number of individuals involved.  Sexual harassment may be committed by an individual or a group.  In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group.  Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context.  For certain types of conduct, there may be "safety in numbers."  For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students.  On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- The age and sex of the alleged harasser and the subject or subjects of the harassment. For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- The size of the school, location of the incidents, and context in which they occurred. Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus.  Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50]  Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area.  On the other hand, harassing conduct in a public place may be more humiliating.  Each incident must be judged individually.

- Other incidents at the school.  A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- Incidents of gender-based, but nonsexual harassment.  Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists.  Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

### 2. Welcomeness

The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome.  Conduct is unwelcome if

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]   Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]  For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.  In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.  The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]  Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.  On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection.  Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.  For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.  Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.  If elementary students are involved, welcomeness will not be an issue:  OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.  In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]  In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]  The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.  For example, a student's age could affect his or her ability to do so.  Similarly, certain types of disabilities could affect a student's ability to do so.

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser.  For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist.  However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment.  For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset?  However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment.  For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred.  However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence.  For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)?  Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

### B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

## 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60]  Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence.  A school also may be responsible for remedying the effects of the harassment on the student who was harassed. The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students.  Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62]  The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has "notice" of the harassment.  (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.)  Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors.  If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.  In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63] Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth-grade student in a school hallway. Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways. Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class. In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

of aid, benefits, or services to students. However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program. Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

If the school takes these steps, it has avoided violating Title IX. If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program. The school, therefore, has engaged in its own discrimination. It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively. (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

## 2. Harassment by Other Students or Third Parties

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67] As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations. On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68] In this case, the school is responsible for taking effective corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program. As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70] For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes. However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back. (This issue is discussed more fully in the section on "Recipient's Response.")

If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79] (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.") These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations. By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied. If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84] (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR. This is true in cases

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence).  This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85]  Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

# VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.  These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86]  As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed.  What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment.  The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works.  If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.  The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors.  However, in all cases the inquiry must be prompt, thorough, and impartial.  (Requests by the student who

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint.  For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation.  Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate.  In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified.  In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation. [88]  Appropriate steps should be taken to end the harassment.  For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both. [89]  A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90]  In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student.  Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed.  If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created.  For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment.  If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record.  Other measures may include, if appropriate, directing a harasser to apologize to the harassed student.  If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93]  For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances. As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95] At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

### B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment. In all cases, a school should discuss confidentiality standards and concerns with the complainant initially. The school should inform the student that a confidentiality request may limit the school's ability to respond. The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs. If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees. Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student.  Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused.  The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment.  There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant.  Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual.  In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action.  In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school.  Those steps can be very effective in preventing further harassment.

### C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student.  If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response.  These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter.  If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome.  If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation.  If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place.  Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations.  However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it. Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment.  Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98]  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100]  Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints.  However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment.  Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both.  In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience.  In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment.  During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint.  Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated.  Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community.  Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]  The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]  Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]  While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.  Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]  Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]  OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).  In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.  Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.  Police investigations or reports may be useful in terms of fact gathering.  However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]  Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.  The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.  In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

## X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution.  The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions.  The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment.  Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions.  Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.  In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements.  Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

## XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112]  Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]).  In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech.  OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117]  In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights.  For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119]  As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

Example 1:  In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

22

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women.  Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class.  What must the school do in response?

Answer:  Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals.  Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

Example 2:  A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus.  The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety.  What must a school do in response?

