# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| **JOHN DOE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:19-cv-02336-JTF-tmp |
| ) | |
| **RHODES COLLEGE,** ) | |
| ) | |
| Defendant. ) | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER

Before the Court is Plaintiff John Doe's Amended Application for Temporary Restraining Order and Preliminary Injunction; the Motion was filed on June 5, 2019. (ECF No. 21.) Defendant Rhodes College filed its Response in opposition to the Motion on June 6, 2019. (ECF No. 24.) The Court held a hearing on Plaintiff's request for a temporary restraining order ("TRO") on June 6, 2019, whereby it received arguments from the parties and took the matter under advisement. (ECF No. 27.) As part of the relief sought, Plaintiff requests that this Court (i) enjoin Defendant from enforcing its decision to expel Plaintiff pending the outcome of this suit; and (ii) enjoin Defendant from refusing to confer his degree, presuming all his remaining graduation requirements are met, with the caveat that the degree may be rescinded should Plaintiff prove unsuccessful in this suit. (ECF No. 21, 18.)

For the reasons that follow, the Court finds that Plaintiff's request for the above TRO should be **GRANTED IN PART AND DENIED IN PART**.

1

**FACTUAL BACKGROUND**

This case concerns alleged violations of Title IX of the Civil Rights Act of 1964 and breaches of contract. Plaintiff is a male that was a senior at Rhodes College, scheduled to graduate in May 2019. (ECF No. 1, 2:10.)[1] He was also a member of the Sigma Alpha Epsilon ("SAE") fraternity and a football player for Rhodes. (*Id.*) Around February 14, 2019, Plaintiff and his friend Z.W., who is also a Rhodes football player, attended a formal event at the SAE fraternity on Rhodes' campus. (*Id.* at 3:11; 10:62.) The event was also attended by C.S. and E.M; C.S. was Plaintiff's date for the event. (*Id.* at 3:11–3:12.) That evening, C.S. consumed a large quantity of alcohol, smoked marijuana, and used cocaine. (*Id.* at 3:13.) C.S. then became violently ill; she was characterized as incapacitated, in-and-out of consciousness, vomiting, refusing to drink water, and speaking incoherently. (*Id.* at 3:13, 3:19, & 9:59.) "Plaintiff, Z.W., E.M., and four other members of SAE attempted to ensure Plaintiff [sic] was not in danger." (*Id.* at 3:13.) As part of this help, Plaintiff contacted C.S.'s friend C.C. to come pick her up. (*Id.*)

When C.C. arrived, C.S. told her, "They raped me[,]" and that she wanted to go to the hospital. (*Id.* at 4:20, 4:21.) Upon arriving at the hospital, C.S. changed her mind and said she wanted to go home. (*Id.* at 4:21.) Although C.S. was intoxicated, C.C. and C.S.'s roommate, D.P., then questioned C.S. about the events of the night. (*Id.* at 4:24.) The Title IX investigative report states, in relevant part, as follows:

> Witness (C.C.) stated C.S. was very non-responsive[.] Witness stated C.S. was very subdued and lacked energy. Witness stated CS's eyes were closed but she could move one arm instead of speaking. Witness stated that she and [another female student] asked C.S. what happened and started using yes or no leading questions. Witness stated they started listed (sic) questions to figure out who raped her, *i.e.*[,] was it a freshman, sophomore, junior, etc. Witness stated C.S. gave a thumbs up to it being a senior, [a thumbs up to it being J.S., and a thumbs

---

[1] Apart from the addition of a breach of contract claim, Plaintiff's original Complaint and Amended Complaint are substantially the same; the Court, however, cites the original Complaint because it is submitted as being verified.

up to it being Z.W.]. Witness also stated that when asked about anyone else, C.S. motioned that she was unsure."

(ECF No. 1. 4:25–5:25.) Even with the above, C.C. also reported that "Witness stated that they asked C.S. if the guys had sex with her[,] and C.S. gave a thumbs down." (*Id.* at 5:26.) C.S. also wrote down the first four letters of E.M.'s first name on a piece of paper. (*Id.* at 5:27.) When asked if she was referring to E.M., C.S. gave a thumbs up and then stated "[E.M." is not ok," "she is not a good person," and "she made it all happen." (*Id.* at 5:26–5:27.) The next morning, C.C. reported that C.S. said "she thinks she was raped but she doesn't know if she's misremembering." [2] (*Id.* at 5:31.) C.C. took C.S. to Methodist Hospital, where a sexual assault kit for C.S. was requested. (*Id.* at 5:35.) The kit was administered, the Memphis Police Department ("MPD") was contacted, and C.S. and her friends gave statements to the sex crimes unit. (*Id.* at 6:37–6:39.)

On February 15, 2019, Rhodes published a notice that a sexual assault was reported on campus. (*Id.* at 6:43.) MPD then came to question students at Rhodes. (*Id.* at 6:44.) The week immediately following the alleged event, an organization called "Culture of Consent" began protesting about topics related to sexual assault and investigations thereof; these protests were directed toward fraternal organizations (which are necessarily male), Rhodes administration, and the student body. (*Id.* at 7:48–53, 9:60–10:62.) The organization also directed the protest to Rhodes football players. Similar protests were made by the organization three days after the Title IX investigation was completed, *i.e.*, thirteen days prior to the disciplinary hearing for Plaintiff and Z.W. (*Id.* at 9:60–10:60.)

---

[2] According to the record, "another of C.S.' roommates, K.K. also gave a statement that on the morning of February 15 C.S. said, when prompted, that she remembered saying that she was raped and mentioning Plaintiff, Z.W. and E.M. the night before, but that she also stated ["] oh my God, I think I was drugged, I don't know what happened last night." (ECF No. 1, 6:40.)

3

Rhodes' Title IX investigator, Emma Davis, interviewed fourteen witnesses, excluding Plaintiff and C.S. (ECF No. 1, 8:55–9:57.) Not one witness with personal knowledge corroborated that C.S. was raped; the only evidence supporting such were C.S.'s statements made to C.C. and D.P. while incapacitated and intoxicated. (*See id.* at 9:57.) In fact, there was at least one witness named J.H. that told the investigator that he was there and would have seen if anything happened to C.S. but that no sexual assault or inappropriate contact took place. (*Id.* at 9:59.) When interviewing C.S., C.S. stated that she recalled E.M. being present while the rape was happening. (*Id.* at 9:56.) When the investigator interviewed E.M., she did not ask about the allegations against E.M. (*Id.* at 9:59.)

Rhodes charged Plaintiff and Z.W. on April 5, 2019, and held a hearing on April 17, 2019, to determine whether they violated Defendant's sexual misconduct policy. (*Id.* at 10:64.) At the hearing, Plaintiff and Z.W. appeared and denied any wrongdoing. (*Id.* at 10:65–10:66.) C.S. did not attend or participate in the hearing and was not subject to any questioning by the decision panel or subject to cross-examination of any kind. (*Id.* at 10:67.) C.S.'s attorney attended the hearing and, throughout the hearing, held a file visible to everyone at the hearing that said "C.S. v. SAE". (*Id.* at 10:68.) No witness testimony supported C.S.'s contention through any form of *direct* evidence. (*Id.* at 11:70.) The only testimony that related to Plaintiff and Z.W.'s conduct towards C.S. was that they attempted to help C.S. and that they contacted her friends to come and pick her up. (*Id.* at 11:73.) No testimony placed Plaintiff and Z.W. alone with C.S., no testimony placed Z.W. alone with C.S., and the only testimony placing J.S. and C.S. alone indicated that they were alone for five minutes after C.C. was contacted to pick C.S. up. (*Id.* at 11:74.) Every witness who was present at the SAE party testified that they were regularly in the presence of C.S. and nothing happened. (*Id.* at 11:71.) It is important to note

that E.M. testified at the hearing but no panel member asked her about her involvement in the alleged incident. (ECF No. 1, 11:72.)

Without warning or notice, the Title IX coordinator introduced additional evidence into the proceeding; which was one-page of a medical examination indicating that C.S. had superficial injuries to her rectum. (*Id.* at 11:75.) The panel was asked to take this as dispositive of the allegation that C.S. was actually raped. (*Id.*) The panel questioned Plaintiff and Z.W. about the cause of the injury in the medical record, but Plaintiff and Z.W. could not answer the question and did not have an opportunity to consult with a medical professional or present testimony as to that issue. (*Id.* at 12:76.) They now assert that injury could be caused by hard stool, gastro-intestinal disorders, or consensual anal penetration. (*Id.* at 12:77.) C.S. was not present and, accordingly, could not be asked about the causes. (*Id.*) Notably, female witnesses were allowed to testify about hearsay statements allegedly made by C.S. during her intoxication, but Rhodes did not call J.H.—a male witness who was present around J.S. virtually the entire evening and no sexual misconduct took place. (*See id.* at 12:78–12:80.) Instead, Plaintiff called J.H., who, again, testified that he had direct knowledge of the events of that evening as they related to C.S., that he was present around her virtually the entire evening, and that no sexual misconduct took place. (*Id.* at 12:80.) Ultimately, Defendant found Plaintiff and Z.W. responsible for sexual misconduct by a preponderance of the evidence, and both were expelled from Rhodes. (*Id.* at 15:90.)

As a result of the above, Plaintiff filed this action alleging Defendant violated Title IX based on an erroneous outcome and selective enforcement theory and that Defendant is in breach of contract. Plaintiff additionally seeks to enjoin Defendant from both enforcing its decision to expel Plaintiff and refusing to confer his degree. (ECF No. 21, 18.)

## LEGAL STANDARD

"The standard for determining whether to grant a temporary restraining order is the same as the standard for determining whether to grant a preliminary injunction."[3] *Provectus Biopharmaceuticals, Inc. v. Dees*, No. 3:16-CV-222, 2016 U.S. Dist. LEXIS 189165, at *3 (E.D. Tenn. Sept. 14, 2016). A request for a preliminary injunction is governed by Fed. R. Civ. P. 65. *Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 427 (6th Cir. 2014). "Generally, the plaintiff bears the burden of establishing his entitlement to a preliminary injunction." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). To obtain a preliminary injunction, a plaintiff must demonstrate a strong or substantial likelihood or probability of success on the merits. *PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 333 (6th Cir. 2018). Courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant is likely to succeed on the merits; (2) whether the movant will suffer irreparable injury in the absence of an injunction; (3) whether the injunction will cause substantial harm to others; and (4) whether the injunction will serve the public interest. *Id.* at 332.

## ANALYSIS

**Preliminary Injunction**

*Likelihood of Success on Merits*

The Court finds that Plaintiff presents a substantial likelihood of success on the merits of at least his Title IX claim based on an erroneous outcome theory. Title IX of the Education Amendments of 1972 provides, "No person in the United States shall, on the basis of sex, be

---

[3] The only meaningful distinction is whether notice must be given to an adverse party. Rule 65 of the Federal Rules of Civil Procedure provides that while a court may issue a preliminary injunction only on notice to the adverse party, the "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Neither the Supreme Court nor the Sixth Circuit has set forth a standard for determining when intentional discrimination has occurred in a case where a student has relied on Title IX to challenge either the initiation or the outcome of a disciplinary proceeding." *Doe v. Miami Univ.*, 247 F. Supp. 3d 875, 884 (S.D. Ohio 2017) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003)). Nonetheless, courts in this Circuit look to the Second Circuit's decision in *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). *See id.*

In *Yusuf*, the Second Circuit identified two categories for attacking a university disciplinary proceeding on grounds of gender bias under Title IX, one of which is called "erroneous outcome." *Id.* This theory involves a plaintiff attacking a university disciplinary proceeding on grounds of gender bias by arguing they were innocent and wrongly found to have committed an offense. *Miami Univ.*, 247 F. Supp. 3d at 886. "[T]o state an erroneous-outcome claim, a plaintiff must plead: (1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Id.* (quoting *Doe v. Cummins*, 662 F. App'x 437, 451 (6th Cir. 2016)). "Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination, however, is not sufficient to survive a motion to dismiss." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (quoting *Yusuf*, 35 F.3d at 715). "Causation sufficient to state a Title IX discrimination claim can be shown via 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend

7

to show the influence of gender.'" *Miami Univ.*, 247 F. Supp. 3d at 886 (quoting *Cummins*, 662 F. App'x at 452).

First, Plaintiff shows a substantial likelihood that he can meet the first element of an erroneous outcome claim regarding articulable doubt because, in the least, Defendant decided Plaintiff's fate without seeing or hearing live testimony from C.S. and did not provide Plaintiff an opportunity to cross-examine C.S., despite credibility being at stake in his case. "The pleading burden as to the first element—articulable doubt—is 'not heavy' and can normally be met by alleging 'particular procedural flaws affecting the proof.'" *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679 (M.D. Tenn. 2018) (quoting *Yusuf*, 35 F.3d at 715). When a disciplinary decision relies on any testimonial evidence in a case where credibility is in dispute and material to the outcome, due process requires an assessment of credibility through cross-examination. *See Doe v. Baum*, 903 F.3d 575, 583–84 (6th Cir. 2018); *see also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 659–660 (S.D Ohio 2016). In cases involving sexual misconduct, an accused student must have the right to cross-examine adverse witnesses. To adequately assess credibility, which concerns both the accused and the accuser, there must be some form of live questioning of the accuser in front of the fact-finder; written statements of the accuser will not suffice. *Baum*, 903 F.3d at 582–53; *see also Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401–04, 406 (6th Cir. 2017). Even more, the accused, specifically, has the right to confront his or her accuser through cross-examination, via an agent or otherwise. *Baum*, 903 F.3d at 583.

Here, Defendant's decision relied on testimonial evidence and statements of C.S. given prior to the hearing. Defendant's decision necessarily involved credibility determinations as to the witnesses before it because the testimony of different witnesses contradicted each other with

regard to Plaintiff's guilt. (ECF No. 1, 10:65–12:80.) *See Baum*, 903 F.3d at 583–84.[4] Notably, the nonappearance of the C.S. appears to be a significant denial of due process. Obviously, the Panel thought C.S.' appearance at the hearing was unnecessary. It seems the Panel resolved credibility issues without seeing or directly hearing from C.S. Moreover, with C.S. never appearing and presenting live testimony, Plaintiff was never given an opportunity to cross-examine her directly, through his agent or otherwise. *Baum*, 903 F.3d at 583; *Cincinnati*, 872 F.3d 393, 401–02, 406. Thus, Plaintiff presents facts sufficient to cast some articulable doubt on the accuracy and reliability of the disciplinary proceeding's outcome and satisfies the first consideration of an erroneous outcome claim under Title IX.

Second, Plaintiff provides facts sufficient to demonstrate a substantial likelihood of a particularized causal connection between the flawed outcome and gender bias. Again, the necessary particularized causal connection can be shown through, *inter alia*, "'patterns of decision-making that also tend to show the influence of gender.'" *Doe v. Miami Univ.*, 882 F.3d 579, 583 (6th Cir. 2018) (quoting *Yusuf*, 35 F.3d at 715). As an initial matter, the Court notes that the public attention caused by the protests and social media posts of Culture of Consent apparently lodged at fraternity members (which are necessarily male) at Rhodes that play for the school's football team, may have put pressure on Defendant to confirm that it took sexual misconduct allegations seriously. *Baum*, 903 F.3d at 586. Indeed, as an institution subject to Title IX, Defendant could lose federal aid if they are found non-compliant with Title IX. *Id.* Although "all of this external pressure alone is not enough to state a claim that the university

---

[4] The Court notes that two courts within this circuit recently held that a plaintiff's allegations that constitutional due process was violated because a university did not allow cross-examination does not stand when the claim is made through a breach of contract claim against a private university. *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 698 (M.D. Tenn. 2018); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 893–94 (M.D. Tenn. 2018). These cases are distinguishable, however, from the present circumstance because although Defendant Rhodes is a private university, Plaintiff's claim here, regarding cross-examination, invokes due process concerns under Title IX, not a breach of contract theory.

acted with bias in this particular case[], . . . it provides a backdrop that, when combined with other circumstantial evidence of bias in [Plaintiff]'s specific proceeding, gives rise to a plausible claim." *Id.*; *see also Doe v. Miami Univ.*, 882 F.3d 579, 593–94 (6th Cir. 2018).

The record tends to show that Defendant credited exclusively female testimony from "C.S.'s witnesses" and rejected all male testimony from Plaintiff and/or his witnesses. *Baum*, 903 F.3d at 586. Moreover, Plaintiff's Amended Complaint alleges that a female named E.M. was clearly implicated in the alleged sexual assault, but was not charged or investigated like Plaintiff and Z.W. *Doe v. Miami Univ.*, 882 F.3d 579, 593–94 (6th Cir. 2018). Thus, Plaintiff alleges sufficient facts showing a substantial likelihood that the decision-making process in this case resulted in a flawed outcome. Plaintiff's allegations also tend to show the influence of gender bias.

*Irreparable Injury*

The Court finds that Plaintiff has adequately shown that absent this Court's intervention, he will suffer irreparable injury. Plaintiff asserts that the disciplinary action taken against him has already damaged his reputation and may affect his ability to enroll at other institutions of higher education and to pursue a career. The Court agrees. These are irreparable harms that favor this Court granting the injunctive relief sought. (ECF No. 21, 14–15; ECF No. 19, 3:18–3:20.) As noted by the Sixth Circuit, "Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life." *Baum*, 903 F.3d at 582. Within the Sixth Circuit, a suspension that occurs after an unfair hearing may constitute an irreparable harm, *Roe v. Dir., Miami Univ.*, No. 1:19-cv-136, 2019 U.S. Dist. LEXIS 55246, at *22–23 (S.D. Ohio April 1, 2019), let alone an expulsion. The Court, having found that Plaintiff presents a sufficient likelihood that he was subjected to an unfair hearing in violation of due process rights,

further finds that the post-hearing expulsion of Plaintiff constitutes irreparable harm. *Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821, 829 (E.D. Mich. 2018) ("Where . . . a plaintiff's constitutional right to due process is 'threatened or impaired' the Court may presume irreparable injury."); *Cummins*, 662 F. App'x. at 448 (noting a diminished private interest when student is facing disciplinary probation as opposed to expulsion). Moreover, Plaintiff faces the immediate and irreparable harm that the sexual misconduct finding will negatively impact his academic and professional reputation. *Univ. of Mich.*, 325 F. Supp. 3d at 829; *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 31272, at *24–25 (S.D. Ohio Mar. 13, 2015); *see* ECF No. 19, 3:18–3:20. *But see Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio Oct. 19, 2015). Accordingly, the Court finds that Plaintiff has adequately shown that absent this Court's granting injunctive relief, Plaintiff will continue to suffer irreparable injury.

<u>Weighing the Balance of Injury to the Parties</u>

The facts support a finding that any harm to Defendant caused by granting the injunctive relief sought does not outweigh the harm faced by Plaintiff if the request is denied. Although Defendant asserts that the public interest would be harmed if this Court granted the relief requested, the argument is not well-taken. Defendant submits that mandating it to confer a degree to Plaintiff would require Plaintiff to return to campus without a substantive determination of his innocence and, ultimately, put the campus community at risk and make victims less likely to participate in Title IX investigations. (ECF No. 24, 6.) However, the Court is only enjoining Defendant from upholding its expulsion of Plaintiff based on the Title IX hearing at issue; the idea that Plaintiff would need to return to campus to satisfy other graduation requirements without a substantive determination of his innocence does not follow from that relief. The Court is not convinced that setting aside Plaintiff's expulsion and allowing Plaintiff

11

to return to campus would result in harm to Defendant or third parties. Clearly, courts are not prohibited from protecting against procedural irregularities in school disciplinary proceedings that amount to due process violations. Accordingly, a balance of the injuries faced by the parties weighs in favor of granting Plaintiff's request for injunctive relief.

*Public Interest*

The Court finds that the Plaintiff has sufficiently shown that the public interest weighs in favor of granting the requested injunctive relief. Defendant argues that the public interest is not served by granting the injunction sought because Plaintiff's claims are unsubstantiated, and Defendant would need to investigate Plaintiff for a different allegation before re-enrolling him. (ECF No. 24, 8.) Plaintiff argues that it is "always in the public's interest that a student be treated fairly[,]"as "[a]ll universities must ensure that the rights afforded to students under Title IX are protected, including the rights of male students accused of sexual assaults." (ECF No. 21, 17.) It is true that there is a public interest in educational atmospheres that are conducive to studying and learning for students. Colleges and universities are afforded great latitude in administering their rules and regulations to achieve such a goal. *Pierre*, 143 F. Supp. 3d at 714. Simultaneously, however, the Court cannot conclude that such interests outweigh that of ensuring that educational institutions comply with procedural due process and Title IX when seeking to achieve such an educational environment. As a result, although Plaintiff cites only persuasive authority for his proposition, his argument is well-taken. With public interests on both sides, the Court finds that the public interest, if anything, weighs in favor of granting injunctive relief.

After conducting its analysis of the appropriateness for injunctive relief, the Court finds that Plaintiff's request should be GRANTED IN PART AND DENIED IN PART. Plaintiff's

request that this Court enjoin Defendant from enforcing its decision to expel Plaintiff pending the outcome of this suit should be GRANTED. Plaintiff has shown a substantial likelihood that the proceeding by which he was expelled was improperly conducted in violation of due process and that there is a particularized connection between the flawed outcome and gender bias. However, as to Plaintiff's request that this Court enjoin Defendant from refusing to confer to him a degree, presuming all his remaining graduation requirements are met, the relief should be DENIED at this time. Plaintiff puts forth evidence showing that Plaintiff's graduation requirements, even without the instant disciplinary proceeding, are not otherwise satisfied. Specifically, Defendant, through its filings and this Court's TRO Hearing, asserts that Plaintiff has not turned in at least one assignment, has grades that need to be calculated, and has other misconduct allegations that need to be investigated and resolved. (*See e.g.*, ECF No. 24, 8; *see also* ECF No. 19, 1:8–2:16.)

## CONCLUSION

For foregoing reasons, the Court finds that Plaintiff's request for a TRO, via his Amended Application for Temporary Restraining Order and Preliminary Injunction, is **GRANTED IN PART AND DENIED IN PART**. Accordingly, Defendant is hereby enjoined from enforcing its decision to expel Plaintiff pending the outcome of this suit.

**IT IS SO ORDERED** this 14th day of June 2019.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge