**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE | : |
| | : |
| Plaintiff, | : |
| v. | :   Case No. 3:20-cv-4352-BRM-TJB |
| | : |
| | : |
| PRINCETON UNIVERSITY | : |
| | :       **OPINION** |
| Defendant. | : |
| | : |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiff John Doe's ("Plaintiff") Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction (ECF No. 3), filed on April 15, 2020, seeking to enjoin Defendant Princeton University ("Princeton" or "the University") from enforcing its decision to expel Plaintiff, removing Plaintiff's status as a full-time student, and preventing Plaintiff from attending classes and sitting for his upcoming exams. The University opposed Plaintiff's Motion. (ECF No. 14.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on April 21, 2020.[1] Having reviewed the submissions filed in connection with the motion and having heard the arguments of the parties, for the reasons set forth below and for good cause appearing, Plaintiff's application for TRO is **DENIED.**

---

[1] In comporting with local regulations regarding social distancing due to the COVID-19 pandemic, the Court held oral argument telephonically. (ECF No. 9.)

I.    BACKGROUND[2]

A.    Factual Background

This action arises out of an investigation by Princeton relating to allegations of intimate partner violence brought against Plaintiff by his ex-girlfriend, Jane Roe ("Jane").[3] (ECF No. 1 ¶ 1.)

Plaintiff and Jane—both students at Princeton—met in ▮▮▮▮▮▮ (*Id.* ¶ 17.)  Their relationship quickly turned intense and volatile, resulting in constant arguments and mutual distrust. (*Id.* ¶ 17-19.) This intensity between Plaintiff and Jane extended to their sex life where Plaintiff and Jane consistently engaged in consensual choking, spanking, and other behaviors that could be classified as BDSM. (*Id.* ¶ 20.) Additionally, during their time together, Jane struggled with drug and alcohol abuse, which included a hospitalization for alcohol poisoning. (*Id.* ¶ 22.)



During her sophomore year, Jane began struggling academically ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (*Id.* ¶ 23.) ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 24.) ▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, Jane informed Plaintiff she had cheated on him with multiple people ▮▮▮▮▮ and Plaintiff decided to end the relationship. (*Id.*) Despite the breakup, Jane continued to call and text Plaintiff apologizing and asking for forgiveness. (*Id.* ¶¶ 25-27.)

---

[2] Unless otherwise noted, the following facts are taken from Plaintiff's Complaint and assumed true for purposes of this Opinion.

[3] Plaintiff has filed a Motion to Proceed with the Use of Pseudonyms and for Protective Order. (ECF No. 2.) While the Motion is pending before Judge Bongiovanni, this Court will use pseudonyms as put forth in Plaintiff's Motion for TRO.

Shortly after the breakup, Jane learned from a friend that Plaintiff had cheated on Jane ███████████████████████████████. (*Id.* ¶ 28.) ██████████████████ Jane confronted Plaintiff about this and expressed her anger, embarrassment, and sadness. (*Id.*) Following this, Jan began to tell others she had initiated the breakup with Plaintiff because he was physically abusive. (*Id.* ¶ 30.) ██████████████ she told multiple friends she had broken up with Plaintiff because she was in an "unsafe relationship." (*Id.*) ███████████████████████████ ███████████████████████████████████

Eventually, ███████████████ Jane threatened Plaintiff that she would be meeting with SHARE—an on-campus center providing resources and counseling for sexual harassment and assault—to "figure out [her] options moving forward." (*Id.* ¶ 33.) Additionally, ████████████ ███████████████████████ Jane directly threatened Plaintiff by saying "take a year off and nothing will happen to you." (*Id.*)

As the semester continued ████████████████, word of Plaintiff's alleged assault had spread through campus and began impacting his reputation at the University. (*Id.* ¶ 34.) Plaintiff reported this harassment to the University's Director of Student Life, Garrett Meggs ("Mr. Meggs"). (*Id.*) He explained to Mr. Meggs that "he simply [didn't] feel safe." (*Id.*) In response, Mr. Meggs simply suggested Plaintiff seek mental health services to deal with the aftereffects of the breakup. (*Id.* ¶ 35.)

Throughout ██████████ Jane continued to contact Plaintiff directly seeking his attention. (*Id.* ¶ 36-37.) After mostly ignoring the communications, Plaintiff finally told Jane the two would never date again. (*Id.* ¶ 38.) In response, Jane stated "you're going to regret this. You're going to feel bad." (*Id.*)

███████████████, Jane had met with Regan Crotty ("Ms. Crotty"), the Director of Gender Equity and Title IX Administration, and told her she had been a victim of "Intimate Relationship Violence" by Plaintiff. (*Id.* ¶ 39.) However, as of their ███████ meeting, Jane stated she did not intend to take further action. (*Id.*) Notwithstanding Jane's hesitation, Ms. Crotty requested Jane to return to the Title IX office and informed her that Princeton wanted Jane to take further action against Plaintiff. (*Id.* ¶ 40.) This resulted in the issuance of a No Communication Order (the "NCO") ██████████ (*Id.* ¶ 41.) ███████████████, Ms. Crotty met with Plaintiff to discuss Jane's allegations and inform him that Jane did not wish to proceed further. (*Id.*) However, █████████████, Jane notified Ms. Crotty that she would cooperate with Princeton's Title IX investigation into Plaintiff's alleged misconduct. (*Id.* ¶ 42.)

██████████████ Plaintiff received a letter from Princeton formally notifying him of Jane's allegation of Intimate Relationship Violence and informing him that a Title IX investigation (the "Investigation") would commence. (*Id.* ¶ 48.) Additionally, the letter advised Plaintiff he was barred from campus during the pendency of the Investigation. (*Id.*)

The Investigation and subsequent adjudication were conducted by the same three individuals: Randy Hubert, Ed White, and Joyce Chen Shueh (the "Panel"). (*Id.* ¶ 49.) The Panel collected information including interviews of Plaintiff and Jane, statements from other relevant individuals, as well as social media posts, voicemails, photographs, and videos. (*Id.*) Under Princeton's RRR policy, the panel interviewed each party separately behind closed doors, collected and weighed the evidence, and made findings of fact and credibility assessments. (*Id.* ¶ 50.)

Following the investigation, the Panel notified Plaintiff—by letter, ████████████ ███ (the "Notice of Allegations")—they would deliberate the following allegations: whether Plaintiff engaged in Intimate Relationship Violence by grabbing and pinching skin on multiple

occasions ███████████████████████, choking Jane on or about each of ████████

███████████████████████████ and pulling Jane's arm and pushing her to the

ground during ████████████ (*Id.* ¶ 52.) Additionally, the Panel deliberated whether Jane

engaged in Intimate Relationship Violence by scratching Plaintiff on multiple occasions, punching

plaintiff ████████████, and elbowing Plaintiff in the face ████████████████

████. (*Id.*) Importantly, neither the Panel nor the Notice of Allegations did not—other than a

footnote—informed Plaintiff of his right to cross-examine Jane. (*Id.* ¶ 53.)

Ultimately, ████████████ the Panel concluded in a report (the "Report") there was

sufficient information to substantiate all five incidents of abuse alleged by Jane, but claimed there

was insufficient information to substantiate any incident of abuse alleged by Plaintiff. (*Id.* ¶¶ 55-

56.) In so finding, the Panel noted they found Jane "very credible" and Plaintiff as not credible.

(*Id.* ¶ 57.) Additionally, the Panel found the interviewed witnesses to be "generally credible." (ECF

No. 14-2 at 64.) Following this, ████████████, Princeton sent a notice to Plaintiff informing

him of the University's decision to expel him, and that he had the right to appeal ████████████

(the "Expulsion Memo"). (*Id.* ¶ 58.)

████████████████████████████████████████████████

████████████████████████████████████████████████

████ ████

████████████—after receiving permission for an extension—Plaintiff submitted his

appeal to the University. By letter ████████████████, a three-member appellate panel denied

Plaintiff's appeal. (*Id.* ¶ 63.)



**B.      Procedural History**

Plaintiff filed the Complaint on April 15, 2020 alleging violations of Title IX for erroneous outcome (Count One), Title IX for selective enforcement (Count Two), breach of contract (Count Three), breach of implied covenant of good faith and fair dealing (Count Four), common law due process (Count Five). (ECF No. 1.) Concomitantly, Plaintiff filed a Motion seeking a TRO and preliminary injunction to "enjoin Defendant from enforcing its decision to expel Plaintiff, removing Plaintiff's status as a full-time student, and preventing Plaintiff from attending classes and setting for his upcoming exams pending resolution of the underlying merits. (ECF No. 3.) On April 17, 2020, Princeton filed an Opposition to the Motion for TRO. (ECF No. 14.) On April 21, 2020, the conducted oral argument on the Motion.

**II.      LEGAL STANDARD**

Both a TRO and preliminary injunctions are "extraordinary remed[ies], which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). To obtain preliminary relief, a movant must show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . .  [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Reilly v. Cty. of Harrisburg*, 858 F.3d at 173, 176 (3d Cir. 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted).) The first two factors are the "most critical." *Reilly,* 858 F.3d at 179. The movant bears the burden of showing that these four factors weigh in favor of granting the

injunction, and a failure to establish any one factor will render a preliminary injunction inappropriate. *Ferring*, 765 F.3d at 210. *See also Am. Tel. & Tel. Co. v. Winback Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (holding that a party must produce sufficient evidence of all four factors prior to granting injunctive relief).

### III.   DECISION

#### A.   Likelihood of Success on the Merits

Plaintiff contends he is likely to succeed on the merits of his Title IX claims for erroneous outcome and selective enforcement as well as his breach of contract claim. (ECF No. 3-3 at 18.) Normally, a Plaintiff need only make a prima facie showing of a likelihood of success on the merits, meaning plaintiff's chances of prevailing need only be "better than negligible but not necessarily more likely than not." *Guille v. Johnson*, 2020 WL 409743, at *1 (D.N.J. Jan. 24, 2020). While Defendant contends Plaintiff's request is one for a mandatory injunction—and therefore requires a higher burden of showing success on the merits—(ECF No. 14 at 20), the Court does not agree. No court in this Circuit has found a request for reinstatement by an expelled student to be a mandatory injunction, and therefore the Court will analyze Plaintiff's claims under the ordinary preliminary injunction standard.[4]

#### 1.   Title IX Erroneous Outcome Claim

Plaintiff contends he is likely to succeed on his erroneous outcome claim because "Princeton's gender-biased and outcome-determinative investigation resulted in an 'erroneous outcome.'" (ECF No. 3-3 at 20.)

---

[4] Defendant cites to *Montague v. Yale Univ.*, No. 16-885, 2017 U.S. Dist. LEXIS 216093 (D. Conn. Mar. 8, 2017) for the proposition that a request for reinstatement by an expelled student should be decided under the mandatory injunction standard. Nevertheless, in the alternative, Defendant argues under the ordinary preliminary injunction standard.

To demonstrate an "erroneous outcome" was reached, a plaintiff must show: (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding;" and (2) "a particularized allegation relating to a causal connection between the flawed outcome and gender bias," i.e., "particular circumstances suggesting that gender bias was a *motivating factor* behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (emphasis added); see also *Doe v. Haas*, 2019 WL 6699910, at *12-13 (E.D.N.Y. Dec. 9, 2019).

Crucial to any Title IX claim is a showing "that Defendant's conduct was motivated by gender bias[.]" *Doe v. Rider Univ.*, No. 16-4882, 2018 U.S. Dist. LEXIS 7592, at *23 (D.N.J. Jan. 17, 2018).[5] Indeed, detrimental to a showing of likelihood of success on the merits of a Title IX claim is a failure to plead particularized allegations of gender bias. *See id.*; *see also Doe v. Trustees of Princeton, et al.*, 19-7853, 2020 U.S. Dist. LEXIS 34174 (D.N.J. Feb. 28, 2020).

As stated above, to state a claim for erroneous outcome, a plaintiff must make a particularized allegation relating to a causal connection between the flawed outcome and gender bias. Plaintiff first contends Princeton's gender bias is demonstrated through the external criticism over the University's perceived mishandling of sexual assault cases brought by female students against male students and faculty. (ECF No. 3-3 at 28.) However, as Plaintiff concedes, external pressure alone is not enough to show gender bias. Indeed, this Court has held those pressures alone to be insufficient to show gender bias, finding "pressure to comply with Title IX does not equate

---

[5] *See also Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("A plaintiff must prove gender bias against the defendant under either theory of Title IX.") (citing 20 U.S.C. § 1681(a) (prohibiting discrimination "on the basis of sex")); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990 (D. Minn. 2017) (same); *Doe v. The Trustees of the Univ. of Pa.*, No. 16-5088, 270 F. Supp. 3d 799, 810 (E.D. Pa. Sept. 13, 2017) (same); *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 U.S. Dist. LEXIS 166940, at *7 (E.D. Pa. Oct. 10, 2017) (same).

with a failure to comply with Title IX." *Doe*, No. 19-7853, 2020 U.S. Dist. LEXIS 34174, at *9. Therefore, the bedrock of an erroneous outcome claim is specific instances of gender bias throughout the proceeding. Plaintiff fails to make this showing.

Plaintiff has merely made conclusory allegations of gender bias. As this Court has held, "specific allegations of procedurally flawed proceedings coupled with conclusory allegations of gender discrimination are not sufficient" to support an erroneous outcome. *Doe*, 2018 U.S. Dist. LEXIS 7592, at *23. Examples of proper allegations might include "statements by members of the disciplinary tribunal, statements by pertinent university officials, [] patterns of decision-making that also tend to show the influence of gender[,] . . . [or] statements reflecting bias by members of the tribunal." *Yusuf*, 35 F.3d at 715. Notably, Plaintiff does not allege any statements by University officials or the Panel that reflect bias by anyone involved in the investigation or adjudication of Jane's claims against Plaintiff.

Instead, Plaintiff attempts to show gender bias by pointing to the alleged disparate treatment he and Jane received throughout the investigation and the fact that Jane was given credibility for her version of the events while he was not. (ECF No. 3-3 at 29-30.) Additionally, Plaintiff contends that, based on the above discrepancies and bias, Princeton "reached an illogical conclusion" in finding he had been violent against Jane. (*Id.*) Even crediting Plaintiff's assertions, however, such flaws in the investigation and adjudication of he and Jane's claims would not state a Title IX claim. *See Doe*, 2020 U.S. Dist. LEXIS 34174, at *10 ("Although Doe has thoroughly detailed the problems he alleges plagued his disciplinary process, none of Doe's allegations show Doe's sex is the reason for these shortcomings."). Because Plaintiff fails to put forth particularized allegations of gender bias, he has failed to satisfy the second requirement for stating an erroneous outcome claim.

Ultimately, as Plaintiff has failed to satisfy the second prong of an erroneous outcome claim, the Court need not analyze the merits of the first prong *.See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 682-83 (M.D. Tenn. 2018) ("The Court need not delve into the first element — i.e., allegations that cast 'some articulable doubt' on the outcome of the disciplinary proceeding — because it concludes that Z.J.'s failure to sufficiently plead the second element of the erroneous outcome claim is outcome determinative."). Nevertheless, Plaintiff fails to satisfy the first prong because he cannot cast articulable doubt on the accuracy of the outcome of his proceeding.

Specifically, Plaintiff contends the proceeding was flawed in part because he was not permitted to cross-examine Jane. (ECF No. 3-3 at 23.) There are two issues with this argument. First, a cross-examination at a live hearing is not required to satisfy due process in a Title IX context involving a *private* university such as Princeton. *See Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018). Further, insofar as some form of cross-examination is required, Princeton fulfilled this obligation by giving Plaintiff the opportunity to submit questions to be asked of Jane, which Plaintiff declined to do. (ECF No. 14 at 31.) Finally, while Plaintiff contends Princeton did not adequately apprise him of his right to submit cross-examination questions, the University once again fulfilled its obligation. Plaintiff never alleges he did not read the Notice that apprised him of that right, and additionally he was represented by counsel during that time.

Plaintiff notes additional procedural flaws including the alleged failure of the Panel to consider Jane's motivation to lie, the Panel's alleged ignoring of exculpatory evidence, and the Panel's allegedly flawed credibility determinations. (ECF No. 3-3 at 20-27.) However, the Panel's well-reasoned and thorough report demonstrates the Panel considered all available evidence and made reasonable credibility determinations based on that evidence. Specifically, in making its determination, the Panel used interviews of Plaintiff, Jane, and many other witnesses, as well as

Jane's photographic evidence and Plaintiff's inconsistent statements. Given the information available at this time, the Court finds Plaintiff has not alleged particular facts sufficient to cast doubt on the accuracy of the outcome of the disciplinary proceeding.

Accordingly, because Plaintiff fails to state an erroneous outcome claim, he will not be likely to succeed on the merits of the claim.

### 2. Title IX Selective Enforcement Claim

Plaintiff additionally contends he is likely to succeed on the merits of his selective enforcement claim.

To support a claim of selective enforcement, "[a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [university]." *Tafuto v. New Jersey Inst. of Tech.*, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011) (citation omitted).Additionally, a plaintiff must allege the university's actions "against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *Id.*

Plaintiff argues there were differences between: (1) the investigations of he and Jane's claims against one another and (2) the responses to he and Jane's respective violations of the NCO. (ECF No. 3-3 at 32.)

With regard to the University's response to the violations of the NCO, both Plaintiff and Jane were treated equally. In his argument, Plaintiff leaves out the fact that his ███████████ violation of "liking" an old message from Jane was his second violation of the NCO. (ECF No. 14 at 15.) ███████████████ Plaintiff first violated the NCO by telephoning Jane. (ECF No. 14-

1 ¶ ¶ 25-26.)[6] The University did not take disciplinary action for this violation but did warn Plaintiff that further violations could lead to discipline. In this regard, both Plaintiff and Jane's first failures to adhere to the NCO were treated equally.

Furthermore, Plaintiff does not demonstrate Jane was treated favorably during the investigations. First, Princeton opened investigations into and initiated proceedings against both Plaintiff and Jane. Additionally, both parties had the same opportunities to submit proposed questions, written responses, and additional information including identifying witnesses. In this regard, there is no apparent difference in the decision to initiate proceedings between the two. *See Haas*, 2019 U.S. Dist. LEXIS 211575, at *44 (dismissing a selective enforcement claim where proceedings were brought against plaintiff and the person accusing him of misconduct). Therefore, Plaintiff fails to show a likelihood of success on his selective enforcement claim.

### 3.    Breach of Contract Claim

Plaintiff contends he is likely to succeed on the merits of his breach of contract claim. (ECF No. 3-3 at 33.)

To show a breach of contract, a plaintiff must show "(1) the existence of a valid contract, (2) defective performance, and (3) damages." *YAPAK, LLC v. Mass. Bay Ins. Co.*, 2009 U.S. Dist. LEXIS 96361, at *3 (D.N.J. October 16, 2009).

First, Plaintiff argues Princeton's written guidelines and policies distributed to students form a contract. (ECF No. 3-3 at 33.) Under New Jersey law, the relationship between a student and a university is not purely contractual. *Napolitano v. Trustees of Princeton Univ.*, 453 A.2d 263, 272 (N.J. Super. App. Div. 1982). However, a court in this District has held that a student at

---

[6] At oral argument, Plaintiff's counsel clarified the telephone call was a "butt dial." (Unofficial Transcript of April 21, 2020 Oral Argument at 13:6.) Even still, Plaintiff received a warning for this infraction.

a private university contesting disciplinary proceedings, including expulsion, will not be able to assert a breach of contract claim if "the university adhered to its own rules, the procedures followed were fundamentally fair, and the decision was based on 'sufficient' evidence." *Moe v. Seton Hall Univ.*, 2010 U.S. Dist. LEXIS 3861, at * 4-6 (D.N.J. Apr. 20, 2010). Even using this standard, Plaintiff fails to assert a breach of contract claim against Princeton.

First, Plaintiff contends the University did not follow its own rules by failing to apply the preponderance of the evidence standard, as mandated by RRR Policy Section 1.3.12(1). (ECF No. 3-3 at 34.) However, this is not supported by the record. Indeed, the Panel's report indicates the outcome was determined "using the preponderance of the evidence standard." (ECF No. 14-3.) Further, as stated above, Plaintiff's contentions that the Panel's investigation and adjudication of the claims were conducted in a "gender-biased manner" lack merit. Finally, Plaintiff argues other courts "have found that procedural and evidentiary discrepancies in a university's 'investigation' demonstrate a breach of the preponderance of the evidence burden established in the Student Code of Conduct." (ECF No. 16 at 15.) While true, the case Plaintiff cites is inapposite. There, the court found the university did not follow a preponderance of the evidence standard where the university "never corroborated" allegations or "spoke to potential witnesses." *Collick v. William Paterson Univ.*, 2016 U.S. Dist. LEXIS 160359, at *70 (D.N.J. Nov. 17, 2016). Here, Princeton completed interviews with over ten witnesses and corroborated Jane's allegations with ample testimony and evidence. As such, the University used the proper standard in accordance with their policies.

Additionally, Plaintiff contends Princeton assigned him a conflicted advisor in breach of its Sexual Misconduct Investigation Procedures. (ECF No. 3-3 at 36.) However, Plaintiff's advisor, Mr. Meggs, was chosen by Plaintiff himself. Additionally, Plaintiff does not point to any conduct by Mr. Meggs that demonstrates his conflict. Further, Plaintiff's counsel, which was present during

portions of the investigation, did not raise any concerns with Mr. Meggs. At oral argument, Defense counsel argued Mr. Meggs—because of his position as a student conduct disciplinary official—had the burden to refuse Plaintiff's request to have Mr. Meggs serve as his advisor. Defense counsel stated, "that doesn't take the burden off of him [to recuse himself". [J]ust like when potential client comes to a lawyer . . . the lawyer knows he has a conflict. He has a duty to tell the potential client can't represent you because I have an actual or potential conflict." (Unofficial Transcript of April 21, 2020 Oral Argument at 17:2-6.) The Court is not persuaded by this argument.  As such, in this regard, Princeton did not breach their own policies.

Further, Plaintiff contends Princeton breached its contract by not granting his 30-day extension of time to appeal. (ECF No. 3-3 at 38.) However, while the RRR policy allows for such an extension for "good cause," Plaintiff failed to provide any reason for his request. Therefore, Princeton acted in accordance with their policies in denying Plaintiff's request.

Finally, Plaintiff contends Princeton breached by imposing the harshest penalty possible in violation of RRR Policy Section 1.3.12(2). Plaintiff argues the University issued this punishment without an explanation, and that the punishment was not based on facts of the case or consistent with the University precedent. (ECF No. 3-3 at 39-40.) However, in his own brief, Plaintiff notes Princeton expelled another student for "multiple separate acts of violence against their dating partner." (*Id.* n.14.) Clearly, Plaintiff's punishment comports with University precedent. Therefore, the University once again acted in accordance with its policies.

Because Plaintiff cannot point to a breach by the University of its policies, he has not shown that he is likely to succeed on the merits of his breach of contract claim.

###### B.      Irreparable Harm

Plaintiff contends he will suffer irreparable harm without judicial intervention. (ECF No. 3-3 at 14.)

To show irreparable harm, a plaintiff must demonstrate there is "a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000.) Plaintiff argues that, absent court intervention, he will be unable to pursue a degree at Princeton, get a degree from any other comparable university, and that his personal and professional reputation will be destroyed forever. (ECF No. 3-3 at 14.)

However, this Court finds the harms Plaintiff alleges are quantifiable and can be adequately remedied by money damages. If Plaintiff prevails on the merits of his underlying claims and is reinstated to Princeton, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation. *See Montague v. Yale Univ.*, 2017 U.S. Dist. LEXIS 21603, at *7 (D. Conn. Mar. 8, 2017). As courts in this Circuit have found, an interruption in a student's education, while a "genuine injury, is not irreparable." *See Knoch v. Univ. of Pittsburgh*, No. 16-00970, 2016 U.S. Dist. LEXIS 117081, at *27 (W.D. Pa. Aug. 31, 2016)*; see also Mahmood v. Nat'l Bd. of Med. Exam'rs.*, No. 12-1544, 2012 U.S. Dist. LEXIS 86837, at *15 (E.D. Pa. June 21, 2012) (finding "delays in . . . education services do not constitute irreparable harm").

Additionally, the cases cited by Plaintiff in support of his argument are distinguishable on the merits. First, Plaintiff cites *Haney v. W. Chester Univ.*, 2018 WL 3917975, for the principle that expulsion constitutes irreparable harm because it denies a student the benefits of an education at his chosen school, his reputation will be damaged, and his ability to enroll at other institutions

and pursue a career would be affected. 2018 WL 3917975, at *11 (E.D. Pa. Aug. 16, 2018).[7] This is distinguishable for several reasons. First, as stated above, Plaintiff—if he succeeds on the merits of his underlying claims—may be reinstated by Princeton. Therefore, his expulsion would effectively become a suspension, which the same court found to not be irreparable harm. *See Mahmood*, 2012 U.S. Dist. LEXIS 86837, at *15. Additionally, the argument that Plaintiff's reputation, ability to enroll at other institutions, and ability to pursue a career would be damaged is too speculative to satisfy the irreparable harm requirement. *See Caila v. Saddlemire*, 2013 U.S. Dist. LEXIS 43208, at *4 (D. Conn. Mar. 27, 2013) (finding Plaintiff's speculation that his expulsion would interfere with his academic and professional career was too tenuous to demonstrate irreparable harm).

Furthermore, the Court notes there was a delay between Plaintiff's expulsion and his filing of the TRO. Normally, a "[d]elay in seeking a preliminary injunction may defeat a movant's assertion of irreparable harm." *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 403 (D.N.J. 2008). However, given the current state of the world in light of the COVID-19 pandemic, the Court will not draw any negative inferences from Plaintiff's delay.

Finally, the Court notes that, even if Plaintiff is granted his proposed equitable remedy, Plaintiff will likely still experience irreparable harm—though to a lesser degree. Plaintiff's counsel discussed his proposed equitable measures, stating:

> MR. FETTERMAN: I was going to ask that the
> Court order to him to be provisionally
> reinstated to watch these classes wherever
> possible after the fact on a recorded basis or
> to show up as an anonymous student, if that's
> necessary because they're not going to record
> although I believe the Court can easily order

---

[7] While the court in *Haney* found expulsion was irreparable harm, it nonetheless denied plaintiff's preliminary injunction because plaintiff was not likely to succeed on the merits of his Title IX claims. 2018 WL 3917975, at *11.

> Princeton to record as you just suggested all
> the classes so he can view them after class so
> that he doesn't have -- no one has to [know]
> that he's reviewing them and then allow him to
> take his exams now provisionally, have them be
> graded and put into a sealed envelope with the
> grades pass fail.

(Unofficial Transcript of April 21, 2020 Oral Argument at 6:2-12.)

Plaintiff concedes that, even given the above, he will not ███████████████ ██ be able to graduate from Princeton—until the merits of his underlying claims are decided. Indeed, adjudication of these claims would likely last for months and, even with the above equitable relief, likely impact Plaintiff's future job prospects, ██████████████ ██████████████. Therefore, with or without injunctive relief, Plaintiff will have a "gap" on his resume, further underlining the fact Plaintiff will not suffer irreparable harm absent injunctive relief.

Because Plaintiff has failed to meet the two "most critical" factors, the Court need not address the final two factors. *See Reilly*, 858 F.3d at 176 ("If these gateway factors are met, a court then considers the remaining two factors . . . ."); *see also Sandoz, Inc. v. United Therapeutics Corp.*, No. 19-10170, 2020 U.S. Dist. LEXIS 27606, at *46 (denying preliminary injunction and declining to analyze the final two factors where plaintiff failed to satisfy the gateway factors).

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff's Motion for TRO (ECF No. 3) is **DENIED.** An appropriate order will follow.

Date: April 21, 2020                    */s/ Brian R. Martinotti*
                                        **HON. BRIAN R. MARTINOTTI**
                                        **UNITED STATES DISTRICT JUDGE**

17