Christian T. Becker
Attorney ID No. 044142005
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1932

Daniel J. Fetterman
(*pro hac vice* application pending)
Fria R. Kermani
(*pro hac vice* application pending)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1925

*Counsel for Plaintiff John Doe*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------x

JOHN DOE,

                    Plaintiff,

      v.

PRINCETON UNIVERSITY,

                    Defendant.

: Case No.: 3:20-cv-4352-BRM-TJB
:
: Judge Brian R. Martinotti
:
:
:
:
:
:
:

-------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ..............................................................................3

I.   PLAINTIFF'S AND JANE'S BREAK-UP AND TITLE IX CHARGES......3

II.  PRINCETON'S TITLE IX PROCEDURES ARE THE PRODUCT OF
     YEARS OF INTERNAL AND EXTERNAL PRESSURE ..........................5

III. THE INVESTIGATION AND ADJUDICATION .....................................6

ARGUMENT ....................................................................................................9

I.   APPLICABLE STANDARDS ..........................................................................9

     A.   Legal Standard on Motions to Dismiss .................................................9

     B.   Distinction Between Judicial Review of Alleged Behavioral
          Misconduct Verses Purely Academic Matters ..................................11

II.  PRINCETON'S VIOLATIONS OF TITLE IX ...........................................13

     A.   Plaintiff Plausibly Alleged that Gender Bias Motivated
          Princeton's Conduct ...........................................................................13

          1.   Plaintiff Alleged Ample Facts Showing that Sex was a
               Motivating Factor in Princeton's Investigation and
               Decision to Impose Discipline ...............................................16

          2.   Plaintiff Alleged Ample Facts Showing that Princeton
               Yielded to External Pressure Related to Its RRR Policy..........19

     B.   The OCR's New Title IX Rules .........................................................23

III. THE COMPLAINT ALLEGES COGNIZABLE CONTRACT
     CLAIMS UNDER NEW JERSEY LAW ......................................................25

     A.   Princeton's Procedures for Investigating and Adjudicating Sexual
          Misconduct & Partner Violence are Fundamentally Unfair ..............26

     B.   Princeton did not Adhere to the Procedures in the RRR Policy .........35

C.    Princeton Breached the Implied Covenant of Good Faith and Fair Dealing ............................................................................................38

CONCLUSION ......................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acra Turf Club, LLC v. Zanzuccki*,
  2015 WL 12724076 (D.N.J. Jan. 31, 2015),
  *aff'd*, 724 F. App'x 102 (3d Cir. 2018)..............................................................10

*B.S. v. Noor-Ul-Iman Sch.*,
  2016 WL 4145921 (App. Div. Aug. 5, 2016)...........................................*passim*

*Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.*,
  255 N.J. Super. 552 (Law. Div. 1991),
  *aff'd*, 255 N.J. Super. 420 (App. Div. 1992) ...............................................12, 13

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
  9 F. Supp. 2d 460 (D.N.J. 1998).........................................................................10

*Clayton v. Trustees of Princeton Univ.*,
  608 F. Supp. 413 (D.N.J. 1985)....................................................................34, 35

*Collick v. William Paterson Univ.*,
  2016 WL 6824374 (D.N.J. Nov. 17, 2016) ....................................17, 37, 39, 40

*Doe v. Allee*,
  30 Cal. App. 5th 1036 (Ct. App. 2019) ........................................................29, 32

*Doe v. Baum*,
  903 F.3d 575 (6th Cir. 2018) ..............................................................................19

*Doe v. Brandeis Univ.*,
  177 F. Supp. 3d 561 (D. Mass. 2016)......................................................29, 32, 33

*Doe v. Brown Univ.*,
  166 F. Supp. 3d 177 (D.R.I. 2016) .............................................................20, 23

*Doe v. Marymount Univ.*,
  297 F. Supp. 3d 573 (E.D. Va. 2018) .................................................................19

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) .......................................................................19, 20

*Doe v. Princeton Univ.*,
No. 18-CV-16539 (MAS), 2019 WL 161513 (D.N.J. Jan. 9, 2019) .................37

*Doe v. Princeton Univ.*,
No. 17-CV-1614 (PGS), 2018 WL 2396685 (D.N.J. May 24, 2018),
*aff'd*, 790 F. App'x 379 (3d Cir. 2019).................................................................38

*Doe v. Rhodes Coll.*,
No. 2:19-cv-02336, Dkt. No. 33 (W.D. Tenn. June 14, 2019)....................20, 23

*Doe v. Rider Univ.*,
2020 WL 634172 (D.N.J. Feb. 4, 2020) ......................................................*passim*

*Doe v. Rollins*,
352 F. Supp. 3d 1205 (M.D. Fla. 2019)................................................21, 22, 23

*Doe v. Trs. of Princeton Univ.*,
2020 WL 967860 ....................................................................................21, 22, 23

*Doe v. Univ. of Notre Dame*,
2017 WL 1836939 (N.D. Ind. May 8, 2017), *vacated on other grounds*,
2017 WL 7661416 (N.D. Ind. Dec. 27, 2017).............................................29, 31

*Hernandez v. Don Bosco Preparatory High*,
322 N.J. Super. 1, 20-21 (App. Div. 1999).............................................25, 27, 30

*John Doe v. University of the Sciences*,
No. 19-2966, 2020 WL 2786840 (3d Cir. May 29, 2020).........................*passim*

*Mittra v. Univ. of Med. & Dentistry of N.J.*,
316 N.J. Super. 83 (App. Div. 1998)................................................................34

*Moe v. Seton Hall University*,
2010 WL 1609680 (D.N.J. Apr. 20, 2010).....................................12, 14, 35, 39

*Napolitano v. Princeton*,
186 N.J. Super. at 576 (Ch. Div. 1982),
*aff'd*, 186 N.J. Super. 548 (App. Div. 1982) ..............................................*passim*

*Prasad v. Cornell Univ.*,
2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016)............................................19, 23

*Webster v. Rutgers-New Jersey Med. Sch.*,
  2017 WL 3399997 (D.N.J. Aug. 4, 2017) ......................................................39

*Wells v. Xavier Univ.*,
  7 F. Supp. 3d 746 (S.D. Ohio 2014) ...................................................23

*Yusuf v. Vassar College*,
  35 F.3d 709 (2d Cir. 1994) ...................................................13

## Other Authorities

34 C.F.R. § 106.45(b)(6)(i) .......................................................24

34 C.F.R. § 106.45 (b)(7)(i) ................................................24, 31

Plaintiff John Doe, by and through his attorneys Kasowitz Benson Torres LLP, respectfully submits this memorandum of law in opposition to Defendant Princeton University's motion (the "Motion") to dismiss Plaintiff's Complaint ("Compl.").[1]

## PRELIMINARY STATEMENT

This action arises from Princeton's expulsion of Plaintiff █████████ ████████████ as a result of a gender-biased and outcome-oriented adjudication process that violated federal law and Princeton's contractual obligations.  Plaintiff brings this action seeking reinstatement, and Princeton moves to dismiss using its usual playbook of callous misdirection and outmoded law.  Princeton's Motion, along with its current Title IX policies, encourage flawed investigations and bad outcomes while ignoring the rights of male students accused of behavioral misconduct.  Princeton's attempt to avoid this litigation without discovery and a trial of Plaintiff's claims must not succeed, especially in light of two fundamental changes that have occurred in the past six weeks.

On May 29, 2020, the United States Court of Appeals for the Third Circuit issued its decision in *John Doe v. University of the Sciences*, No. 19-2966, 2020

---

[1] Capitalized terms have the meaning ascribed to them in the Complaint unless otherwise defined herein.  (ECF No. 1.)  "Compl. ¶ _" refers to the enumerated paragraph in the Complaint.  (ECF No. 1.)  "MTD at _" refers to the enumerated page in Princeton's memorandum of law in support of its motion to dismiss.  (ECF No. 33.)

WL 2786840 (3d Cir. May 29, 2020) (cited herein as "*USciences*" and attached as Exhibit A to the Declaration of Christian Becker in Opposition to Defendant's Motion to Dismiss (the "Becker Decl.")), reversing a decision by the United States District Court for the Eastern District of Pennsylvania which dismissed similar Title IX and breach of contract claims against a private university in Philadelphia. The *USciences* decision brings this Circuit into harmony with the chorus of other jurisdictions that have protected the right to a fair process for male students accused of various forms of behavioral—not academic—misconduct.  The opinion clarifies the pleading standard for Title IX claims and definitively holds, contrary to Princeton's urging, that no school is entitled to independence or judicial deference when it comes to the investigation and adjudication of alleged criminal activity—a field in which the courts are supremely qualified.  Under *USciences*, this Court must consider the outside pressures faced by Princeton with respect to Title IX investigations in determining whether Plaintiff has alleged a plausible claim of sex discrimination.  In light of this decision, Plaintiff's well pled allegations against Princeton should undoubtedly proceed.

Additionally, on May 7, 2020, the U.S. Department of Education's Office of Civil Rights ("OCR") released final regulations for Title IX investigations of sexual assault, following the public notice and comment process for the first time since 1997.  These new regulations are consistent with the guidance issued in 2018

which, as alleged in the Complaint, Princeton wholly ignored due to internal and outside pressure.  If not for Princeton's stubborn refusal to adopt policies consistent with the 2018 guidance, Plaintiff would have been afforded the procedural safeguards now guaranteed by the new regulations.  Among other things, these include the presumption of innocence, the right to a live hearing with cross examination, and the right to an impartial tribunal separate from the investigatory personnel and process, all of which were denied to Plaintiff.

In light of these developments, Plaintiff plausibly alleges that Princeton discriminated against him on account of his sex in violation of Title IX.  Plaintiff also plausibly alleges that Princeton breached its contractual obligations to provide him a fair process and breached the implied covenant of good faith and fair dealing in its adjudication of Jane Roe's allegations and its decision to expel him.

## FACTUAL BACKGROUND

## I.   PLAINTIFF'S AND JANE'S BREAK-UP AND TITLE IX CHARGES

Plaintiff and Jane began a long-term romantic relationship starting ████████ ████ during their freshman semester at Princeton.  (Compl. ¶¶ 16-18.)  Their relationship was toxic and tumultuous, the two argued constantly, and they did not trust one another.  (*Id.* ¶¶ 18-22.)  Plaintiff was concerned about Jane's apathy towards her academics, and her perceived prioritizing of partying and drinking ██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Thereafter, Plaintiff

ended their relationship ████████ because Jane cheated on him.  (*Id.* ¶¶ 25-27.)

Jane was profoundly angry and responded poorly to the break up, launching a vindictive campaign to malign, falsely accuse and threaten Plaintiff.  (*Id.* ¶¶ 28-38.)  She began to tell others that *she* initiated the break up because Plaintiff was physically abusive (*id.* ¶ 30); she publicized social-media posts targeting Plaintiff by name and insinuating that he had abused her (*id.* ¶ 31); and she even contacted other women Plaintiff was dating, to warn them that Plaintiff was a terrible person and was abusive (*id.* ¶ 32).  ████████████████████████ Jane returned to Princeton, her pervasive harassment and spreading of rumors gained traction on campus, leaving Plaintiff feeling vulnerable.  (*Id.* ¶¶ 33-34.)

Plaintiff first reported concerns of Jane's harassment to Princeton █

████████████ (*Id.* ¶ 34.)  Princeton downplayed Plaintiff's concerns, advised that he seek "counseling" and otherwise took no action.  (*Id.* ¶ 35.)  Around the same time, Jane began meeting with Princeton's Title IX office alleging that she had been a victim of "Intimate Relationship Violence."  (*Id.* ¶ 39.)  Princeton encouraged and coaxed Jane to move forward, filed a No Contact Order ██████████

████ and then began a formal investigation into Jane's allegations ██████████

████ (*Id.* ¶¶ 39-42.)

## II.    PRINCETON'S TITLE IX PROCEDURES ARE THE PRODUCT OF YEARS OF INTERNAL AND EXTERNAL PRESSURE

The alleged charges against Plaintiff and the resulting disciplinary hearing arose in the context of the University's perceived mishandling of sexual assault cases brought by female students against male students and faculty.  Such criticism had taken the form of adverse news coverage, campus meetings or protests, and enforcement actions involving the University over several years.  (Compl. ¶¶134-143.)  The OCR's issuance in 2011 of a "Dear Colleague Letter" ("DCL"), subsequent complaints by female victims which resulted in its opening of investigations into Princeton's handling of sexual assault reports, and the threat of withdrawal of federal funding, gave Princeton a powerful incentive to adopt and implement policies deliberately designed to find male students guilty.  (*Id.*)  In an attempt to comply with the DCL and to assuage this stream of criticism, Princeton entered into a resolution agreement with the DOE and made substantial changes to its Title IX processes including, among other things, adopting a lower burden of proof—preponderance of the evidence—making it easier to find respondents, who are primarily male, responsible for policy violations.[2]  (*Id.*)

---

[2] Contrary to Princeton's assertion (MTD at 2, 7), OCR did not "review[] and approve[]" Princeton's Title IX policy.  The resolution agreement specifically says that, "[w]hile OCR has not yet reviewed these grievance procedures, the University affirms that these procedures are internally consistent and provide for the prompt and equitable resolution of complaints alleging sexual misconduct (including sex

In September 2017 the OCR withdrew the DCL, and the agency issued interim guidance designed to bolster procedural safeguards for the accused that had been undermined by some aspects of the DCL. (*Id.* ¶¶ 144-145.) Even though Princeton's Title IX policies and procedures in place had been changed specifically to comply with the DCL, Princeton announced it would not make any alterations to align with the new guidance. (*Id.* ¶ 147.) The guidance was formalized into proposed new rules in November 2018, which continued to conflict with Princeton's policies and procedures, yet Princeton continued to refuse to make any changes. (*Id.* ¶ 148.) Finally, in May 2020, OCR's new rules went into effect (Becker Decl. Ex. B), meaning Princeton was and continues to be, out of compliance with official OCR regulations.

## III.   THE INVESTIGATION AND ADJUDICATION

Given this background, it is not surprising that Princeton's Title IX investigation into Plaintiff, conducted pursuant to the outdated procedures provided in the RRR Policy, did not provide basic and rudimentary procedural safeguards to the accused. A panel comprising three Princeton faculty members was instituted to conduct the investigation, analyze the evidence collected and deliberate and render a decision. (Compl. ¶¶ 47-50.) Thus, both the investigation

---

discrimination, sexual harassment, and sexual assault/violence)." (ECF No. 33-1, Certification of Regan H. Crotty, Ex. A.)

and subsequent adjudication were conducted by the same three individuals, which is known as the "investigator only" or "single-investigator" model.  (*Id.*)  In addition to conducting several interviews of Plaintiff and Jane, the Investigators collected statements from other individuals who had potentially relevant information, and collected other forms of evidence, including but not limited to text messages, social media messages and posts, voicemails, photographs and videos.  (*Id.* ¶ 49.)

During the course of the investigation Plaintiff counterclaimed against Jane based on the physical abuse he had suffered during the course of their relationship, included scratching, punching and elbowing him on multiple occasions.  (*Id.* ¶¶ 51-52.)  With respect to Jane's allegations, the Panel ultimately deliberated on five specific instances of alleged abuse, including pulling, pushing, grabbing, pinching, and choking, of which there was ***no direct evidence***.  (*Id.* ¶¶ 49, 51-52, 57, 93.)  The Panel interviewed the parties and witnesses separately behind closed doors, collected and weighed the evidence, and made findings of fact, credibility assessments, and determinations of responsibility memorialized in a Report.  (*Id.* ¶ 50.)  Plaintiff was never provided complete transcripts of these interviews and was only given access to the Panel's filtered and subjective summaries, which severely undermined his ability to defend himself against Jane's accusations.  (*Id.*)

There was no live hearing, nor live witness testimony of any sort and Plaintiff was never given the opportunity to engage in cross-examination. (*Id*. ¶¶ 52-54, 115.) While Plaintiff was notified in a single footnote that he was permitted to submit proposed written questions for the Panel to ask Jane or other witnesses, subject to the approval of the Panel, he was not permitted to attend any interviews in person, and was never given an opportunity to cross-examine Jane or adverse witnesses directly, through his agent or otherwise, nor assess her demeanor and credibility. (*Id.* ¶¶ 53, 115.)

By memorandum ███████████████ the Panel rendered its findings with respect to the allegations of abuse made by Plaintiff and Jane (the "Report"). (*Id*. ¶ 55.) The Report concluded there was sufficient information to substantiate all five incidents of abuse alleged by Jane, but found there was insufficient information to substantiate any incident of abuse alleged by Plaintiff. (*Id*. ¶ 56.)

Because of the lack of direct evidence, Princeton almost exclusively based its finding of responsibility of Plaintiff as to each incident on the fact that it found Jane "very credible" and Plaintiff not credible. (*Id*. ¶¶ 57, 93-96.) Jane's statements contained changing details and outright lies on some of the most crucial elements of her allegations (*e.g.*, that she initiated the break up), but these inconsistencies were never acknowledged, let alone weighed against Jane in the investigation and adjudication. (*Id*. ¶¶ 57, 94-5.) The corresponding motivation

she had to lie was completely disregarded, along with documented patterns of substance abuse that could have affected her memory.  (*Id.* ¶¶ 57, 95-103.) Princeton ignored that Jane had threatened and harassed Plaintiff, something that Plaintiff had brought to the attention of Princeton before any investigation into him began.  The Panel failed to acknowledge other indicators that would make anyone—let alone trained investigative and adjudicatory professionals—question Jane's veracity.  Plaintiff on the other hand was scrutinized so closely that even an easily explainable discrepancy in testimony was used against him.  (*Id.* ¶¶ 93-103.)

By letter, ███████████████ Plaintiff was provided with a copy of the Report and informed of Princeton's decision to expel him based on the Report's findings (the "Expulsion Memo").  (*Id.* ¶ 58.)  Despite immediately requesting an extension of 30 days to submit his appeal, Princeton denied Plaintiff's request and only granted him an extension of three calendar days.  (*Id.* ¶ 62.)  Princeton subsequently denied Plaintiff's appeal, and Plaintiff filed the instant action seeking to hold Princeton accountable.

## ARGUMENT

## I.   APPLICABLE STANDARDS

### A.   <u>Legal Standard on Motions to Dismiss</u>

In deciding a motion to dismiss, the court is required to "accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party." *USciences*, 2020 WL 2786840, at *3.  The complaint

must set forth enough factual allegations to "state a claim to relief that is plausible on its face." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A facially plausible claim is one that permits a reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Notwithstanding Defendant's suggestion to the contrary (MTD at 11), this Court's previous decision denying Plaintiff's motion for a temporary restraining order ("TRO Opinion") does not amount to the law of the case.  Rather, "factual findings entered in connection with the denial of [a] preliminary injunction . . . are not binding on the [c]ourt in considering a motion to dismiss . . . [n]or are the conclusions of law entered in connection with the injunction considered the law of the case." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 466 (D.N.J. 1998) (partially denying defendant's motion to dismiss after originally denying plaintiff's motion for preliminary injunction); *see, e.g.*, *Acra Turf Club, LLC v. Zanzuccki*, 2015 WL 12724076, at *4 (D.N.J. Jan. 31, 2015), *aff'd*, 724 F. App'x 102 (3d Cir. 2018) (after initial denial on preliminary injunction, holding judge's previous analysis of the likelihood of the merits was not law of the case and that "findings of fact and conclusions of law made by a court deciding an application for a preliminary injunction are indeed nonbinding on the court's later decisions on the merits").  Thus, Princeton's repeated references to this Court's

TRO decision as definitive are without merit, and in any event, the TRO was decided before the Third Circuit's decision in *USciences* which clarified the controlling standards applicable to this case.

**B.   Distinction Between Judicial Review of Alleged Behavioral Misconduct Verses Purely Academic Matters**

Throughout this action, as a means to avoid or constrain judicial review of the objectionable disciplinary proceeding at issue, Princeton has harped on the notion that "Courts afford universities great latitude and autonomy in administering their rules and regulations" (MTD at 2; *see also* TRO Opp. at 2, 29, and 37).[3]  This assertion is not only demonstrably false in this type of case, but also representative of Princeton's mischaracterizations of applicable law.

As the Third Circuit definitively states in its *USciences* decision, which also involved a private university:

> [C]ourts are sometimes chary about reviewing too closely the manner in which a private university chooses to investigate and discipline its students.  That is especially appropriate for matters uniquely within the institution's province, such as academic integrity or faculty development and discipline. . . .  This is not such a case. ***The investigation and fair adjudication of alleged criminal activity like sexual assault is not uniquely within the province of colleges and universities***. Yet accused "students have a substantial interest at stake when it comes to school disciplinary hearings for sexual

---

[3] "TRO" refers to Plaintiff's brief in support of his motion for a TRO, ECF No. 3, filed on April 15, 2020.  "TRO Opp." refers to Princeton's brief in opposition to Plaintiff's motion for a TRO, ECF No. 14, filed on April 17, 2020.

> misconduct," because the consequences are potentially
> dire and permanent: "[a] finding of responsibility for a
> sexual offense can have a 'lasting impact' on a student's
> personal life, in addition to his 'educational and
> employment opportunities,' especially when the
> disciplinary action involves a long-term suspension."

2020 WL 2786840, at *7 (citing *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018))

(emphasis added).

Consistent with this distinction, even in cases not involving claims based on

Title IX, it was already well settled under New Jersey law that private educational

institutions receive marginal deference when courts evaluate legal challenges

***unrelated to academic*** disciplinary procedures. *See, e.g.*, *B.S. v. Noor-Ul-Iman*

*Sch.*, 2016 WL 4145921, at *4 (App. Div. Aug. 5, 2016) (reversing dismissal of

student's contract claims where discipline imposed for bullying and allegations of,

*inter alia* "bias, the manner in which [student] was questioned, the lack of a fair

opportunity to respond to the charges … if true, suggest defendant's process was

fundamentally unfair"); *Moe v. Seton Hall University*, 2010 WL 1609680, at *5-6

(D.N.J. Apr. 20, 2010) (sustaining contract claims and noting that although "rigid

application of contract principles to controversies concerning ***student academic***

***performance*** would tend to intrude upon academic freedom and to generate

precisely the kind of disputes that the courts should be hesitant to resolve, by

contrast, the sort of dispute alleged here, [unrelated to academic performance,]

does not raise those policy concerns") (emphasis added); *Beukas v. Bd. of Trustees*

12

*of Fairleigh Dickinson Univ.*, 255 N.J. Super. 552 (Law. Div. 1991), *aff'd*, 255 N.J. Super. 420 (App. Div. 1992) (rejecting "Defendants' position [] that the doctrine of judicial deference to university autonomy in ***academic*** decision making . . . requires the court to decline to interfere with defendants' ***administrative*** decision") (emphasis added).

Princeton's arrogant view of the judiciary's limited ability to scrutinize sanctions imposed for behavioral discipline is therefore wrong, and this court should not empower Princeton's deeply flawed and gender-biased process for adjudicating students' competing claims of physical assault.

## II.     PRINCETON'S VIOLATIONS OF TITLE IX

### A.     Plaintiff Plausibly Alleged that Gender Bias Motivated Princeton's Conduct

Taking the factual allegations in the Complaint as true and drawing all reasonable inferences in favor of Plaintiff,  Plaintiff has made a plausible showing that gender bias motivated Princeton's actions in connection with his specific Title IX proceeding.

In the *USciences* decision, the Third Circuit held that it will no longer follow the doctrinal framework announced by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), which recognized two theories under which one may allege a Title IX violation: erroneous outcome and selective enforcement. *USciences*, 2020 WL 2786840, at *4.  Instead, the Third Circuit adopted "the

Seventh Circuit's straightforward pleading standard and [held] that, to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Id.* at 6.  The court noted that "[a]lthough parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX." *Id.*[4]

In *USciences*, the Court of Appeals found that the plaintiff's plausible allegations supporting a reasonable inference of discrimination based on sex fit into two categories. *Id*. at \*4.  "First, Doe alleges that USciences yielded to external pressure when implementing and enforcing [the school's policy].  Second, he alleges that sex was a motivating factor in [the] investigation and decision to impose discipline." *Id*.  Evidence that sex was a motivating factor included that the school failed to investigate three female students despite having knowledge that they likely violated the school's policies. *Id.* at \*5-6.

---

[4] The Complaint, the Court's TRO Opinion, and Princeton's entire argument against Plaintiff's claims, are thus based on the now supercilious standards of "erroneous outcome" and "selective enforcement."  (*See e.g.*, Compl. ¶¶ 154-84, TRO Opinion at 7-12; MTD at 13-24.)  These standards have all been clarified in light of the Third Circuit's recent decision in *USciences*.  While Plaintiff is confident that the Complaint would have survived Princeton's motion under the previous nomenclature, this opposition focuses instead on the now-binding law in this jurisdiction.  Evidence and argument specific to the previous standards can still be found in Plaintiff's briefing on its Motion for a TRO (ECF Nos. 3 and 16.)

Princeton argues incorrectly that Plaintiff has made only conclusory allegations and provides no specific instances of gender bias.  (MTD at 16.) Princeton also claims that the external pressure on Princeton cited by Plaintiff is not enough and that it must be targeted at Plaintiff's specific proceedings to state a claim.  (MTD at 15-16.)  Princeton is incorrect on both fronts.

As detailed further below, Plaintiff's Complaint against Princeton makes virtually identical allegations to those in *USciences*.  (*See e.g.*, Compl. ¶¶ 92-115 (detailing six procedural deficiencies evidencing sex-based bias); ¶¶ 116-28 (concerning Princeton's selective enforcement); ¶¶ 134-143 (regarding Princeton's implementation of the RRR Policy following the 2011 DCL also referenced by the *USciences* decision); and ¶¶ 142-3, 161 (alleging that "gender bias was the motivating factor behind the flawed outcome").)

While even under the previous standards, Princeton's arguments were legally insufficient, the *USciences* decision has now solidified that:  (i) Plaintiff does *not* need to connect external pressure to Plaintiff's specific proceeding; and (ii) statements by members of the disciplinary tribunal or pertinent university officials are not the exclusive manner in which to show gender bias in a specific proceeding.  *See USciences*, 2020 WL 2786840 at *6 (when plaintiff's "allegations about selective investigation and enforcement are combined with his allegations

related to pressure applied by the 2011 Dear Colleague Letter . . . he states a plausible claim of sex discrimination.").

Following the analytical rubric of *USciences*, Plaintiff has plausibly alleged that sex was a motivating factor in Princeton's treatment of him, and that Princeton succumbed to outside pressure in the implementation and enforcement of the RRR.

### 1. Plaintiff Alleged Ample Facts Showing that Sex was a Motivating Factor in Princeton's Investigation and Decision to Impose Discipline

Plaintiff has alleged numerous, specific examples of how gender-bias against males permeated Princeton's investigation and adjudication such as, *inter alia*:  downplaying Plaintiff's credible concerns of Jane's harassment while urging Jane to formalize her subsequent allegations of abuse by Plaintiff (Compl. ¶¶ 40, 112-13, 116-18, 178); misconstruing and slanting evidence, including witness testimony, against Plaintiff and in favor of Jane (*id*. ¶¶ 57, 104-06); rendering inconsistent credibility determinations and drawing prejudicial conclusions in the light most favorable to Jane without sufficient evidence (*id*. ¶¶ 93-100), including by ignoring Jane's material lies and motive to lie (*id*. ¶¶ 6, 57, 94-5, 101-03, 114); extending differing treatment to Plaintiff in his capacity as a victim of abuse despite compelling and contemporaneous evidence corroborating his counter-

claims[5] (*id.* ¶¶ 107-11, 117, 121); and disciplining Plaintiff with the highest possible penalty while exonerating Jane despite credible evidence of her violations (*id.* ¶¶ 180, 204, 212).[6]  Plaintiff, who like Jane, "held dual roles of victim and accused," was extended differing treatment despite compelling and contemporaneous evidence corroborating his counter-claims, thus "permit[ing] an inference of bias based on sex." *Collick v. William Paterson Univ.*, 2016 WL 6824374, at *11 (D.N.J. Nov. 17, 2016) (facts "that the process was one-sided, irregular, and unsupported by evidence may give rise to an inference of bias.").

In *USciences*, the court held that there were sufficient allegations of gender bias when the university did not investigate one of plaintiff's female accusers and a witness, both female students—despite having notice that both allegedly violated the university's sexual misconduct policy.  *Id.* at *5-6.[7]  Here, Plaintiff has shown

---

[5] Princeton self-servingly takes issue with Plaintiff's claim that there is "no direct evidence" to support Jane's allegations (Compl. ¶ 47), claiming Plaintiff "forgets" that the "victim's testimony is evidence."  (MTD at 18.)  By that standard, *Plaintiff's* complaint about *Jane's* physical assault against him would also have been treated as direct evidence supporting some sanction against her.  Thus, Princeton's exoneration of Jane is even more inexplicable absent underlying bias.

[6] Princeton addresses Plaintiff's robust evidence of myriad procedural deficiencies by the conclusory statement that "the investigatory panel's 25 single-spaced, thoughtful, well-reasoned and supported conclusions speak for themselves." (MTD at 22.)  At best, this amounts to raising an issue of fact not proper for decision at the motion to dismiss phase, and the Court must accept as true Plaintiff's detailed and specific allegations.

[7] Princeton investigated Plaintiff's allegations that Jane had hit him, but this is a distinction without a difference, because Princeton did *not* investigate Plaintiff's

Princeton was on notice that Jane may have violated the Policy, but did not investigate her.  Plaintiff brought his concerns of Jane's harassment against him to the attention of Princeton prior to any formal investigation into Plaintiff.  (Compl. ¶¶ 34-8, 113.)  Princeton entirely dismissed Plaintiff's concerns, and only suggested seeking "counseling."  (*Id.* ¶¶ 35, 113.)  At the same time, Plaintiff has shown Title IX coordinator Regan Crotty coaxed and *urged* Jane to formalize her later allegations notwithstanding Jane's initial preference not to do so.  (*Id.* ¶¶ 39-40.)  Chief Compliance Officer Michele Minter, in consultation with Ms. Crotty, was responsible for barring Plaintiff from campus pending resolution of the investigation, which substantial interim disciplinary action was instituted absent a hearing and compromised Plaintiff's ability to adequately prepare for and participate in the investigation and adjudication.  (*Id.* ¶ 48.)  Ms. Minter, in consultation with Ms. Crotty, was responsible for instituting the Panel.  (*Id.* ¶¶ 47, 74.)  While dismissing Plaintiff's concerns of harassment, Princeton went on to investigate Jane's allegations zealously, construing any and all inconsistencies in her favor.  (*Id.* ¶¶ 34-5, 93-100.)  Under *USciences,* this is sufficiently indicative of gender bias in Plaintiff's Title IX process.

---

earlier complaints that Jane was harassing and stalking him, and Princeton did *not* sanction Jane for intentionally violating the no-contact order.  (Compl. ¶ 43.)

The court in *USciences* also cites favorably to the Sixth Circuit's decision in

*Doe v. Baum* where the court found that the plaintiff stated a viable claim because,

"[w]hen viewing th[e] evidence in the light most favorable to [the accused

student], . . . one plausible explanation is that the [b]oard discredited all males,

including [the accused student], and credited all females, including [the accuser],

because of [sex] bias." *USciences*, 2020 WL 2786840 at *6 (citing *Doe v. Baum*,

903 F.3d 575, 586 (6th Cir. 2018).  *USciences* found that the "allegations of sex-

motivated investigation and enforcement are like the plausible allegations in

Baum."[8]  *Id*. at *6.  Accordingly, Plaintiff's allegations of a sex-biased

investigation and enforcement here are also plausible.

### 2. Plaintiff Alleged Ample Facts Showing that Princeton Yielded to External Pressure Related to Its RRR Policy

Just as the plaintiff in *USciences*, Plaintiff has shown that Princeton faced

considerable criticism and pressure from its student body, the federal government,

and the media over its perceived mishandling of sexual assault cases brought by

---

[8] *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018) (in reversing dismissal of Title IX complaint, finding that the university did not sufficiently analyze evidentiary inconsistencies); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585-86 (E.D. Va. 2018) (declining to dismiss Title IX claim, noting investigator overlooked "exculpatory evidence" and inconsistencies in accuser's statements, and "instead relied exclusively on the investigative report and John and Jane's competing narratives to reach his final conclusion"); *Prasad v. Cornell Univ.*, 2016 WL 3212079, at *24 (N.D.N.Y. Feb. 24, 2016) (declining to dismiss Title IX claims when the female complainant "was treated more favorably than Plaintiff, that the investigators seemingly slanted the Investigative Report against Plaintiff").

female students against male students and faculty.  (*See* Compl. ¶¶ 134-143.)  In an attempt to comply with the DOE's investigation into it and the DCL, and quell the specter of regulatory and public condemnation, Princeton entered into a resolution agreement with the DOE and made substantial changes to its Title IX processes including, among other things, adopting a lower burden of proof—preponderance of the evidence—making it easier to find respondents, who are primarily male, responsible for policy violations.  (*Id.*)  Despite this, in May of 2019, student protests erupted at perceived shortcomings of Princeton's "opaque, victim-blaming and traumatizing" Title IX processes.  (*Id.* ¶ 140.)  Among a laundry list of demands, the student protestors called for the immediate dismissal of Regan Crotty and a review of Michele Minter, who, as previously described, were also central in Plaintiff's specific Title IX proceeding.

Many courts presiding over analogous Title IX lawsuits, including this court in *Doe v. Rider Univ.*, have recognized that backlash and pressure from the student body and public over a college's handling of complaints by female students alleging sexual assault by male students "provides a backdrop that, ***when combined with other circumstantial evidence of bias in [Plaintiff]'s specific proceeding***, gives rise to a plausible claim."  *Rhodes Coll.*, No. 2:19-cv-02336, Dkt. No. 33, at 10 (emphasis added); *see also Doe v. Rider Univ.*, 2020 WL 634172, at *11 (D.N.J. Feb. 4, 2020); *Miami Univ.*, 882 F.3d at 593-94; *Doe v.*

*Brown Univ.*, 166 F. Supp. 3d 177, 181, 189 (D.R.I. 2016); *Doe v. Rollins,* 352 F. Supp. 3d 1205, 1210 (M.D. Fla. 2019) (plaintiff met his burden to plead gender bias where, in addition to circumstantial evidence of bias in plaintiff's specific proceeding, "Rollins investigated [p]laintiff's claims amidst a clamor of public and campus scrutiny over its treatment of sexual assault complaints by female students").

Princeton grossly mischaracterizes Plaintiff's claims as "strikingly similar" to Title IX claims dismissed by this Court that were brought by an accused male who Princeton found responsible for raping his ex-girlfriend.  (MTD at 18, citing *Doe v. Trustees of Princeton*, 3:19-cv-7853, 2020 U.S. Dist. LEXIS 34174  (D.N.J. Feb. 28, 2020)).  Not only is the underlying conduct and evidence at issue significantly different, the relevant allegations of Title IX violations were also different.  There, the Court dismissed the complaint partially on the fact that "absent from Doe's complaint is mention of any statements or conduct by administrators involved in Doe's discipline specifically suggesting any gender bias." *Id. at* \*8.  Here, especially after the clarification provided by the *USciences* decision, this Court must join the several other courts that have recognized that statements by members of the disciplinary tribunal or pertinent university officials are not the exclusive manner in which to show gender bias in a specific proceeding. *Doe v. Trs. of Princeton Univ.*, 2020 WL 967860, at \*2 (particular

circumstances suggesting gender bias was a motivating factor behind the erroneous finding also include conduct by pertinent university officials, and patterns of decision-making); *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1209 (M.D. Fla. 2019) (same); *Rider Univ.*, 2020 WL 634172, at *7 (same).

Plaintiff has more than satisfied his burden by showing both "patterns of decision making that tend to show the influence of gender," (Compl.¶ 141), and conduct by pertinent university officials, Ms. Crotty and Ms. Minter, who were under immense pressure to find male students guilty of sexual misconduct allegations against females and impose disproportionately harsh penalties (*Id.* ¶¶ 5, 140-41).[9]

---

[9] This Court can also take judicial notice of the growing accretion of and similarity in Title IX litigation brought by males against Princeton which is beginning to prove the very point Princeton is doing its utmost to deny—that "disciplinary outcomes in cases like Doe's vary by sex." *Doe v. Trustees of Princeton Univ.*, 2020 WL 967860, at *3. These lawsuits show a discernible pattern of gender-bias against males as opposed to bias in favor of victims more generally. Of six Title IX lawsuits against Princeton alleging botched and gender-biased sexual misconduct investigations since 2016, two were brought by ***male victims of sexual assault*** claiming the University discounted their allegations, three were brought by males accused of sexual misconduct whom the University found responsible, and one was brought—prior to the advent of the #MeToo era—by a female victim dissatisfied with Princeton's disciplinary action against her male attacker. At bottom, Princeton's Title IX processes are skewed in favor of female victims, are premised on gendered stereotypes and are therefore designed to make men lose, regardless of whether they are accused perpetrators or victims of sexual misconduct. (Compl. ¶¶ 142-43.) In and of itself, this shows a "pattern[] of decision-making that [] tend[s] to show the influence of gender" necessitating that males turn to the federal district courts for relief from what cannot, and should not,

Thus, Plaintiff has demonstrated a sufficient inference of intentional gender discrimination to sustain his Title IX claims. *USciences*, 2020 WL 2786840 at *4-6; *see, e.g.*, *Rider Univ.*, 2020 WL 634172, at *10-11 (denying dismissal of Title IX claim noting that, in the cumulative, allegations (i) of external pressure from regulators, (ii) of concern by university officials and student body for protecting female victims of sexual assault, (iii) that disciplinary proceedings were sufficiently one-sided and flawed, and (iv) that male accused was punished severely were sufficient to show gender-bias); *see also Rhodes Coll.*, No. 2:19-cv-02336, Dkt. No. 33, at 9-10 (same); *Rollins Coll.*, 352 F. Supp. 3d at 1209-10 (same); *Brown*, 166 F. Supp. 3d at 189 (same); *Wells v. Xavier Univ.,* 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014); *Cornell*, WL 3212079, at *16-17 (same).

## B.   The OCR's New Title IX Rules

On May 7, 2020, the DOE released its final Title IX regulations (the "Rules"), which implemented the regulations it had originally proposed on November 16, 2018 in a notice of proposed rulemaking. (*See* Compl. ¶¶ 148-150.) Just like the proposed rules, these Rules are in direct conflict with Princeton's current policies and procedures for adjudicating sexual misconduct claims. For example, the Rules require that investigative panels be separate from adjudicative

---

be considered routine academic disciplinary action. *Doe v. Trs. of Princeton Univ.*, 2020 WL 967860, at *2 (citation omitted).

panels, unlike Princeton's use of the "investigator only" model where one panel conducts both the investigation and the adjudication which is explicitly prohibited. 34 C.F.R. § 106.45 (b)(7)(i) Single Investigator Model Prohibited.  (Becker Decl. Ex. B.)  The Rules also require that universities provide a live hearing and some form of meaningful cross-examination at that live hearing.  34 C.F.R. § 106.45(b)(6)(i) Postsecondary Institution Recipients Must Provide Live Hearing with Cross-Examination.  (*Id.*)

While the Rules may not apply retroactively to Plaintiff's matter, the fact that the DOE started changing its rules in 2018, and the fact that Princeton ignored those changes and stubbornly adhered to its earlier and now-improper policies, shows that the procedures in place at Princeton did not safeguard the rights of all students, including the accused, and casts further doubt on the outcome reached for Plaintiff.  In announcing the Rules' final implementation, the DOE specifically noted that the "new Title IX regulation holds schools accountable for failure to respond equitably and promptly to sexual misconduct incidents and ensures a more reliable adjudication process that is fair to all students."  *Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students*, Department of Education (May 6, 2020), available at https://www.ed.gov/news/press-releases/secretary-devos-takes-historic-action-strengthen-title-ix-protections-all-students.  The DOE has made it clear that the accused in Title IX scenarios were

not being adequately protected.  In Plaintiff's case, he was denied multiple procedural protections these Rules provide—including holding a live hearing, meaningful cross examination, separate investigatory and adjudicatory panels, and the right to proactive representation by a qualified and conflict-free advisor from the outset.

### III.   THE COMPLAINT ALLEGES COGNIZABLE CONTRACT CLAIMS UNDER NEW JERSEY LAW

Princeton's assertion that "Doe fails to point to a valid contract with Princeton, so his allegations do not make out a breach of contract claims" (MTD at 25), is based on a misleading portrayal of applicable law and the Complaint.

Under well settled New Jersey precedents, a private educational institution's disciplinary procedures must meet two judicially imposed requirements for a sanction to withstand judicial review.  *First*, the disciplinary procedures must be "fundamentally fair," and *second*, they must be consistent with the published procedures.  *Noor-Ul-Iman Sch.***,** 2016 WL 4145921, at *1 ("In order to state a claim against a private school for improperly exercising a disciplinary policy, a plaintiff must allege the school either failed to "adhere to its own established [disciplinary] procedures" or, in carrying out the discipline, failed to 'follow a procedure that is fundamentally fair.'"); *Hernandez v. Don Bosco Preparatory High*, 322 N.J. Super. 1, 20-21 (App. Div. 1999) ("We hold that a private high school, when expelling a student for misconduct, must follow a two-prong process.

First, the private high school must adhere to its own established procedures for dismissal**.** Second, in executing the dismissal, the school must follow a procedure that is fundamentally fair.").

The Complaint easily satisfies both requirements precluding dismissal because, as set forth more fully below, the procedure laid out in the RRR policy in and of itself is not "fundamentally fair" as it pertains to private university students accused of sexual misconduct and intimate partner violence facing the penalty of expulsion, and because Princeton failed to adhere to its own established procedures by breaching numerous distinct provisions of the RRR policy.

### A.  Princeton's Procedures for Investigating and Adjudicating Sexual Misconduct & Partner Violence are Fundamentally Unfair

The question here is whether Princeton's process for adjudicating and investigating Title IX charges comported with notions of "fundamental fairness." The answer is "No."  As alleged in detail (Compl. ¶¶ 47-54, 80), Princeton's disciplinary procedure is inherently unfair and fundamentally flawed, in that, among numerous other procedural and substantive deficiencies (1) it provides no mechanism for a party accused of sexual misconduct or partner violence to question witnesses at a hearing before a neutral fact finder with power to make credibility determinations (*id.* ¶¶ 54, 76); (2) it is based on a "single investigator" model which vests in one panel the incompatible roles of jury, judge and

26

prosecutor (*id.* ¶¶ 50, 80, 150); and (3) it is biased against males and respondents accused of sexual misconduct or partner violence (*id.* ¶¶ 111, 143).

"Fundamental fairness" requirements are flexible and vary with the competing interests at stake. *See Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *6 (when evaluating whether a private institution's behavioral disciplinary procedures comports with "fundamental fairness" the court will "balance the organization's interest in autonomy . . . against the magnitude of interference with the member's interest in the organization and the likelihood that the established procedures would safeguard that interest"); *Hernandez*, 322 N.J. Super. at 19 (quoting *Rutledge v. Gulian,* 93 N.J. 113, 123 (1983)).  Ultimately, "[w]hether the procedure is fundamentally fair will depend on the circumstances."  *Id.* at 22.[10]

---

[10] The New Jersey courts have, consistent with the notion that "fundamental fairness" is an elastic concept, made the distinction that "the procedural rights of a ***private university student*** will be ***more aggressively protected by the courts*** when compared to the procedural rights of an expelled student at a ***private high school***." *Hernandez*, 322 N.J. Super. at 20-21 (declining to "hold that the rights of a private high school student are the same as those of a private university student, because" of the "***distinction between the two institutions***.  A student at a private university, if expelled during the semester for misconduct, loses academic credit for the entire semester … [and] must complete applications for admission to another university in order to complete the expected degree.  An expelled student in a private high school, on the other hand, may transfer immediately to the local public high school.  The high school student will not lose credit for the semester; rather, the student may complete the semester at the public school, and receive a high school diploma from the public school.") (emphasis added).

For example, in *Napolitano v. Princeton*, involving judicial review of Princeton's adjudication of a plagiarism charge which resulted in the student's temporary suspension, in declining to enforce a right to counsel, the court balanced several factors:

> Among these were the absence of counsel representing the complainant or university at the hearing, the university's practice of permitting the student to select an advisor from within the Princeton University community, the academic nature of the matter in dispute and the probable punishment that could reasonably attend a determination of plaintiff's guilt.

186 N.J. Super. at 576, 583 (Ch. Div. 1982), *aff'd*, 186 N.J. Super. 548 (App. Div. 1982).  The court went on to recognize, however:

> [T]hat there may be academic areas where the right to counsel might properly be mandated ….  However, given the history of penalties actually rendered in plagiarism cases where there had been no "palming off" of an obscure source as the student's own work, there was little likelihood that the hearing would have resulted in plaintiff's suffering any forfeiture, *i.e.*, expulsion, with the resultant loss of her four-year investment of time and money, or immediate suspension, with a similar loss of a semester's time and expenses.  ***Whether in such forfeiture cases a sufficient right might exist was not before the court, and, therefore, this court expresses no opinion on the right to counsel in academic forfeiture situations.***

*Id.* (emphasis added).  Factors pertinent to the inquiry are therefore, *inter alia*, the gravity of the alleged infraction, the likely sanctions of a finding of guilt, the opportunity to be heard, and the university's aptitude in resolving disputes of that nature.

Thus, New Jersey and state cases law shows that "fundamental fairness," in the context of a private institution's sexual misconduct disciplinary procedures, is practically equivalent to, and carries all the hallmarks of, due process requirements, and any distinction between the two is academic.[11]   *See, e.g.*, *USciences*, 2020 WL 2786840, at *7 (3d Cir. May 29, 2020) ("the fairness promised by the Student Handbook and the Policy relates to procedural protections

---

[11] *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) (rejecting dismissal of contract claims and finding *Brandeis'* process for investigating sexual misconduct which are analogous to Princeton's, "unfair" where, *inter alia*, no right to counsel, "no right to confront accuser … either directly or through counsel," no live hearing with the ability to cross-examine adverse witnesses, "no separation of investigatory, prosecution and adjudication functions," lower standard of proof (preponderance) for sexual misconduct versus the clear and convincing standard for other infractions, and "no effective appeal"); *Doe v. Allee*, 30 Cal. App. 5th 1036 (Ct. App. 2019) (reversing trial court and granting writ of mandate finding private university's Title IX disciplinary procedures, which are analogous to Princeton's, "fundamentally unfair" where, *inter alia*, "no in-person hearing" and therefore no ability to confront accuser and adverse witnesses (the court found prepared questions posed by the investigator insufficient), no right to counsel but merely the right to a passive advisor, use of the preponderance standard, and use of the "single investigator" model with "a single individual acting as investigator, prosecutor, factfinder and sentencer"); *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at *10 (N.D. Ind. May 8, 2017), *vacated on other grounds*, 2017 WL 7661416 (N.D. Ind. Dec. 27, 2017) (finding likelihood of success on the merits of Plaintiff's contract claims in analogous circumstances where university's Title IX process "fundamentally unfair" given "at the [] hearing the accused student is essentially on his own … [and] while he is permitted to have a lawyer or advisor present, those folks can't really do anything;" the panel's failure to properly consider "motive to lie" noting "[i]n a disciplinary matter concerning behavior in a long-term existing relationship, context matters, and the motive of the complainant (as it relates to credibility) bears more scrutiny than in some other cases;" and "a conclusory and dismissive" appeals process).

for students accused of sexual misconduct . . . . ***In this context, a 'fair hearing' or 'fair process' 'is a term of art used to describe a judicial or administrative hearing conducted in accordance with due process***'") (citing *Wojchowski v. Daines*, 498 F.3d 99, 102 n.5 (2d Cir. 2007)) (emphasis added)[12]; *Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *4 (reversing dismissal on the pleadings in case involving suspension of a high-school student for harassment and bullying where the complaint allegations regarding, "bias, the manner in which [student] was questioned, [and] the lack of a fair opportunity to respond to the charges … suggest defendant's process was fundamentally unfair"); *Hernandez*, 322 N.J. Super. at 22 (noting that that "***due process safeguards can [not] be cavalierly ignored or disregarded***" but nonetheless reversing denial of summary judgment where private high-school student "was notified of the charges of steroid use and distribution" "took the opportunity to appeal" "had the opportunity to defend the charges, and did so by taking a polygraph test and a drug test").

---

[12] Like Princeton here, "USciences argue[d] that, under Pennsylvania law, it need not provide Doe with a 'full-dress judicial hearing.'"  2020 WL 2786840, at *9. While the Third Circuit agreed that "[b]asic fairness in this context does not demand the full panoply of procedural protections available in courts" it made equally explicit that "***it does include the modest procedural protections of a live, meaningful, and adversarial hearing and the chance to test witnesses' credibility through some method of cross-examination.***"  *Id.* (emphasis added)

Accordingly, in the context of an **uncounseled**[13] **university student** faced

with the daunting and serious prospect of expulsion for a charge carrying

considerable and indelible social stigma, the Complaint adequately alleges that

Princeton's Title IX procedures do not comport with "fundamental fairness"

because of, *inter alia*, the following:

  a.   Utilization of the "investigator only"[14] model which has been

recognized as intrinsically flawed and incompatible with the provision of a fair

---

[13] Princeton's consistent assertions that "during the course of the investigation, an attorney at the law firm representing Doe in this lawsuit became Doe's adviser" (MTD at 8; TRO Opp. at 10), the underlying implication being Plaintiff's interests were adequately represented, is beyond disingenuous.  Whereas Jane Roe was represented by counsel ████████████████████ the day Plaintiff was notified of her charges (Becker Decl. Ex. C - Response to Plaintiff's counter claims provided to Princeton by Jane Roe's attorney, ████████████ which counsel responded to on her behalf to Plaintiff's counter-claims (*id.*), Plaintiff had as an advisor a conflicted Princeton faculty member for three out of the four months of Princeton's investigation.  (Compl. ¶¶ 112-14.)  In any event, due to Princeton's RRR procedures, the adviser plays a passive role, stripped of the ability to advocate or defend.  This is insufficient given the interests at stake.  *See Napolitano*, 186 N.J. Super. at 583 (suggesting that "there may be academic areas where the right to counsel might properly be mandated" such as where, like here, discipline is imposed for behavioral misconduct resulting in "forfeiture, *i.e.*, expulsion"); *see also Notre Dame*, 2017 WL 1836939, at *10 (Title IX process "fundamentally unfair" where "[t]he actual presentation of the student's side of the case is left to the student himself, but with severe limitations.  As noted, while he is permitted to have a lawyer or advisor present, those folks can't really do anything.").

[14] The new Title IX Rules explicitly condemn the "single-investigator" model, prohibiting entirely its use by Title IX recipients.  Becker Decl. Ex. B (34 C.F.R. § 106.45(b)(7)(i) Single Investigator Model Prohibited.)

investigation.  (Compl. ¶¶ 50, 80, 150); *see also USciences*, 2020 WL 2786840, at

*10 (reversing dismissal of contract claim on the basis, among others, that "the

single-investigator model violated the fairness that USciences promises students

accused of sexual misconduct"); *Brandeis Univ.*, 177 F. Supp. 3d 561 at 606 (D.

Mass. 2016) ("The dangers of combining in a single individual the power to

investigate, prosecute, and convict, with little effective power of review, are

obvious.  No matter how well-intentioned, such a person may have preconceptions

and biases, may make mistakes, and may reach premature conclusions."); *Allee*, 30

Cal. App. 5th at 1069 (same).

        b.     Failing to hold a fact finding hearing requiring that Jane and witnesses

appear and give live testimony with the ability to engage in meaningful cross-

examination.  (Compl. ¶¶ 52, 54); *see USciences*, 2020 WL 2786840, at *9 ("Doe

plausibly alleges that USciences deprived him of fairness because he never

received a chance to cross-examine witnesses or any sort of real, live, and

adversarial hearing"); *see also Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *7

(reversing dismissal where, *inter alia*, "plaintiffs' allegations pertaining to … the

lack of a ***fair opportunity*** to respond to the charges suggest defendant's process

was fundamentally unfair") (emphasis added); *Allee*, 30 Cal. App. 5th at 1039

("when a student accused of sexual misconduct faces severe disciplinary sanctions,

and the credibility of witnesses … is central to the adjudication of the allegation,

**fundamental fairness requires**, at a minimum, that the university provide a

mechanism by which the accused may cross-examine those witnesses, directly or

indirectly, at a hearing in which the witnesses appear in person or by other means

(such as means provided by technology like videoconferencing)"); *Brandeis*, 177

F. Supp. 3d at 605 (same).

      c.      Subjecting Plaintiff to a biased disciplinary process.  (Compl. ¶¶ 6, 92,

99, 107-11, 141-43); *see Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *4, 7

(reversing dismissal where, *inter alia*, plaintiff's allegation that "the investigation

was conducted by people who had a personal and biased interest in the outcome []

instead of neutral and unbiased decision makers without any conflict of interest

that could hamper their judgment" suggests defendant's process was fundamentally

unfair); *see also Brandeis*, 177 F. Supp. 3d at 606 (allegations that process was

tainted by bias, which is augmented with use of a "single investigator" model,

suggests process is fundamentally unfair).

      Princeton's assertion, that the RRR policy "fulfills all of the elements New

Jersey courts look to in determining fairness" (MTD at 28), is therefore

substantively indefensible.  It is not enough to say that the RRR Policy provides for

"notice," a chance to review the evidence," and "an opportunity to present [one's]

case" (MTD at 28)—the details matter.[15]  And the details of Princeton's

disciplinary procedures shows that it failed to provide rudimentary procedural

protections and, as a result, denied plaintiff a "fundamentally fair" process

commensurate with the gravity of the charges and penalty.[16]  Dismissal of

Plaintiff's contract claims is precluded on this basis alone.

---

[15] New Jersey courts have not hesitated to conduct a probing inquiry and, a thorough factual analyses of the underlying record and the institution's history in similar, unrelated situations.  *See, e.g, Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *4 (chiding the "motion judge" for "reject[ing] plaintiffs' argument that they were entitled 'to go into the details of the [school's] investigation'"); *Napolitano*, 186 N.J. Super. at 580-82, 584 n.2 (the trial court, among other things, undertook a "detailed examination" of the entire disciplinary record, ordered accelerated depositions, reviewed "over 20 disciplinary files, … a table of some 78 cases of academic fraud (mainly plagiarism) and the penalties imposed therefor at Princeton over the past four years," analyzed whether the decision comported with the evidentiary standard, and ordered a rehearing consistent with the court's orders including application of the court's interpretation of the definition of "plagiarism" and the ability to cross-examine adverse witnesses); *Clayton v. Trustees of Princeton Univ.*, 608 F. Supp. 413, 440 (D.N.J. 1985) (the court denied summary judgment after reviewing both the transcript and the hearing tapes of the underlying disciplinary record and made specific findings of fact).

[16] Because of the distinction between judicial review of academic versus misconduct related discipline, Princeton's citation to *Mittra v. Univ. of Med. & Dentistry of N.J.*, 316 N.J. Super. 83, 92 (App. Div. 1998), for the proposition that a "university's procedures are fair when the university provides the student (i) notice of the allegations against him or her, (ii) an opportunity to examine the evidence which the university will use in evaluating the student's conduct, and (iii) an opportunity to present his or her case to the decision-making body"(MTD at 27), is inapposite.  *Mittra* involved a former dental student, who was dismissed from state university for poor ***academic performance*** after, unlike here, the student was given an adequate opportunity to present his case—a live hearing before the Academic Performance Committee panel where the student was represented by counsel.  In any event, the procedures at issue in *Mittra* consisted precisely of the kind lacking here—a live hearing and proper representation.  Similarly, the courts

## B.    <u>Princeton did not Adhere to the Procedures in the RRR Policy</u>

Princeton additionally failed to adhere to its own published disciplinary procedures, which procedures embody the terms of the contractual relationship between it and its matriculated students.[17] *See, e.g.*, *Noor-Ul-Iman Sch.*, 2016 WL 4145921, at *7 (reversing dismissal where allegations, taken as true, "suggest defendant failed to follow its established procedures [in its "Harassment, Intimidation, and Bullying Policy"] when disciplining [student]"); *Moe*, 2010 WL 1609680, at *5 (denying dismissal and noting that "[u]nder federal notice pleading rules, it is sufficient that Plaintiff put Defendants on notice of the claim: breach of contract and the facts giving rise to that claim"—"that the University failed to comply with its own rules in regard to grading, personal leave, and failed to follow

---

in *Napolitano v. Princeton* & *Clayton v. Trustees of Princeton Univ.*, both of which involved **academic related discipline**, sustained the litigation beyond the summary judgment stage, and although ultimately finding the process at issue "fair," the process Princeton afforded these students—a live hearing, involved defense representation, ability to cross examine—are far more robust and holistic than what was accorded Plaintiff.

[17] Princeton's assertion that the RRR Policy "does not give rise to contractual principles under New Jersey law (MTD at 26) is baseless. *See, e.g.*, *Noor-Ul-Iman Sch.*, 2016 WL 4145921 (the school's "Harassment, Intimidation, and Bullying Policy" formed basis of contractual rights and relationship between the parties and court found school did not follow its published procedures); *Moe*, 2010 WL 1609680, at *5 (D.N.J. Apr. 20, 2010) (rejecting Seton Hall's argument that "Plaintiff's contract claim is based upon a student manual and therefore fails as a matter of law" given "New Jersey case law does not preclude courts from looking to [the student manual] to determine the scope of the contractual relationship") (citations to a plethora of New Jersey state court cases omitted).

its own policies for handling grievances and complaints"); *Rider Univ.*, 2018 WL 466225, at *13 (sustaining contract claim where "the Complaint sufficiently alleges Defendant breached at least two provisions of its policies and procedures" including the provision "require[ing] 'a trained investigator … to promptly, fairly and impartially investigate the complaint," given allegations of investigator's bias).

As alleged in detail in the Complaint, and summarized below, Princeton breached numerous distinct provisions of the RRR Policy, which breaches contributed to the overall skewed and unfair process Plaintiff was subjected to:

- Breach of the contractual "commit[ment] to investigat[e] and adjudicate[e] sexual misconduct matters in a manner that is ***fair and equitable*** to all parties involved." (Compl. ¶ 129.) In *USciences*, the Third Circuit reversed dismissal of a strikingly similar contract claim premised on the university's breach of the promise contained in the "Student Handbook," that it will "engage in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, ***fair and equitable***," where there was, like here, no live hearing, no meaningful cross examination and use of the "single investigator model." 2020 WL 2786840, at *7-10.

- Failing to apply the preponderance of the evidence standard in breach of RRR Policy Section 1.3.12(1). (Compl. ¶¶ 107-11; TRO at 28.) The Panel

clearly did not afford Plaintiff the requisite presumption of innocence, and Plaintiff was required both to prove his claims of abuse by Jane and to disprove Jane's allegations against him.  Thus, the Panel disregarded exculpatory evidence for Plaintiff and incriminating evidence against Jane (*id.* ¶ 105); rendered inconsistent credibility determinations and prejudicial conclusions all in Jane's favor (*id.* ¶¶ 117-21); and, ignored compelling evidence of Jane's improper motivation to malign and lie (*id.* ¶¶ 109, 115, 117-21).  *See Collick*, 2016 WL 6824374, at *23 (allegation, among others, that "Defendants' investigation did not yield sufficient evidence to meet the preponderance of the evidence burden established in the Student Code of Conduct" sufficient to state "breach under the law of contract as interpreted by New Jersey courts in analogous contexts").

- Providing Plaintiff with a conflicted "advisor" in breach of Princeton's mandated Sexual Misconduct Investigation Procedures, which procedures required conflicted individuals to self-recuse.  (Compl. ¶¶ 112-14; TRO at 31-32.)

- Denying Plaintiff's request for an extension of time to appeal despite RRR Policy Section 1.3.10(3) providing for such an extension for "good cause" and notwithstanding a letter from counsel explicitly requesting an extension and articulating "good cause", including by specifically referencing relevant sections of the RRR Policy.  (Compl. ¶ 132; TRO at 32-33) ; *see also Doe v. Princeton Univ.*,

2019 WL 161513, at*8 (D.N.J. Jan. 9, 2019) ("Plaintiff has plausibly alleged the

existence of a contract between Princeton and Plaintiff … [and] that Princeton has

breached that contract by denying Plaintiff's extension of time for 'good cause").

- Imposing the harshest penalty without a sufficient explanation and

without comparison to other like complaints, which penalty was not based on the

facts of the case or consistent with Princeton precedent, in violation of RRR Policy

Section 1.3.12(2).  (Compl. ¶ 133.)

Accordingly, under controlling New Jersey law and Third Circuit precedent,

these distinct breaches show that Princeton "failed to adhere to its own published

disciplinary procedures,"[18] and provides an additional basis to sustain Plaintiff's

contract claims

### C.   Princeton Breached the Implied
### Covenant of Good Faith and Fair Dealing

"In every contract there is an implied covenant of good faith and fair

dealing" and "the court must measure the university's conduct [against] that of

---

[18] Princeton's citation to *Doe v. Princeton Univ.*, No. 17-CV-1614 (PGS), 2018 WL 2396685, at *7 (D.N.J. May 24, 2018), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) is not even remotely comparable.  That plaintiff did not invoke New Jersey's "fundamental fairness" prong and alleged breaches of general and vague aspirational provisions:  that the purpose of the [RRR policy] is to protect the well-being of the Princeton community, Policy 1.1.1; that Princeton agreed to allow its community members to live in a discrimination—and harassment free environment, Policy. 1.2.2.  In contrast, Plaintiff here has invoked "fundamental fairness" and alleged specific breaches of distinct procedural provisions.

good faith and fair dealing." *Napolitano*, 186 N.J. Super. at 584; *Rider Univ.*, 2018 WL 466225, at \*14 (sustaining breach of covenant cause of action because allegations that dean was biased against plaintiff  "was sufficient to demonstrate Defendant's ill motives without any legitimate purpose to deprive Plaintiff of the fruits of the contracts"); *Collick*, 2016 WL 6824374, at \*24 (sustaining breach of covenant cause of action because "[t]he Complaint alleges … that Defendants, even if they observed the outward forms, discriminated against Plaintiffs and engineered a finding that Plaintiffs they were guilty of misconduct and should be expelled" which "is a sufficient allegation of bad faith"); *Moe*, 2010 WL 1609680, at \*5 (sustaining breach of covenant cause of action on same basis as breach of contract claim—that complaint alleged "defects in the procedures used prior to [complainant] being expelled" and an unfair process").[19]

   For the same reasons that render Princeton's Title IX procedure "fundamentally unfair," as set forth *supra*, the allegations of the Complaint are sufficient to state a claim for breach of the implied covenant.  The Complaint alleges, in substance, that although Princeton may have technically complied with

---

[19] Princeton's reliance on *Webster v. Rutgers-New Jersey Med. Sch.*, 2017 WL 3399997, at \*12 (D.N.J. Aug. 4, 2017), for the proposition that Plaintiff's breach of covenant cause of action fails "because it is based on the same conduct as his breach of contract claims" (MTD at 33) is misplaced.  In *Webster*, ***at the summary judgment stage***, the court sustained the breach of contract action and therefore, dismissed the breach of covenant cause of action as duplicative. *Id.* at 11-12.

the letter of the RRR Policy, it was executed in bad faith and with ill motives depriving Plaintiff of the fruits of the contracts.  Princeton subjected Plaintiff to a biased process, which substantially impaired his ability to defend himself and "engineered a finding that Plaintiff[] [was] guilty of misconduct and should be expelled.  That is a sufficient allegation of bad faith."  *Collick*, 2016 WL 6824374, at *24; Compl. ¶¶ 108, 111, 142-43.

## CONCLUSION

For the foregoing reasons, Princeton's Motion to Dismiss Plaintiff's Complaint should be denied.

Dated: New York, New York
      June 15, 2020

**KASOWITZ BENSON TORRES LLP**

By:      /s/  Christian T. Becker     
Daniel J. Fetterman
(*pro hac vice* application pending)
Christian T. Becker
Attorney ID No. 044142005
Fria R. Kermani
(*pro hac vice* application pending)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel for Plaintiff John Doe*