<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JOHN DOE<br><br>     Plaintiff,<br><br>     v.<br><br>PRINCETON UNIVERSITY<br><br>     Defendant. | Case No. 3:20-cv-4352 (BRM)(TJB)<br><br>**OPINION REDACTED** |

**MARTINOTTI, DISTRICT JUDGE**

   Before this Court is Defendant Princeton University's ("Princeton") Motion to Dismiss Plaintiff John Doe's ("Plaintiff")[1] Complaint ("Complaint"). (ECF No. 31.) Plaintiff opposes the Motion. (ECF No. 38.) Having reviewed the submissions filed in connection with the Motion and having declined to hear oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Princeton's Motion to Dismiss is **GRANTED**.

## I.  **BACKGROUND**

   For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

---

[1] On April 15, 2020, Plaintiff filed a Motion for Permission to Proceed under a Pseudonym and for a Protective Order. (ECF No. 2.) On July 13, 2020, The Honorable Tonianne J. Bongiovanni, U.S.M.J., granted Plaintiff's right to proceed under pseudonym. (ECF No. 49.)

### A. Factual Background[2]

Plaintiff and Jane Roe ("Jane") met in ███████████ at Princeton and immediately started a relationship that was "intense and unhealthy." (ECF No. 1 ¶ 17.) Throughout the relationship, Plaintiff and Jane would "constantly argue and did not trust one another." (*Id.* ¶ 18.) The relationship also featured physical altercations, for example, when Jane and Plaintiff were on a family trip with Plaintiff's parents, the two got into an argument and "Jane became so angry that she lost control and lashed out, scratching and grabbing at Plaintiff's arm." (*Id.* ¶ 21.) Plaintiff and Jane also "consistently engaged in erotic asphyxiation (*i.e.*, consensual choking) as well as spanking, and other behaviors that could be classified as BDSM." (*Id.* ¶ 20.) Jane had a difficult sophomore year at Princeton ██████████████████████████████████████████ ██████████ (*Id.* ¶ 23.) ███████████████████████████████████████ ███████████████████████████████ (*Id.* ¶ 24.) ██████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ (*Id.*)

When the ███████ semester ended, Plaintiff was ███████████████████ and Jane was ████████████████████████████████ (*Id.* ¶ 25.) Around ███████████ Jane informed Plaintiff she had cheated on him ████████████████████████ and Plaintiff ended the relationship. (*Id.*) Then, Jane heard from a friend that Plaintiff himself had cheated on Jane ██████████████████████ ██████████████████ (*Id.* ¶ 28.) Following these cheating allegations, Plaintiff alleges Jane reached

---

[2] The underlying facts are set forth at length in this Court's April 21, 2020 Opinion, where the Court denied Plaintiff's Motion for a Temporary Restraining Order. (ECF No. 20.) In the interest of judicial economy, the Court refers the parties to that opinion for a full recitation of the factual background of this dispute, as well as its procedural history. Here, the Court will reiterate, in detail, the facts surrounding the investigation of Plaintiff and Jane, as those facts provide the basis for Plaintiff's claims.

out to him through a series of texts, and "alluded to wanting to punish Plaintiff" for what he had done. (*Id.*)

Plaintiff alleges that after these ominous statements, "Jane launched a campaign of harassment, threats and false accusations directed at Plaintiff." (*Id.* ¶ 30.) Jane "began to tell others that she initiated the breakup because Plaintiff was physically abusive" and "told multiple friends . . . that she was 'grappling' with whether an occurrence between herself and Plaintiff constituted sexual assault or rape." (*Id.*)

When Jane's "harassment and spreading of rumors" began to permeate campus, Plaintiff decided to take action and "voiced his concerns in an email to the residential college's Director of Student Life, Garrett Meggs" ("Meggs") in ██████████ (*Id.* ¶ 34.) Meggs was responsible for "conflict resolution" and "investigation and adjudicating disciplinary issues." (*Id.*) Plaintiff reported he was being harassed by Jane, who was spreading false information about him and that "he simply didn't feel safe." (*Id.*) Plaintiff alleges Meggs did nothing besides suggest that Plaintiff seek mental health services, even though Jane's alleged actions were a violation of Princeton's Rules, Rights, Responsibilities (the "RRR Policy"). (*Id.* ¶ 35.)

On ██████████ Jane met with Regan Crotty ("Crotty"), the Director of Gender Equity and Title IX Administration,  told her she had been a victim of "Intimate Relationship Violence" as described in the RRR Policy, and named Plaintiff as the party to the allegations. (*Id.* ¶ 39.) After this meeting, however, Jane decided "she did not want to take further action." (*Id.*) On ██████████ "Ms. Crotty requested Jane return to the Title IX office for a meeting during which Ms. Crotty informed Jane that Princeton wanted Jane to take further action against Plaintiff." (*Id.* ¶ 40.) Jane then "contacted Ms. Crotty to approve the issuance of a No Communication Order, which was implemented on ██████████ and served on Plaintiff by

Mr. Meggs." (*Id.* ¶ 41.) The No Communication Order prohibited Plaintiff and Jane from communicating with each other. (Crotty Certification (ECF No. 14-1) ¶¶ 23–24.) The same day, Jane violated this order when she "approached Plaintiff on a campus running trail and attempted to apologize to him"; Princeton told Jane "not to let it happen again." (ECF No. 1 ¶ 43.) The University did not take action against Jane because it was her first violation of the No Communication Order. (ECF No. 14-1 ¶ 24.) On ████████ Plaintiff met with Crotty to discuss the allegations against him and was told "Jane did not wish to proceed further." (*Id.* ¶ 41.)

However, on ████████ Jane changed her mind again and told Crotty "she would cooperate with Princeton's Title IX investigation into Plaintiff's alleged misconduct." (*Id.* ¶ 42.) On ████████ "Princeton formally notified Plaintiff of the allegations against him and that a Title IX investigation would commence." (*Id.*) Also on ████████ Princeton implemented a No Contact Order. (ECF No. 14-1 ¶ 25.)

Plaintiff's first violation of the No Contact Order occurred when he called Jane. (*Id.* ¶ 26.) He alleged the violation was an accident, and Princeton did not take any further action. (*Id.*) Subsequently, on ████████ "Plaintiff was scrolling through past social media posts from Jane" while preparing a submission in his defense for the Title IX Panel, and accidently "liked" one of Jane's previous posts. (ECF No. 1. ¶ 44.) Plaintiff self-reported this incident to Meggs, but in response, "Plaintiff was put through a disciplinary process and issued both a Dean's warning and a threat that 'this kind of infraction would normally lead to three months of disciplinary probation.'" (*Id.* ¶¶ 45–46.) In deciding to issue a warning instead of disciplinary probation, Princeton considered the fact that this was Plaintiff's second violation of the No Contact Order against the fact that Plaintiff self-reported the incident and alleged it was an accident. (ECF No. 14-1 ¶ 27.)

A three-member panel initiated the Title IX process against Plaintiff, conducted the investigation, analyzed the evidence collected, and rendered a decision. (ECF No. 1 ¶ 47.) These three members were Randy Hubert, Ed White, and Joyce Chen Shueh (the "Panel"). (*Id.* ¶ 48.) Since the alleged incidents occurred when Plaintiff and Jane were alone, there was little direct evidence, so the Panel collected several types of evidence including "statements from other individuals who had information potentially relevant to the investigation," text messages, social media messages and posts, voicemails, photographs, and videos. (*Id.* ¶ 49.) During a second interview with the Panel, Plaintiff made clear that he wanted to assert a counterclaim against Jane for the physical abuse he had suffered during the relationship. (*Id.* ¶ 51.) Therefore, the Panel also became "responsible for thoroughly investigating Plaintiff's own claims of abuse against Jane." (*Id.*) By letter dated ███████████ (the "Notice of Allegations"), the Panel informed Plaintiff it "would deliberate and adjudicate" the allegations made by both Plaintiff and Jane. (*Id.* ¶ 52.)

The Notice of Allegations described Plaintiff's rights during the Panel's proceedings. (*Id.* ¶ 53.) Most of these rights were described in the body of the Notice, but Plaintiff's right to "engage in cross-examination by submitting proposed questions for the Panel to ask parties and/or witnesses" was buried in a footnote. (*Id.*) Plaintiff alleges that, other than this footnote, nobody involved with the Title IX process "spoke with Plaintiff to ensure he understood what his rights were, including the very critical right to cross-examine Jane." (*Id.*) Plaintiff also alleges "there were no live hearings" and without such hearings, "there was no opportunity for meaningful cross-examination." (*Id.* ¶ 54.)

On ███████████ the Panel issued a memorandum (the "Report"), finding "there was sufficient information to substantiate all five incidents of abuse alleged by Jane, but claimed there was insufficient information to substantiate any incident of abuse alleged by Plaintiff." (*Id.* ¶¶ 55–

56.) Princeton based its finding of Plaintiff's responsibility "on the fact that it found Jane 'very credible' and Plaintiff not credible." (*Id.* ¶ 57.) In a ███████████ letter, Plaintiff was provided with a copy of the Report and "informed of Princeton's decision to expel him based on the Report's findings." (*Id.* ¶ 58.) The letter also informed Plaintiff of his right to appeal by ███████ (*Id.*) On ███████████ Plaintiff requested a 30-day extension to submit his appeal. (*Id.* ¶ 62.) Princeton denied the request and gave Plaintiff a "three calendar day (and single business day) extension." (*Id.*) Plaintiff submitted his appeal on ██████████ which was denied on ██████ ███ (*Id.* ¶ 63.)

**B. Procedural Background**

On April 15, 2020, Plaintiff filed the Complaint alleging violations of Title IX for erroneous outcome (Count One), Title IX for selective enforcement (Count Two), breach of contract (Count Three), breach of implied covenant of good faith and fair dealing (Count Four), and common law due process (Count Five). (ECF No. 1.) Along with the Complaint, Plaintiff filed a motion seeking a temporary restraining order ("TRO") and preliminary injunction to "enjoin Defendant from enforcing its decision to expel Plaintiff, removing Plaintiff's status as a full-time student, and preventing Plaintiff from attending classes and sitting for his upcoming exams pending resolution of the underlying merits." (ECF No. 3) On April 17, 2020, Princeton opposed the Motion for TRO. (ECF No. 14.) On April 21, 2020, the Court conducted oral argument and also denied Plaintiff's Motion for TRO. (ECF No. 20.)

On May 20, 2020, Princeton filed a Motion to Dismiss Plaintiff's Complaint. (ECF No. 31.) Plaintiff filed an opposition on June 15, 2020, (ECF No. 38), and on June 29, 2020, Princeton filed its reply. (ECF No. 40.)

## II.   LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While as a general rule, a court many not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *see also Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (hereinafter "*USciences*").

## III.   DECISION

### A.   Title IX (Count I and II)

Princeton argues Plaintiff's Title IX claim should be dismissed because he failed to allege Princeton's actions during Plaintiff's Title IX proceeding were motivated by gender bias. (ECF No. 32 at 13.) Plaintiff contends he "made a plausible showing that gender bias motivated Princeton's actions with his specific Title IX proceeding" (ECF No. 38 at 13) by alleging Princeton's proceedings violated Title IX under both the "erroneous outcome" theory and the "selective enforcement" theory. (ECF No. 1 ¶¶ 154–84.)

Following the Third Circuit's decision in *USciences*, Plaintiff need not allege Title IX violations under separate theories. *See Univ. of Scis.*, 961 F.3d at 209. Nonetheless, the Court will consider all the allegations made by Plaintiff. [3]

Specifically, Plaintiff alleges Princeton's investigation featured "procedural and evidentiary errors" that led to a flawed outcome motivated by gender bias. (ECF No. 1 ¶ 161.) The investigation allegedly included "substantial evidentiary weaknesses" since the Panel "failed to consider Jane's motivation to lie," misconstrued exculpatory evidence for Plaintiff and evidence incriminating Jane, and "made inconsistent credibility determinations and drew prejudicial conclusions without sufficient evidentiary support." (*Id.* ¶ 162.) In addition, the investigation featured "significant procedural flaws affecting proof" such as the Panel's failure to provide Plaintiff with a meaningful right to cross-examination and allow a live hearing. (*Id.* ¶ 164.) Plaintiff also alleges "selective enforcement occurred" because while both Jane and Plaintiff brought complaints and violations based on Princeton's sex discrimination and sexual misconduct policy, "Princeton dismissed Plaintiff's initial concerns of harassment by Jane but subsequently, urged Jane to formalize her allegations and investigated Jane's allegations zealously, construing all inconsistencies in her favor." (*Id.* ¶¶ 175, 178.) Lastly, Plaintiff points to Princeton's differing reactions to Jane and Plaintiff violating the No Contact Order as further evidence that selective enforcement occurred. (*Id.* ¶ 179.)

---

[3] Plaintiff clarifies that, as a result of the Third Circuit's decision in *USciences*, he is not proceeding under theories of "erroneous outcome" and "selective enforcement." (ECF No. 38 at 14 n.4.) Instead, Plaintiff argues: (1) he alleged sufficient facts showing sex was a motivating factor in Princeton's investigation and ultimate decision to discipline Plaintiff, and (2) he alleged sufficient facts showing Princeton yielded to external pressure in its RRR Policy. (*Id.* at 16–23.) For these reasons, the Court will consider Counts I and II together.

Title IX provides in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714–15 (2d Cir. 1994)); *see A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 805 (3d Cir. 2007). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* Plaintiff alleges Princeton receives federal funds (ECF No. 1 ¶ 87) and therefore may be held liable under Title IX. Indeed, Princeton does not dispute it must comply with Title IX. (*See* ECF No. 32 at 5.)

Plaintiff directs the Court to the Third Circuit's recent decision in *USciences*. Plaintiff argues, "Following the analytical rubric of *USciences*, Plaintiff has plausibly alleged that sex was a motivating factor in Princeton's treatment of him, and that Princeton succumbed to outside pressure in the implementation and enforcement of the RRR." (ECF No. 38 at 16.) In response, Princeton notes "[a]lthough the *USciences* decision clarifies that landscape for Title IX claims in the Third Circuit, it does not remedy [Plaintiff]'s failure to state one." (ECF No. 40 at 3.) Because this Court previously relied on the standards announced by the Second Circuit in *Yusuf*, the Court will address the new findings of the Third Circuit in *USciences*.

The basic facts in *USciences* are similar to the facts in this action. John Doe ("Doe") was a student at the University of the Sciences ("USciences"), a private college in Philadelphia, Pennsylvania. *Univ. of Scis.*, 961 F.3d at 205. Just before Doe was ready to graduate, two female

10

students accused Doe of violating the school's sexual misconduct policy. *Id.* After an investigation, USciences concluded Doe violated its policy and expelled him. *Id.* Doe challenged USciences' decision to expel him, alleging the school's investigation and enforcement of its policy was improperly motivated by sex. *Id.*

Before assessing Doe's Title IX claim, the Third Circuit outlined the Title IX tests adopted by other circuits, including "erroneous outcome," "selective enforcement," "deliberate indifference," and "archaic assumptions." *Id.* at 209.  The Seventh Circuit observed these tests all address the same issue: whether sex was a motivating factor in a school's decision to discipline a student. *Id.* (citing *Doe v. Purdue University*, 928 F.3d 652, 667 (7th Cir. 2019)). The Third Circuit, in agreement with the Seventh Circuit, adopted the Seventh Circuit's test and held "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Id.* The Third Circuit in *USciences* ultimately found Doe had properly stated a Title IX claim. *Id.* at 209.

Doe in *USciences* alleged "USciences yielded to external pressure when implementing and enforcing" its policy since it "limited procedural protections afforded to male students like Doe in sexual misconduct cases" in response to the Department of Education's "Dear Colleague Letter." *Id.* at 209–10. The Third Circuit noted the "Dear Colleague Letter" brought a more rigorous approach to campus sexual misconduct allegations and pointed out "three of our sister circuits have found that alleged university overreaction to [Department of Education] or other public pressure is relevant to alleging a plausible Title IX discrimination claim." *Id.* at 210. However, the Third Circuit specified "allegations about pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination." *Id.*

11

Doe also alleged "sex was a motivating factor in USciences's investigation and decision to impose discipline." *Id.* The Third Circuit focused on the fact that USciences investigated Doe but not three female students alleged to have violated the policy. *Id.* at 210. Based on this selective enforcement, the court found "Doe plausibly alleges that USciences enforced the Policy against him alone because of his sex." *Id.* at 211. The court concluded the allegations of selective investigation and enforcement "combined with [Doe's] allegations related to pressure applied by the 2011 Dear Colleague Letter" amounted to a properly stated claim for sex discrimination. *Id.*

Because Plaintiff alleges Princeton's investigation was motivated by gender bias, the Court will briefly summarize the process and findings of the Panel's report to determine whether Plaintiff properly states a claim.[4] (ECF No. 32-4.) The Panel states both Plaintiff and Jane were charged with Intimate Relationship Violence. (*Id.* at 1.) The six claims against Plaintiff and three claims against Jane were thoroughly investigated—Plaintiff alleges the Panel took 108 days to carry out its investigation (ECF No. 1 ¶ 56) and the Panel detailed its findings in a single-spaced 25 page Report. (*See generally* ECF No. 32-4.) The Panel also interviewed sixteen different witnesses, in addition to Plaintiff and Jane, and "reviewed all of the evidence provided by the parties and witnesses in connection with the investigation including messages between the parties, photographs and video footage." (*Id.* at 3.)

While Plaintiff was charged with six allegations of Intimate Relationship Violence, he was only found responsible for five of those incidents. (*Id.* at 2.) And for each allegation—both Plaintiff's allegations against Jane and Jane's allegations against Plaintiff—the Panel provided the accounts of both parties, evidence relevant to the parties' accounts of the allegations, and

---

[4] Plaintiff explicitly refers to the Report several times in the Complaint (ECF No. 1 ¶¶ 56, 58, 59, 62, 93, 98, 103), therefore, the Court is properly able to and will consider the Report on this Motion to Dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

communications between the parties and witnesses surrounding the allegations. (*Id.* at 4–16.) After this exhaustive analysis, the Panel made credibility determinations. (*Id.* at 16.) The Panel found Jane credible because her accounts were detailed and, on some occasions, corroborated by photographic and video evidence. (*Id.*) Contrary to Plaintiff's allegations, the Panel did consider the possibility that Jane had a motive to lie, but ultimately decided she did not have the motive to lie because she "appeared to be conflicted about bringing forward these claims." (*Id.* at 17.) The Panel also found there were "significant concerns" with Plaintiff's credibility because of several "inconsistent accounts related to core allegations," accounts that were inconsistent with photographic evidence, and "statements that were contradicted by the accounts of other witnesses." (*Id.* at 18.) Importantly, the Panel also found the other interviewed witnesses—a mix of males and females—to be "generally credible." (*Id.* at 19.) Based on a reading of the Report, these credibility determinations were supported by sufficient evidence. The mere fact the Panel found Jane credible and Plaintiff not credible does not mean those credibility determinations were "inconsistent," as Plaintiff alleges.

Plaintiff analogizes Princeton's investigation to the investigation undertaken in *USciences*. There, the Third Circuit found gender bias when the school did not investigate three females alleged to have violated the school's policy. *USciences*, 961 F.3d at 120. Here, the Panel investigated all allegations of Intimate Relationship Violence by both Plaintiff and Jane. (*See* ECF No. 32-4). Therefore, Plaintiff's reliance on *USciences* to argue Princeton's investigation was motivated by gender bias is unpersuasive. And while Princeton did not investigate Plaintiff's claims that Jane was harassing him, Plaintiff does not allege he filed a complaint to trigger such an investigation. (ECF No. 1 ¶ 34.)

Additionally, Plaintiff's citation of *Doe v. Baum* to argue he properly alleged a sex-based investigation and enforcement is also improper. (*See* ECF No. 38 at 19.) In *Baum*, the Sixth Circuit found a student properly stated a Title IX claim when "viewing [all the] evidence in the light most favorable to Doe . . . one plausible explanation is that the Board discredited all males, including Doe, and credited all females, including Roe, because of gender bias." 903 F.3d 575, 586 (6th Cir. 2018). Such a "plausible explanation" does not exist here: the Panel discredited Plaintiff—a male—and credited Jane—a female—while also finding all other witnesses interviewed—a mix of males and females—generally credible. (ECF No. 32-4 at 19.)

Overall, Plaintiff merely details issues he encountered with the disciplinary process. *See Doe v. Trustees of Princeton Univ.*, Civ. A. No. 31907853, 2020 WL 967860, at *3 (D.N.J. Feb. 28, 2020) (finding Plaintiff could not state a Title IX claim when he "thoroughly detailed the problems he allege[d] plagued his disciplinary process" but did not make any allegations that showed his sex was the reason for those problems); *see also Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). As this Court has already stated, "Plaintiff does not allege any statements by University officials or the Panel that reflect bias by anyone involved in the investigation or adjudication of Jane's claims against Plaintiff." (ECF No. 20 at 9.) And as explained above, Plaintiff's attempts to analogize *USciences* and *Baum* are unpersuasive. Therefore, this Court holds that Plaintiff has not properly alleged "sex was a motivating factor in the investigation and decision to impose discipline." *Univ. of Scis.*, 961 F.3d at 209. Because Plaintiff has not made the kind of proper allegation required by *USciences*, the Court will not reach the issue of whether Princeton "yielded to external pressure when implementing and enforcing" the school's sexual assault policy. *Univ. of Scis.*, 961 F.3d at 210–11 (noting allegations about external pressure "cannot alone support a plausible claim of Title IX sex discrimination" but finding Plaintiff had stated a plausible

14

Title IX claim only when his "allegations about selective investigation and enforcement [were] combined with his allegations" about external pressure). As a result, Plaintiff's conclusory allegations of gender bias do not "support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Id.* at 209. Accordingly, Princeton's Motion to Dismiss Counts I and II of Plaintiff's Complaint is **GRANTED**.

### B.  Breach of Contract (Count III)

Princeton argues Plaintiff fails to state a breach of contract claim because: (1) Plaintiff does not allege the existence of an enforceable contract and (2) even if there were an enforceable contract, Plaintiff's allegations do not amount to breach by Princeton. (ECF No. 32 at 25–27.) Princeton states, "[Plaintiff] could only state a claim that the University breached its obligations to him if he were able to make particularized allegations that either Policy was unfair or that the University substantially deviated from that Policy." (*Id.* at 32.) Plaintiff argues the Complaint properly alleges a breach of contract claim under New Jersey law because he alleged Princeton's process for adjudicating and investigation Title IX was "fundamentally unfair" and Princeton failed to "adhere to its own published disciplinary procedures." (ECF No. 38 at 26–38.)

To properly plead a cause of action for a breach of contract, a plaintiff must allege "(1) the existence of a valid contract, (2) defective performance, and (3) damages." *Yapak, LLC v. Massachusetts Bay Ins. Co.*, Civ. A. No. 09-3370, 2009 WL 3366464, at *1 (D.N.J. Oct. 16, 2009) (quoting *Coyle v. Englander's*, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985)). New Jersey courts repeatedly refuse to apply strict contractual principles to conflicts between a university and its students. *See Napolitano v. Trustees of Princeton Univ.*, 453 A.2d 263, 272 (N.J. Super. Ct. App. Div. 1982); *see also Mittra v. Univ. of Med. & Dentistry of New Jersey*, 719 A.2d 693, 697 (N.J. Super. Ct. App. Div. 1998). While a student's tuition payments in exchange for education

"may in some circumstances be considered contractual consideration," New Jersey courts have "nevertheless emphasized the necessity for independence of a university in dealing with the academic failures, transgressions or problems of student." *Romeo v. Seton Hall Univ.*, 875 A.2d 1043, 1049 (N.J. Super. Ct. App. Div. 2005) (citation omitted). "Rather, when a student asserts a contract claim, the scope of judicial review of the disciplinary process is limited to 'a determination whether the procedures followed were in accordance with the institution's rules and regulations.'" *Collick v. William Paterson Univ.*, Civ. A. No. 16-471, 2016 WL 6824374, at *22 (D.N.J. Nov. 17, 2016) (quoting *Mittra*, 719 A.2d at 697). New Jersey courts have clarified this determination, especially for breach of contract claims, consists of whether "the university adhered to its own rules, the procedures followed were fundamentally fair, and the decision was based on sufficient evidence." *Sapp v. Premier Educ. Grp., LP*, Civ. A. No. 15-8591, 2016 WL 6434137, at *12 (D.N.J. Oct. 28, 2016) (citation omitted); *Hernandez v. Don Bosco Preparatory High*, 730 A.2d 365, 375–76 (N.J. Super. Ct. App. Div. 1999) (announcing the three-part test in the context of private high schools); *Moe v. Seton Hall University*, Civ. A. No. 2:09-01424, 2010 WL 1609680, at *4 (D.N.J. Apr. 20, 2010) (providing that "[w]hether the Defendants met their contractual duties will be evaluated under the three-part test announced by the *Hernandez* court"); *Collick*, 2016 WL 6824374, at *23 (determining that "if Plaintiffs allege facts that plausibly suggest that the procedures did not satisfy the three *Moe/Hernandez* factors, they will have adequately stated a claim for breach of contract").

Plaintiff alleges Princeton's RRR Policy and Title IX procedures "establish reciprocal responsibilities between Princeton and matriculated students and form a binding contract." (ECF No. 1 ¶ 186.) Plaintiff further alleges Princeton breached various sections of the RRR Policy "by withholding Plaintiff's degree based on an investigative process that . . . was arbitrary, capricious,

malicious, discriminatory, conducted in bad faith and failed to accord with the Policy." (*Id.* ¶¶ 188–97.) Based on these allegations, and following *Hernandez*'s first factor, Plaintiff argues "Princeton breached numerous distinct provisions of the RRR Policy." (ECF No. 38 at 36.) The Court will review each argument in turn.

First, Plaintiff argues[5] Princeton failed to investigate sexual misconduct in a fair equitable way by providing him with a conflicted advisor. (ECF No. 38 at 36–37.) Under Princeton's Sexual Misconduct Investigations Procedures, "those who investigate and adjudicate matters must be impartial and unbiased" and "all individuals who are involved in the Title IX process, including those who set penalties and hear appeals, are required to identify any real or perceived conflicts and recuse themselves as necessary." (ECF No. 1 ¶ 77.) Plaintiff alleges Meggs, the advisor initially assigned to Plaintiff, "was clearly conflicted" due to his status as Director of Student Life of the Residential College and membership on the Residential College Disciplinary Board and was

---

[5] Plaintiff argues Princeton breached its contractual "commitment to investigate and adjudicate sexual misconduct matters in a manner that is fair and equitable to all parties involved" and cites "Compl. ¶ 129." However, paragraph 129 of Plaintiff's Complaint alleges "Princeton's investigation and adjudication, discussed *supra*, breached several provisions of the RRR Policy in that the process was fundamentally unfair and biased, did not adhere to Princeton's own rules, and culminated in a disproportionate penalty based on flimsy and contradictory evidence." (ECF No. 1 ¶ 129.) Paragraph 77 of Plaintiff's Complaint tracks much closer to the language Plaintiff refers to in his opposition brief and improperly cites as coming from paragraph 129 of the Complaint. That paragraph reads, in part, "the University explicitly affirms its 'commitment to investigating and adjudicating sexual misconduct matters in a manner that is fair and equitable to all parties involved, including that such investigations are free of actual or reasonably perceived conflicts of interest." (*Id.* ¶ 77.) The "fair and equitable language" encompasses conflicts of interest, and the only other argument Plaintiff asserts related to conflicts of interest is that Princeton provided Plaintiff with a conflicted advisor. (ECF No. 38 at 37.) Importantly, in support of that argument, Plaintiff cites to Princeton's Sexual Misconduct Investigations, which are quoted in paragraph 77 of Plaintiff's Complaint. (*See* ECF No. 1 ¶ 77.) Because this review of Plaintiff's Complaint and opposition brief indicates Plaintiff's arguments that Princeton failed to investigate in a "fair and equitable way" and provided Plaintiff with a conflicted advisor are the same, and because Plaintiff has not provided additional clarity in his opposition brief, those arguments will be treated as the same for the purposes of this Motion to Dismiss.

"not someone who could serve as a fair and impartial advisor to a student undergoing a disciplinary investigation." (*Id.* ¶ 112.) However, as this Court has already noted, Meggs "was chosen by Plaintiff himself" and "Plaintiff does not point to any conduct by Mr. Meggs that demonstrates" any kind of conflict. (ECF No. 20 at 13.) Plaintiff merely alleges Meggs, by virtue of positions he held at Princeton, was conflicted without specifying how Meggs' alleged conflict resulted in an adjudication that was not "fair and equitable to all parties involved." (*See* ECF No. 1 ¶ 77.) Accordingly, Plaintiff did not sufficiently allege Princeton breached its own policy here.

Next, Plaintiff argues Princeton failed "to apply the preponderance of the evidence standard in breach of RRR Policy Section 1.13.12(1)." (ECF No. 38 at 36–37.) For nearly every determination the Panel made during Plaintiff's investigation, it specified its findings were made "using the preponderance of the evidence standard." (*See generally* ECF No. 32-4.) Plaintiff makes several additional, related arguments. (ECF No. 38 at 36–37.) None of them are persuasive and have been rejected in greater detail above. Plaintiff argues "the Panel disregarded exculpatory evidence for Plaintiff and incriminating evidence against Jane" but only alleges potential evidentiary issues with one incident—not the four other incidents for which Plaintiff was found responsible—between Plaintiff and Jane. (ECF No. 1 ¶ 105–06.) Additionally, Plaintiff's argument that the Panel "rendered inconsistent credibility determinations and prejudicial conclusions all in Jane's favor" ignores the fact that the Panel found the 16 witnesses interviewed, one of whom was Plaintiff's mother, generally credible. (ECF No. 32-4 at 19.)

Further, Plaintiff argues Princeton breached its policy by "denying Plaintiff's request for an extension of time to appeal despite RRR Policy Section 1.3.10(3) providing for such an extension for 'good cause.'" (ECF No. 38 at 37–38.) Plaintiff does not allege that his request was made for "good cause." (ECF No. 1 ¶ 62–63.) In fact, this Court has already noted "Plaintiff failed

to provide any reason for his request" for an additional 30-day extension to appeal. (ECF No. 20 at 14.) Princeton granted Plaintiff's extension, but not for the 30 days Plaintiff requested. (ECF No. 1 ¶ 62.) Therefore, Plaintiff did not sufficiently allege Princeton breached its policies by denying Plaintiff's request.

Lastly, Plaintiff argues Princeton violated RRR Policy Section 1.3.12(2) when it "impos[ed] the harshest penalty without a sufficient explanation and without comparison to other like complaints, which penalty was not based on the facts of the case or consistent with Princeton precedent." (ECF No. 38 at 38.) The Court has already found Plaintiff's punishments comport with University precedent, since Princeton previously expelled a student for multiple acts of violence against their dating partner—the same conduct Plaintiff was found responsible for here. (ECF No. 20 at 14.) Therefore, Princeton did not breach its policies by expelling Plaintiff. Overall, Plaintiff has not properly demonstrated or alleged that Princeton breached any of its policies.

In light of *Hernandez*'s second factor, Plaintiff argues Princeton's Title IX investigatory procedures are "fundamentally unfair" because it "(1) provides no mechanism for a party accused of sexual misconduct . . . to question witnesses at a hearing before a neutral fact finder with power to make credibility determinations, (2) is based on a 'single investigator' model . . . and (3) is biased against males." (ECF No. 38 at 26–27.)

Whether a school's disciplinary procedures are "fundamentally fair will depend on the circumstances." *Hernandez*, 730 A.2d at 376 (finding private high school's procedure fair when plaintiff was notified of the charges, had and took the opportunity to appeal, and the opportunity to defend the charges); *B.S. v. Noor-Ul-Iman Sch.*, Civ. A. No. 4905-13T2, 2016 WL 4145921, at *7 (N.J. Super. Ct. App. Div. Aug. 5, 2016) (concluding plaintiff's allegations "pertaining to bias, the manner in which H.K. was questioned, the lack of a fair opportunity to respond to the charges,

and the failure of defendant to disclose any information about its investigation, if true, suggest defendant's process was fundamentally unfair"). New Jersey courts have held institutions of higher education, like Princeton, must guarantee a "fair procedure" which includes, "'adequate notice of deficiencies,' an 'opportunity to examine evidence of those deficiencies,' and the 'right to present a case to the decision-making authority.'" *Behne v. Union Cty. Coll.*, Civ. A. No. 146929, 2018 WL 566207, at *7 (D.N.J. Jan. 26, 2018) (citing *Mittra*, 719 A.2d at 698).

The court in *USciences*, applying Pennsylvania law, found Doe was deprived of fairness because the school could not provide "the modest procedural protection of a live, meaningful, and adversarial hearing and the chance to test witnesses' credibility through some method of cross examination." *Univ. of Scis.*, 961 F.3d at 215. The only court to interpret *USciences* on this issue has clarified what protections are required. *Gendia v. Drexel Univ.*, Civ. A. No. 20-1104, 2020 WL 5258315, at *5 (E.D. Pa. Sept. 2, 2020) (finding Drexel "fulfilled the requirements for fundamental fairness" when it allowed the parties to submit cross-examination questions to the adjudicator and declining "to read *University of the Sciences* as requiring *live* cross-examination by an accused or his representative as a prerequisite to fairness").

The Panel, in a ███████████ letter, notified Plaintiff of the allegations against him. (ECF No. 1 ¶ 52.) This letter "advised Plaintiff of his rights during the Panel's adjudication process, which included the right to request a meeting with the Panel, to prove additional information to the Panel, to request that the Panel consider collecting other information, and/or identify other individuals for the Panel to interview." (*Id.* ¶ 53.) Plaintiff was also provided with the Panel's Report on ███████████ which detailed the evidence considered in deciding to expel Plaintiff. (*Id.* ¶ 58.) Plaintiff took advantage of his opportunity to present a case to the Panel by filing his own complaint against Jane, which was similarly investigated and considered by the

Panel. (ECF No. 32-4.) Additionally, Princeton advised Plaintiff of his right to cross-examine any party or witness by submitting proposed questions to the Panel. (*Id.* ¶ 53.) Plaintiff alleges this right "was buried in a footnote" but does not allege that he was unaware of this right. (*Id.*) As this Court has specified, "a cross-examination at a live hearing is not required to satisfy due process in a Title IX context involving a *private* university such as Princeton." (ECF No. 20 at 10.) Neither courts in New Jersey, nor the Third Circuit after *USciences*, have required live cross-examination in Title IX actions. *Gendia*, 2020 WL 5258315, at *5. Therefore, Princeton's procedures appear to meet the procedural requirements for fundamental fairness recognized by New Jersey courts. *See Behne*, 2018 WL 566207, at *7.

Plaintiff's argument that Princeton's procedures were fundamentally unfair because they employed a "single-investigator" model is premised on the Department of Education's Title IX newly adopted rules. (ECF No. 38 at 23–24.) While the Department of Education's new rules do prohibit a "single-investigator" model, *see* 34 C.F.R. § 106.45(b)(7)(i), the rules did not become effective until August 14, 2020, and the Department itself noted it "will not enforce these regulations retroactively." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). Plaintiff's proceeding was concluded on ███████████ when Princeton's appellate panel denied Plaintiff's appeal. (ECF No. 1 ¶ 63.) The Department of Education's new rules were not effective at any time during Plaintiff's proceeding so they have no bearing on the proceeding, a fact Plaintiff recognizes. (*See* ECF No. 38 at 24.) Therefore, Plaintiff has not properly alleged Princeton's procedures were fundamentally unfair. *Doe v. Princeton Univ.*, Civ. A. No. 1816539, 2019 WL 161513, at *8 (D.N.J. Jan. 9, 2019) (dismissing plaintiff's allegation because "Plaintiff has alleged no facts establishing that the RRR Policy in its present

form violates current binding DOE regulations or other binding precedent"). Because Plaintiff has not properly alleged Princeton breached its own policy, followed procedures that were fundamentally unfair, and did not make a decision based on sufficient evidence,[6] Plaintiff has not properly alleged a breach of contract claim against Princeton. *Sapp*, 2016 WL 6434137, at *12. Accordingly, Princeton's Motion to Dismiss Count III is **GRANTED**.

### C.  Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV)

Princeton contends Plaintiff "cannot assert a claim for the breach of the covenant of good faith and fair dealing" because "the Policy does not constitute a contract" in the first place. (ECF No. 32 at 33.) And even if the Policy were considered a contract, Princeton argues Plaintiff's claims fail because "his claims about breach of the covenant of good faith and fair dealing are based on the same conduct as his breach of contract claims." (*Id.*) Plaintiff argues "[f]or the same reasons that render Princeton's Title IX procedure 'fundamentally unfair' . . . the allegations of the Complaint are sufficient to state a claim for breach of the implied covenant." (ECF No. 38 at 39.)

In New Jersey, every contract "contains an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 778 A.2d 580, 584 (N.J. Super. Ct. App. Div. 2001), *aff'd as modified*, 798 A.2d 1251 (N.J. 2002). Although no universally-accepted test exists for establishing a breach of the duty of good faith and fair dealing, "two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC*, 2009 WL 3366464, at *2; *Edelson v. Cheung*, Civ. A. No.  13-5870, 2019 WL 2099841, at *9 (D.N.J. May 14, 2019).

---

[6] Plaintiff provides no argument or allegation as to *Hernandez*'s third factor. (*See* ECF No. 1; ECF No. 38.)

Plaintiff alleges Princeton "violated the covenant of good faith and fair dealing" but points towards the same conduct underlying its breach of contract allegations. (*Compare* ECF No. 1 ¶¶ 64-133, 185–99 *with* ECF No. 1 ¶ 204.) "No claim for a breach of the covenant of good faith and fair dealing may lie, however, unless the underlying conduct is distinct from that alleged in a corresponding breach of contract claim." *MZL Capital Holdings, Inc v. TD Bank, N.A.*, 734 F. App'x 101, 106 (3d Cir. 2018) (finding plaintiff's claim for breach of the implied covenant of good faith and fair dealing identical to breach of contract claim and affirming "the dismissal of plaintiff's breach of the implied covenant of good faith and fair dealing claim as duplicative of the breach of contract claim"); *Hahn v. OnBoard LLC*, No. 09–3639, 2009 WL 4508580, at *6 (D.N.J. Nov. 16, 2009) ("In New Jersey, a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract." (citing *Wade v. Kessler Inst.*, 798 A. 2d 1251, 1259–60 (N.J. 2002)); *see also TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, Civ. A. No. 12-3355, 2013 WL 6048720, at *3 (D.N.J. Nov. 14, 2013) (ruling on a 12(b)(6) motion to dismiss). However, breach of the implied covenant of good faith and fair dealing may be an independent cause of action under three limited circumstances:

> (1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance.

*Kumon N. Am., Inc. v. Timban*, No. 13–4809, 2014 WL 2812122, at *7–8 (D.N.J. June 23, 2014) (quoting *Barrows v. Chase Manhattan Mortg. Corp.*, 456 F. Supp. 2d 347, 365 (D.N.J. 2006)).

23

But Princeton's actions do not give rise to an independent cause of action because none of the three limited circumstances articulated by *Kumon* and *Hills* are satisfied. Because the conduct underlying Plaintiff's breach of the implied covenant of good faith and fair dealing claim is identical to the conduct underlying his breach of contract claim[7] and because Plaintiff has not alleged conduct giving rise to an independent cause of action, Plaintiff has not adequately pled a breach of the implied covenant of good faith and fair dealing. Accordingly, Princeton's Motion to Dismiss Count IV is **GRANTED.**

### D. Common Law Due Process: Fundamental Fairness in School Disciplinary Proceedings (Count V)

Here, Princeton argues this claim should be dismissed because "New Jersey courts have not recognized this claim." (ECF No. 32 at 34.) If the Court were to entertain such a claim, Princeton notes, "it should still be dismissed because Princeton adhered to its Policy" and "[a] plaintiff cannot state a fundamental fairness claim where the private university followed it [sic] internal rules." (*Id.* at 35.) Further, Princeton notes Plaintiff "[i]n his Opposition, makes no effort to defend" this claim. (ECF No. 40 at 15.) Plaintiff does not appear to oppose dismissal, since he did not provide the Court with any argument in favor of this claim in his opposition brief. (*See generally* ECF No. 38.) Indeed, Plaintiff's only arguments regarding "fundamental fairness" in his Opposition relate to his breach of contract claim, not his common law fundamental fairness claim.

---

[7] Princeton's main argument on this Count is that Plaintiff alleges the same conduct underlying his breach of contract and breach of implied covenant of good faith claims. (*See* ECF No. 32 at 33.) This "same conduct" argument has not been evaluated by courts in this district considering similar sets of claims against private universities. *See e.g.*, *Doe v. Princeton University, et al.*, Civ. A. No. 31907853, 2020 WL 7383192, at *6 (D.N.J. Dec. 16, 2020); *Moe*, 2010 WL 1609680, at *5; *see Doe*, 2019 WL 161513, at *9. The courts in those cases neither reached nor addressed the issue of whether the individual plaintiffs alleged the same underlying conduct for the breach of contract and breach of covenant of good faith and fair dealing claims. *Doe*, 2020 WL 7383912, at *5–6; *Moe*, 2010 WL 1609680, at *5–6; *Doe*, 2019 WL 161513, at *8–9.

(*Id.* at 26–38.) Consequently, Plaintiff's claim can be dismissed on this basis alone. *See Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1992) (explaining that if a party represented by counsel fails to oppose a motion to dismiss, the district court may treat the motion as unopposed and subject to dismissal without a merits analysis); *Jones v. Unemployment Comp. Bd. of Review*, 381 Fed. App'x. 187, 189 (3d Cir. 2010) (explaining same); *see also Lightfoot v. Healthcare Revenue Recovery Grp., LLC*, Civ. A. No. 14-6791, 2015 WL 1103441, at *4 (D.N.J. Mar, 11, 2015) (holding "[d]efendant's Motion to Dismiss Count Four is unopposed and will be granted"). Accordingly, because Plaintiff does not provide an opposition here, Princeton's Motion to Dismiss Count V, is **GRANTED.**

## IV. CONCLUSION

For the reasons set forth above, Princeton's Motion to Dismiss is **GRANTED**. An appropriate order follows.

Date: December 31, 2020

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**