**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>  v.<br><br>PRINCETON UNIVERSITY,<br><br>    Defendant. | Civil Action No. 20-4352 (MAS) (RLS)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

  This matter comes before the Court on Plaintiff John Doe's[1] ("Plaintiff") appeal of the Hon. Rukhsanah L. Singh, U.S.M.J.'s October 11, 2023 Order (the "Discovery Order") (ECF No. 128) denying Plaintiff's Motion to Compel and for a Protective Order against Defendant Princeton University ("Princeton"). (ECF No. 130.)[2] Princeton filed a brief in opposition (ECF No. 137), and Plaintiff replied (ECF No. 141).[3] The Court has carefully considered the parties' briefs and decides

---

[1] On July 13, 2020, U.S. Magistrate Judge Tonianne J. Bongiovanni granted Plaintiff's motion to proceed under a pseudonym. (ECF No. 49.)

[2] After Judge Singh issued the Discovery Order, Plaintiff filed a request to stay pending resolution of Plaintiff's appeal. (ECF No. 136.) Plaintiff's request to stay was granted on November 6, 2023. (*See* Letter Order, ECF No. 138.)

[3] Also pending before the Court is Princeton's Motion for Leave to file a Sur-Reply. (ECF No. 142.) Princeton's Motion for Leave to File a Sur-Reply provides additional reasons why Plaintiff's request for a protective order should be denied. (*Id.*) For the reasons discussed herein, the Court affirms Judge Singh's denial of Plaintiff's request for a protective order. As such, Defendant's Motion to File a Sur-Reply is denied as moot.

the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court affirms in part and remands in part the Discovery Order.

I.      **BACKGROUND**

Given that the underlying facts and procedural history of this case are well known to the parties, the Court recites only the facts necessary to resolve the instant appeal.

In April 2020, Plaintiff initiated this action against Princeton for its alleged gender-bias during an investigation of "intimate partner violence" against Plaintiff, a male student at Princeton, and Jane Roe ("Roe"), a female student. (Compl. ¶ 1, ECF No. *1[4].) Plaintiff matriculated at Princeton in 2016. (*Id.* ¶ 16.) Although Plaintiff was initially scheduled to graduate in 2020, Princeton's investigation resulted in Plaintiff's expulsion months before receiving his degree. (*Id.* ¶ 15.) Shortly thereafter, Plaintiff filed a Complaint against Princeton for Violations of Title IX of the Education Amendments of 1972 (Counts One and Two); Breach of Contract (Count Three); Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Four); and Violation of Common Law Due Process (Count Five). (*Id.* at 46-56.)

The parties have engaged in discovery since at or around July 2022.[5] (*See* Joint Discovery Plan, ECF No. 90.) Discovery in this matter has been intimately handled by Judge Singh. (*See, e.g.*, Pretrial Scheduling Order, ECF No. 93; Am. Scheduling Order, ECF No. 120.) Pursuant to a Scheduling Order entered on June 20, 2023, the parties were to complete fact discovery by August 31, 2023. (Am. Scheduling Order, ECF No. 120.)

---

[4] ECF Nos. preceded by an asterisk represent docket entries that are sealed in whole or in part.

[5] On December 31, 2020, the Hon. Brian R. Martinotti, U.S.D.J., entered an Order granting Princeton's motion to dismiss and dismissing Plaintiff's Complaint with prejudice. (ECF Nos. 55, 56.) Plaintiff appealed (ECF No. 61), and the Third Circuit issued a mandate on March 23, 2022 vacating the order of dismissal and remanding the case to this Court for further proceedings. (ECF No. 63.) The next day, this matter was reopened and reassigned to the undersigned. (ECF No. 64.)

### A. The August 15, 2023 Correspondence

On August 15, 2023, the parties e-filed joint correspondence, addressed to Judge Singh, that largely summarized the nature of the underlying discovery dispute. (Correspondence, ECF No. 121.) As it pertains to the instant appeal, the parties raised disagreements concerning Princeton's objections to providing complete responses to Plaintiff's outstanding Requests for Production of Documents[6] and Interrogatories. (*See generally id.*) In addition, the parties disputed Plaintiff's request for a protective order against Princeton, which would prohibit Princeton from accessing some of Plaintiff's medical records. (*Id.*)

#### i. RFP 51 and the Title IX Chart

With respect to Princeton's alleged inadequate responses to fact discovery requests, Plaintiff challenged Princeton's responses to Request for Production No. 51 ("RFP 51"), which requested "[a]ll documents and communications referenced or relied upon in [Princeton's] response to [Plaintiff's] Interrogatories." (*Id.* at 2.) Relevant here, in response to RFP 51, Princeton provided Plaintiff with a chart (the "Title IX Chart") that detailed Title IX investigations and adjudications conducted by Princeton between the Fall of 2016 (the time when Plaintiff matriculated at Princeton) through the Spring of 2020 (when Plaintiff was expelled from the university). (*Id.*) During a meet and confer, it appears that Princeton agreed to provide Plaintiff with the Title IX Chart in a summary form. (*Id.*) The information sought in the Title IX Chart would support Plaintiff's theories that "the outcome of [Title IX] investigations . . . by [Princeton] routinely favored female complainants over male respondents." (*See id.* at 4; Discovery Hearing Trans. 20:6-9.)

---

[6] While the parties initially disputed Plaintiff's Requests for Production Nos. 29, 31, 32, and 33 (*see* Correspondence), Plaintiff's counsel indicated that these requests will be withdrawn. (Discovery Hearing Trans. at 4:24 to -5:3, ECF No. 129.)

3

As early as October 2022, Plaintiff argued that Princeton's responses to RFP 51, and the information contained in the Title IX Chart, were deficient. (Def.'s Opp'n Br., Ex. 2.) Plaintiff asserted that "other than a limited number of summaries, Princeton still has not provided [Plaintiff] with the documents and communications related to the case file regarding the Title IX investigation of [Plaintiff's] and Roe's claims." (*See id.*) According to Plaintiff, Princeton had not only an obligation to provide a summary of its Title IX investigations, but was also required to produce all underlying "documents and communications relied upon in creating the Title IX [C]hart." (*See* Correspondence 2; Pl.'s Moving Br. 3, ECF No. 130.)

Not surprisingly, Princeton took the opposite stance. Princeton asserted that it only agreed to provide the Title IX investigations in "summary form" but did not agree (and was not otherwise required) to provide further detail of the documents pertaining to such investigations. (Correspondence 4.) Further, Princeton maintained that in its current form, the Title IX Chart was sufficient as it detailed more than 50 Title IX investigations conducted by Princeton including "the members of the panel that investigated the claims, the specific claims and counterclaims, the gender of the claimants/victims and the respondents, the outcome of the investigations, any conduct for which respondents were held responsible, any discipline imposed, and the outcome of any appeals." (*Id.*) Princeton also argued that producing said discovery would be unduly burdensome because Princeton had already produced 2,200 documents at a significant expense. (*Id.* at 4. n.2.) According to Princeton, another document production in responding to RFP 51 would cost "an additional $25,000 to redact information protected by the Family Educational Rights and Privacy Act ("FERPA")[.]" (*Id.*; *see also* Def.'s Opp'n Br. 3.)

          ii.    *Request for a Protective Order*

Separately, the parties' Correspondence addressed a dispute over Plaintiff's request for a protective order that would prohibit Princeton from accessing medical records that were not related

to his mental health. (Correspondence 2-3.) During discovery, Princeton issued Interrogatories and a Request for Production of Documents[7] to Plaintiff seeking, in relevant part, "all medical or mental health care, services, or treatment by [Plaintiff] from September 1, 2016" which would "include[] any physician, therapist, nurse, or other practitioners that provided such care to Plaintiff[.]" (*Id.* at 4.) Plaintiff argued that, while he has seen general practitioners for annual physicals since September 2016, these visits "have no bearing on the claims and defenses in this lawsuit" because he is only seeking damages for his emotional and mental health in this case. (*Id.* at 3.)

Princeton countered that Plaintiff's position that Princeton should consider only a mental health practitioner's medical records was "false" as it is "common practice for any healthcare provider in a routine checkup to ask questions directed to assessing whether a teen or young adult patient is depressed." (*Id.* at 6.) Princeton thus argued that it was entitled to production of all of Plaintiff's medical records, including annual physicals, since September 1, 2016. (*Id.*) Princeton cross-moved for a court order that would "compel [Plaintiff] to sign HIPAA consent forms allowing for disclosure of his medical records by any healthcare practitioner or practice he has visited since his matriculation at Princeton[.]" (*Id.*)

### B.    Discovery Hearing and Order

Judge Singh held a hearing on October 11, 2023[8] to address the various discovery issues raised in the Correspondence. (*See* Discovery Hearing Trans.) As to Plaintiff's request to compel production of RFP 51, Judge Singh opened the floor to Plaintiff's counsel, who indicated that:

---

[7] These requests involved **Princeton's Second Set of Interrogatories No. 18 and Requests for Production Nos. 26 and 27.** (Correspondence 5.)

[8] Judge Singh entered a Discovery Order on the day of the Discovery Hearing, which detailed the conclusions reached on the record. (*See* Order, ECF No. 128.)

> While the [Title IX Chart] does provide useful information for [Plaintiff's] claims in this case, it also omits information that is necessary for his claims, namely information pertaining to how the adjudicators and the Title IX adjudications listed in the charts investigated claims and came to the conclusions that they came to.

(*Id.* at 7:25 to -8:5.) Plaintiff's counsel reiterated that the information sought within the Title IX chart was "necessary for [Plaintiff's claims] in this case" because he was not only seeking release of information related to improprieties and the unfairness of his individual investigation, but he was also bringing a claim of relief against Princeton generally for "institutionalized bias against males from Princeton." (*Id.* at 8:6-11.) Plaintiff inquired how he "could prove a claim of institutionalized bias if he does not have materials from other Title IX investigations[.]" (*Id.* at 8:12-14.) With respect to the countervailing privacy interests of non-parties in this lawsuit, Plaintiff's counsel raised that Princeton could produce "FERPA redactions" to the materials underlying the Title IX Chart and that he was "unsure why an [A]ttorney's [E]yes [O]nly designation would not have sufficed[.]" (*Id.* at 9:1-6.)

After hearing both parties' arguments, which largely reiterated the arguments put forth in the Correspondence, Judge Singh issued a bench decision. (*Id.* at 32-35.) First, Judge Singh denied Plaintiff's request to compel Princeton to produce documents in response to RFP 51 and the documents underlying the Title IX Chart. (*Id.* at 33:1-4.) Judge Singh expressed concerns of "balancing . . . the privacy rights of nonparties to this lawsuit [i.e. other Princeton students] that may be contained within the underlying documents" and the anticipated number of FERPA redactions that would be needed to protect such information. (*Id.* at 33:20-25.) Considering the interests of nonparties, their privacy rights, and corresponding rights under FERPA, Judge Singh found that the Title IX Chart, as produced, allowed Plaintiff to argue "any indicia of institutional bias." (*Id.* at 35:1-6.)

6

Judge Singh also denied Plaintiff's request for a protective order—finding that "Plaintiff has placed into issue in this case his mental state in regards to seeking damages for anxiety, depression, psychological, and other injuries in the complaint." (*Id.* at 36:21-24.) In weighing Plaintiff's privacy concerns against Princeton's need for facts and evidence to mount a complete defense, Judge Singh found that production of the medical records weighed in favor of Princeton. (*Id.* at 36:4-8.) The Court granted Princeton's cross-application for Plaintiff to produce HIPAA consent forms for disclosure of his medical records for any healthcare providers that Plaintiff visited since the Fall of 2016. (*Id.* at 36:14-23; *see also* Discovery Order 2.)

Plaintiff filed an appeal of the Discovery Order on October 26, 2023. (*See* Pl.'s Moving Br.) Princeton opposed (Def.'s Opp'n Br.) and Plaintiff replied (Pl.'s Reply, ECF No. 141).

## II.   LEGAL STANDARD

A magistrate judge's resolution of a matter may only be set aside if the "order is clearly erroneous or contrary to law." *Marks v. Struble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004); Fed. R. Civ. P. 72(a); Loc. Civ. R. 72.1(c)(1). "A finding is clearly erroneous only 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Cooper Hosp./Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 127 (D.N.J. 1998) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). For a magistrate judge's decision to be contrary to law, the Court must find the magistrate judge misapplied or misinterpreted the applicable law. *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 162, 164 (D.N.J. 1998).

The burden of demonstrating that the magistrate judge's order is clearly erroneous or contrary to law lies with the party filing the appeal. *Marks*, 347 F. Supp. 2d at 149. The Court may not consider evidence that was not presented to the magistrate judge. *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 91-92 (3d Cir. 1992). Further, when, "as here, the magistrate [judge] has ruled on a

non[-]dispositive matter such as a discovery motion, his [or her] ruling is entitled to great deference and is reversible only for abuse of discretion." *Frank v. County of Hudson*, 924 F. Supp. 620, 623 (D.N.J. 1996) (citations omitted); *see also Marks*, 347 F. Supp. 2d at 149 (stating a magistrate judge is "accorded wide discretion in addressing non-dispositive motions"). Abuse of discretion is found "when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man [or woman] would take the view adopted by the [deciding] court." *Fagan v. Fischer*, No. 14-7013, 2018 WL 2859541, at *3 (D.N.J. June 11, 2018) (quoting *Lindy Bros. Builders v. Am. Radiator & Standard Corp.*, 540 F.2d 102, 115 (3d Cir. 1976)).

**III.   DISCUSSION**

    **A.   RFP 51 and the Title IX Chart**[9]

Plaintiff contends that Judge Singh's denial of the request for production of documents underlying Princeton's Title IX Chart must be set aside. For the reasons articulated below, this Court will remand the case to the Magistrate Judge to determine whether Princeton can produce the underlying documents using safeguards to ensure the privacy interests of its students are fully protected—while counterbalancing the need for Plaintiff's access to such information to support his claims in this proceeding.

---

[9] At the outset, Princeton contends that Plaintiff's appeal should be denied as untimely under Local Civil Rule 72.1(c)(1)(A). Princeton asserts that Plaintiff untimely filed his appeal 15 days—instead of 14 days—after Judge Singh issued the Discovery Order. (Pl.'s Moving Br. 6.) Plaintiff responds that his appeal was timely because it was filed fourteen days after he was electronically served with a copy of the Discovery Order. See *In re Lipitor Antitrust Litig.*, No. 12-2389, 2022 WL 4586419, at *2 (D.N.J. Sept. 29, 2022) (citing Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A) (finding that appeals "filed beyond fourteen (14) days after the electronic service of the [Magistrate Judge's] Order[] . . . can be denied as untimely.")) (emphasis added). In any case, the Court, in its discretion, will not deny Plaintiff's appeal on this basis. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) (noting the Third Circuit's preference for cases be decided on the merits, rather than by procedural technicalities).

Discovery in federal civil actions is governed by the Federal Rules of Civil Procedure. "The standard for discovery under the [Federal Rules] is very broad." *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999). Federal Rule of Civil Procedure[10] 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action."

Inasmuch as discovery is generally broad and liberally construed, courts must tread carefully where a party seeks the production of student records. Both New Jersey and federal law obligate school districts to safeguard the privacy of their students' records. *See Mason v. Roman Catholic Archdiocese of Trenton*, No. 18-10733, 2019 WL 5906837, at *9 (D.N.J. Nov. 8, 2019). Under New Jersey law, "generally, '[p]ersons outside the school' are authorized to view confidential student records [only] if the students' parents consent . . . or a court orders it." *Id.* (citing N.J.A.C. § 6A:32-7.5(e)(14), (15)). "FERPA likewise allows for the disclosure of such records with parental consent or as a result of a court order." *Id.* (citing 20 U.S.C. § 1232g(b)).

The Court also agrees with Judge Singh—and the parties do not dispute—that "disciplinary records of non-party student comparators [are protected] under FERPA." *Haque v. Swarthmore Coll.*, No. 15-1355, 2017 WL 3218073, at *6 (E.D. Pa. July 27, 2017); *see also United States v. Miami Univ.*, 294 F.3d 797, 812 (6th Cir. 2002) (noting that "a detailed study of the statute and its evolution by amendment reveals that Congress intends to include student disciplinary records within the meaning of 'education records' as defined by the FERPA.").

To secure disciplinary records protected under FERPA, a party "requesting the documents must demonstrate that his or her need for disclosure outweighs the privacy interest in maintaining the records' confidentiality." *Id.* A plaintiff will generally satisfy this burden where it is shown

---

[10] Unless otherwise noted, all references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

9

that the requested student records are needed to support the claims underlying the litigation. *See, e.g.*, *Hashem v. Hunterdon County*, No. 15-8585, 2018 WL 2337145, at *11-12 (D.N.J. May 23, 2018) (granting production of student records where the names of students and parents "were essential" and without the same, the plaintiff could not "evaluate the evidence in the context of the claims and defenses in [the] lawsuit."); *Davids v. Cedar Falls Cmty. Sch.*, No. 96-2071, 1998 WL 34112767, at *3 (N.D. Iowa Oct. 28, 1998) (finding that a plaintiff's need for disclosure of records to prove allegation that school engaged in disparate discipline of non-minority and minority students outweighed students' privacy interests); *Ragusa v. Malverne Union Free Sch. Dist.*, 549 F. Supp. 2d 288, 293-94 (E.D.N.Y. 2008) (finding a teacher's need for disclosure of records in a discrimination action outweighed the student's privacy interest); *Mason*, 2019 WL 5906837, at *11-12 (noting "once personally identifying student information is redacted" in the production of student records, this "outweighs the [school district's] interest in maintaining their privacy" insofar that the student records had direct bearing on the plaintiff's claims; specifically, whether the school district was "aware of, race-based student harassment and whether [the school district] took appropriate action to remedy those circumstances.").

Here, Plaintiff argued during the Discovery Hearing that there was a compelling need for the documents underlying Princeton's Title IX Chart. (Discovery Hearing Trans. 7-8.) While Plaintiff acknowledges that the Title IX Chart contains *some* useful information to support his claims, Plaintiff maintains that the Title IX Chart, in its current summary form, does not provide key details of Princeton's investigations. (*Id.* at 7:23 to -8:5.) In particular, Plaintiff represents that the Title IX Chart does not provide him with the necessary methodologies and procedures employed by Princeton in its Title IX investigations that led to its final determinations and adjudications. (Discovery Hearing Trans. 7:23 to -8:5.) Plaintiff contends that the materials underlying other Title IX investigations are essential to his case because Plaintiff does not only

10

seek resolution for wrongdoings and unfair treatment in Princeton's investigations involving him and Roe, but he is also seeking more broad redress against Princeton for alleged systematic and institutional biases against males. (*Id.* at 8:6-14; *see also* Compl. at 40-42 (detailing Plaintiff's allegations of how Princeton's discriminatory actions appear to be motivated by institutionalized anti-male bias).)

This theory of liability is not devoid of merit. Indeed, the Third Circuit has already offered guidance in this case that—at the motion to dismiss stage—Plaintiff raised allegations showing that Princeton's alleged policy of favoring female accusers at the expense of finding male respondents guilty was relevant to Plaintiff's sex discrimination claim. *See, e.g.*, *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022) (finding that whether Princeton applied "a more rigorous approach to campus sexual misconduct allegations . . . factors into the total mix of information supporting a plausible Title IX discrimination claim") (citations omitted). Hence, the appropriate legal standard to be considered is whether "the party requesting the documents [] demonstrate[s] that his or her need for disclosure outweighs the privacy interest in maintaining the records' confidentiality." *Mason*, 2019 WL 5906837, at *10 (citing *Doe v. Galster*, No. 09-1089, 2011 WL 2784159, at *10 (E.D. Wis. July 14, 2011) (describing the standard as whether the interest in disclosure outweighs the interest in maintaining the privilege)).

Princeton objects to RFP 51 on the basis that producing the materials underlying the Title IX Chart would be disproportionate and unduly burdensome. (Def.'s Opp'n Br. 8-9; *see also* Discovery Hearing Trans. 21:19 to -22:5.) Plaintiff, however, represents (and Princeton does not dispute) that his request for production of documents only involves the production of "140 pages[11]

---

[11] Princeton clarifies that the 140 documents are comprised of 1,350 pages. (Discovery Hearing Trans. 21:22-23.)

11

that have already been segregated by Princeton." (Pl.'s Moving Br. 2.) Plaintiff reiterated at the Discovery Hearing that he is not seeking "every single document from every single Title IX adjudication that Princeton has ever conducted"; rather, Plaintiff seeks a limited number of documents that are already "segregated and identified." (Discovery Hearing Trans. 8:15-21.) Princeton argues, nevertheless, that these requests are unduly burdensome because it will incur approximately $25,000 in making further redactions to the 140 documents requested by Plaintiff. (*Id.* at 22:2-6.) For one, this Court questions how redactions on a production of approximately 140 documents that are already identified and separated would cost upwards of $25,000. And, in any case, Princeton's representations that a $25,000 fee would be "unduly burdensome" are at best questionable, and at worst, strain credulity. (*See id.* at 9:7-13.)

That said, this Court certainly recognizes Princeton's concerns and the importance of keeping student records confidential and protecting students' privacy interests. The Court wholly agrees with Judge Singh that it must factor in the privacy concerns of students who are not parties to this action. In the interest of protecting students' privacy interests and avoiding unnecessary disclosure, it appears that Plaintiff's Counsel has proposed an "Attorney's Eyes Only" designation in order to alleviate Princeton's primary concerns. (*See* Pl.'s Moving Br. 8-9 (noting that an appropriate "alternate path" for production of the documents is to designate them on an attorney's eyes only basis).); *see also Hashem*, 2018 WL 2337145, at *12 (finding in a case involving production of student records protected by FERPA, the privacy concerns of students can be alleviated by applying a "Attorney's Eye's Only" designation to the produced materials). An Attorney's Eyes Only designation may protect the privacy interests of any student identified in the produced documents, provide Plaintiff's counsel with the information needed to prove Plaintiff's claims, and remove any compliance burdens on Princeton's part. (*Id.*)

It appears, however, that Judge Singh denied Plaintiff access to the requested documents underlying the Title IX Chart without considering whether an Attorney's Eyes Only designation could adequately protect the non-parties' privacy interests at stake. Accordingly, this Court will remand the proceedings to Judge Singh to determine whether an Attorney's Eyes Only designation can adequately protect the privacy interests of non-parties that may be jeopardized in Princeton's production of the documents in question.[12]

### B.  Plaintiff's Request for a Protective Order

Next, Plaintiff appeals Judge Singh's denial of his request for a protective order and grant of Princeton's cross-motion to compel the release of his medical records since the Fall of 2016. (Pl.'s Moving Br. 9-10; *see also* Discovery Order 2.) Plaintiff does not contest the production of his mental health records. (Pl.'s Moving Br. 8.) Rather, Plaintiff argues that there is good cause for a protective order because the damages in this case are limited only to his emotional distress claims; thus, any of his primary health records are "irrelevant" and need not be produced. (*Id.* at 10-11.) The Court disagrees.

Rule 26(b)(1) provides that "[p]arties may obtain discovery of any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). Counterbalancing the broad scope of Rule 26(b), Rule 26(c) provides that upon "motion by a party or by the person

---

[12] Plaintiff contends that Princeton, as the responding party who proposed the redactions, must pay for the associated costs. (Discovery Hearing Trans. 9:12-17.) This Court agrees. There is a general presumption that a party must pay its own costs to respond to discovery. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978); *Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth.*, No. 12-3427, 2013 WL 541972, at *9 (D.N.J. Feb. 11, 2013). The Court may nevertheless allocate costs in appropriate circumstances. *Id.* Princeton contends that the expense of conducting FERPA redactions on documents already produced in this litigation justifies transferring the cost of redactions on non-party student records to Plaintiff. (Def.'s Opp'n Br. 10 n.5.) As stated, *supra*, this Court does not find that it will be unduly burdensome for Princeton to produce the materials sought by RFP 51. To the extent that Judge Singh orders production of the documents under an Attorney's Eyes Only designation, Princeton, as the responding party, must bear the costs of its production.

13

from who discovery is sought . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). To prevail, the movant must demonstrate good cause for a protective order. *Id.* "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (quoting *Publicker Indus. Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984)). In determining whether there is good cause, courts will balance the interests of the parties and the public. *Pansy*, 23 F.3d at 787.

Here, Plaintiff concedes that his mental health records are discoverable and relevant to his alleged emotional distress damages. (Pl.'s Moving Br. 8.) With respect to medical records concerning his physical health, the Court finds that Plaintiff waived these privacy privileges when he placed his medical conditions at issue in this litigation. *See Jackson v. Chubb Corp.*, 193 F.R.D. 216, 225 (D.N.J. 2000) ("[T]his [c]ourt is convinced that the broad view of waiver best serves the respective interests of the parties to a lawsuit . . . a defendant against whom a claim of emotional distress has been asserted is helpless in mounting an adequate defense without all the relevant evidentiary materials"). As determined by Judge Singh, Plaintiff has placed his mental state directly at issue in this case seeking damages related to anxiety, depression, psychological, and other injuries.[13] (Discovery Hearing Trans. 35:21-24.) The Court agrees that Plaintiff's physical health records may lead to probative evidence of his emotional damages claims since it is not atypical for a primary care provider to ask whether a patient has symptoms of depression or other mental health issues. (*Id.* at 35:14-17); *see also Iniguez v. Wayfair LLC*, No. 21-880, 2022 WL

---

[13] Plaintiff's initial disclosures, for example, indicate that he is seeking $1 million in damages for "impairment of quality of life, humiliation, disappointment, frustration, fear, anxiety, depression, psychological, and other injuries." (Correspondence 5.)

2168152, at *6 (C.D. Cal. Jan. 11, 2022) ("[W]hile plaintiff wishes to separate her mental health records from her physical health records and permit only the former to be produced, defendant reasonably seeks both given that plaintiff has placed both her mental and physical health at issue in this case, and *the two may affect one another*.") (emphasis added). As such, the Court finds that Princeton's discovery requests and medical releases are reasonably calculated to lead to the discovery of admissible and relevant evidence.

Disclosure of Plaintiff's physical and mental health records will also facilitate expert discovery. (*See* Discovery Hearing Trans. 36:4-8.) Indeed, Princeton's experts are entitled to Plaintiff's mental and physical medical records, which may help them assess Plaintiff's mental state before and after the Title IX investigation and subsequent expulsion. (*See* Correspondence 6.)[14] The Court therefore affirms the denial of Plaintiff's request for a protective order and grant of Princeton's cross-application to compel this discovery. (Discovery Order 2.)

## IV. CONCLUSION

For the reasons stated above, the Court affirms in part and remands in part Judge Singh's Discovery Order. (ECF No. 128.) The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[14] This is not to say that Plaintiff does not have legitimate privacy concerns as to the types of records and content of medical records properly discoverable. But Princeton's proposal effectively mitigates such concerns. Princeton is only seeking Plaintiff's medical records from September 1, 2016, the time at which he matriculated at Princeton, to the present. (Correspondence 4.) This allows for a thorough understanding of the cause and extent of Plaintiff's claims for emotional distress, while considering Plaintiff's countervailing privacy interests. (*Id.*)

15