Answer:  Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment.  The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

_____

# Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX.  20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E.  If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance.  28 CFR 42.604.  Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964.  For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General.  This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

(professor's spanking of university student may constitute sexual conduct under Title IX); <u>Doe v. Petaluma</u>, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim);  <u>Denver School Dist. #2</u>, OCR Case No. 08-92-1007 (same as to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); <u>Nashoba Regional High School</u>, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also <u>Shoreline School Dist.</u>, OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); <u>Dartmouth Public Schools</u>, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); <u>San Francisco State University</u>, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); <u>Analy Union High School Dist.</u>, OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987).  See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance.  (See section on "Harassment by Teachers and Other Employees.")  See <u>Brown v. Hot, Sexy, and Safer Products, Inc.</u>, 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees.  (See section on "Harassment by Teachers and Other Employees.")  For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10]  <u>Cf.</u> <u>John Does 1 v. Covington County Sch. Bd.</u>, 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that sex discrimination consisting of same-sex sexual harassment can violate Title VII's prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997 guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds, 171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65, 1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other students, including both boys and girls, sufficient to raise a claim under Title IX); John Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by a male teacher.)  It can also occur in certain situations if the harassment is directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334, 1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment, but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex, court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee.)  In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g, pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both.  Thus, in Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband.  In both cases, according to the court, the remarks were based on sex in that they were made with an intent to demean each member of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct. 733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19] See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

may be actionable even if the harassment is not sexual in nature); Hicks, 833 F.2d at 1415; Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] Davis, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); Franklin, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation.  34 CFR 106.31; See Sexual Harassment Guidance, 62 FR 12034 (1997).  When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment.  S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987).  The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, id. at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students.  Congress also intended that if discrimination occurred, recipients needed to implement effective remedies.  S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements.  34 CFR 106.31(a)(b).  Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions.  For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment.  62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw.

[37] 34 CFR 106.31(b).  See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment.  The Court stated–– "... if the victim does not subjectively perceive the environment to be abusive, the

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  510 U.S. at 21-22.

[39] See Davis, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); Elgamil v. Syracuse University, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing Harris); Booher v. Board of Regents, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same).  See Oncale, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing Harris, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment.  This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., Ellison, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See Davis, 526 U.S. at 651, citing both Oncale, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., Davis, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); Doe v. Petaluma, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); Modesto City Schools, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); Weaverville Elementary School, OCR Case No. 09-91-1116 (students left school due to the harassment).  Compare with College of Alameda, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] Doe v. Petaluma, 830 F.Supp. at 1566.

[43] See Waltman v. Int'l Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); Monteiro v. Tempe Union High School, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing Waltman; see also Hall, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., Elgmil 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Andrews, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986).

[45]  34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf. Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf. Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf. Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding a racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment.  Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b).  Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination.  Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.

The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action.  Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642.  The concept of a "responsible employee" under our guidance is broader. That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations.  34 CFR 106.8(a).

[76] 34 CFR 106.31.  See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been sexually harassed by that coach.  See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises ....  The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII); but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3.  Gebser, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3.").

[85] 20 U.S.C. 1682.  In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students.  It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] Gebser, 524 U.S. at 288; Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); accord, Jones v. Flagship Int'l, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) (citing Waltman); Waltman, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See Intlekofer v. Turnage, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment –– to inform the school community that harassment will not be tolerated.  Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e).  The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent.  Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b).  This requirement has been part of the Title IX regulations since their inception in 1975.  Thus, schools have been required to have these procedures in place since that time.  At the elementary and secondary level, this responsibility generally lies

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] Fenton Community High School Dist. #100, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally Meritor, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  See note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] Id.

[106] See Meritor, 477 U.S. at 72-73.

[107] University of California, Santa Cruz, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  See University of Maine at Machias, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in Cape Cod Community College, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

[109] Indeed, in University of Maine at Machias, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated.  While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way.  However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] Academy School Dist. No 20, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); Mills Public School Dist., OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] Cf. EEOC v. Board of Governors of State Colleges and Universities, 957 F.2d 424 (7th Cir. 1992), cert. denied, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors.  The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).  However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); Portland School Dist. 1J, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See Florida Agricultural and Mechanical University, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); Cf. Cohen v. San Bernardino Valley College, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); George Mason University, OCR Case No. 03-94-2086 (law professor's use of a

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones).