**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JOHN DOE,

Plaintiff,

v.

PRINCETON UNIVERSITY,

Defendant.

Civil Action No. 20-4352 (MAS) (RLS)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Princeton University's ("Princeton") Motion for Summary Judgment. (ECF No. 211.) Plaintiff John Doe ("Doe") opposed Princeton's Motion (ECF No. *215[1]), and Princeton replied (ECF No. *216). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons below, Princeton's Motion is granted in part and denied in part.

## I. BACKGROUND

The Court recites only the facts necessary to contextualize the present motion. The facts are derived from Princeton's Statement of Material Facts ("Def.'s SOMF," ECF No. *212-1), Doe's Response to Princeton's Statement of Material Facts ("Pl.'s RSOMF," ECF No. *215-1), Doe's Supplemental Statement of Disputed Material Facts ("Pl.'s SSODMF," ECF No. *215-2),

[1] ECF Numbers preceded by an asterisk indicate sealed filings.

and Princeton's Response to Doe's Supplemental Statement of Disputed Material Facts ("Def.'s RSSODMF," ECF No. *216-1). Disputed facts will be indicated as such.[2]

### A. Factual Background

In the fall of 2019 and early 2020, Princeton conducted a Title IX investigation into claims of intimate relationship violence between Doe and Jane Roe ("Jane")—two undergraduate students who dated from the fall of 2016 through June 2019. (Def.'s SOMF ¶ 9; Pl.'s RSOMF ¶ 9.) Jane alleged that, during their relationship, Doe had: (1) choked Jane; (2) hit Jane in the face until her nose bled; and (3) pushed, grabbed, pulled, and pinched Jane. (Def.'s SOMF ¶¶ 9, 13; Pl.'s RSOMF ¶¶ 9, 13 (disputing allegations of violence, undisputed that investigation was conducted).) Doe counter-alleged that Jane had scratched and punched Doe. (Def.'s SOMF ¶ 54; Pl.'s RSOMF ¶ 54; *see also* Pl.'s SSODMF ¶ 50 (noting Jane scratched and punched Doe).)

Title IX Sexual Harassment and University Sexual Misconduct for the 2019 to 2020 academic year was governed by Section 1.3 of Princeton's Student Code of Conduct, entitled "Rights, Rules, and Responsibilities" (the "RRR"). (Def.'s SOMF ¶ 1; Pl.'s RSOMF ¶ 1.) Section 1.3.10(1) provides that:

---

[2] The Court notes that the parties appear to agree on very little in this case. For instance, the parties' respective responsive statements of material facts: (1) quibble with the context surrounding the asserted fact rather than clearly admitting or disputing that fact; (2) contain—sometimes paragraphs of—improper legal argumentation and legal conclusions as to the significance of those facts and how those facts support the parties' respective contentions; or (3) raise evidentiary objections as to the admissibility or relevance of the proffered material facts. (*See, e.g.*, Pl.'s RSOMF ¶¶ 1, 4, 10-18, 20-21, 25, 27, 34, 39, 51-53, 55-58, 60-78, 81-87, 92, 94, 96, 97, 101-102, 104-105, 110-111; Def.'s RSSODMF ¶¶ 5-11, 13-14, 18-20, 26-33, 39-43, 46-55, 57, 59-60, 64-65, 67-71, 73.) The purpose of Local Civil Rule 56.1 is intended "to narrow the issues before the court and assist in identifying whether facts are disputed or not[,]" and "[these] statements should clarify the issues for the Court, not . . . increase the burden before it." *Balanced Bridge Funding, LLC v. Mitnick L. Off., LLC*, No. 21-20512, 2024 WL 3949334, at *2 n.2 (D.N.J. Aug. 27, 2024) (internal quotation marks and citations omitted). The Court thus disregards those portions of the parties' statements of facts that assert legal argumentation. *See Doe v. Rutgers Univ.*, No. 21-20763, 2025 WL 763107, at *1 n.1 (D.N.J. Mar. 11, 2025).

> The Title IX Coordinator may need to proceed with an investigation even if a complainant specifically requests that the matter not be pursued. In such a circumstance, the Title IX Coordinator will take into account the complainant's articulated concerns, the best interests of the University community, fair treatment of all individuals involved, and the University's obligations under Title IX.

(Def.'s SOMF ¶ 3; Pl.'s RSOMF ¶ 3.) Section 1.3.12 outlines the procedures for investigating, adjudicating, disciplining, and appealing sexual harassment or misconduct cases in which the respondent is a student. (Def.'s SOMF ¶ 4; Pl.'s RSOMF ¶ 4 (not disputing text of procedures as written but disputing whether procedures were followed).) Section 1.3.12(1) requires the investigative panel members to remain "impartial and unbiased." (Def.'s SOMF ¶ 5; Pl.'s RSOMF ¶ 5.) Section 1.3.12(2) states that "[p]enalties will be determined based on the seriousness of the misconduct as compared to like cases in the past, and the student's previous disciplinary history (if any)." (Def.'s SOMF ¶ 6; Pl.'s RSOMF ¶ 6.) Section 1.3.12(3) outlines a party's right to an "impartial appeal," and states that the appellate body must remain "impartial and unbiased." (Def.'s SOMF ¶ 7; Pl.'s RSOMF ¶ 7.) Under that provision, a party may "file written appeal on the grounds that: (1) there is substantial relevant information that was not presented, and reasonably could not have been presented during the investigation; (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct, or (3) there was procedural unfairness during the disciplinary process." (Def.'s SOMF ¶ 8; Pl.'s RSOMF ¶ 8.)

On September 3, 2019, Princeton became aware Jane was interested in pursuing a Title IX investigation. (Def.'s SOMF ¶ 16; Pl.'s RSOMF ¶ 16.) Jane met with Regan Crotty ("Crotty")—Princeton's then-Director of Gender Equity and Title IX Administration—to share her concerns about Doe's acts of intimate relationship violence. (Def.'s SOMF ¶ 17; Pl.'s RSOMF ¶ 17.) On September 7, 2019, Jane informed Crotty that "she was 'leaning towards moving forward with the

investigation.'" (Def.'s SOMF ¶ 18; Pl.'s RSOMF ¶ 18.) Crotty then followed up with Jane several times because Jane had previously indicated that she might not want to move forward with the investigation and otherwise felt safe. (Def.'s SOMF ¶¶ 19, 22; Pl.'s RSOMF ¶¶ 19, 22.) Crotty, however, informed Jane that the allegations were serious enough such that Princeton might nonetheless be obligated to investigate even if she did not want to proceed. (Def.'s SOMF ¶ 21; Pl.'s RSOMF ¶ 21 (denied).)

On September 10, 2019, Doe sent an e-mail message to Garrett Meggs ("Meggs"), a Princeton Administrator: (1) indicating that he was being harassed by Jane because she was spreading false information about him following their breakup; (2) stating that he did not feel safe; and (3) requesting guidance. (Pl.'s SSODMF ¶ 28; Def.'s RSSODMF ¶ 28 (disputed).) Meggs did not recommend that Doe file a Title IX complaint at that time but instead suggested that Doe seek counseling services to cope with the aftermath of his breakup. (Pl.'s SSODMF ¶¶ 2-30; Def.'s RSSODMF ¶¶ 29-30 (disputed).) Meggs never followed up with Doe. (Pl.'s SSODMF ¶¶ 31-32; Def.'s RSSODMF ¶¶ 31-32).

By October 8, 2019, Jane asked Princeton to issue a no contact order against Doe, which instructed that neither Jane nor Doe "may have any communication with each other, in person or through another party, by telephone, [correspondence], e-mail [message], or other electronic media, or by any other means." (Pl.'s SSODMF ¶ 34; Def.'s RSSODMF ¶ 34.) Approximately one month later, Jane requested that Princeton initiate the Title IX investigation of her allegations against Doe. (Def.'s SOMF ¶ 23; Pl.'s RSOMF ¶ 23.) Crotty subsequently met with Doe and Meggs to inform Doe of this development. (Def.'s SOMF ¶ 24; Pl.'s RSOMF ¶ 24.) Doe, additionally, received correspondence from Princeton providing him with notice of the allegations and the commencement of an investigation against him on that same date. (Pl.'s SSODMF ¶ 38;

Def.'s RSSODMF ¶ 38 (disputed to the extent the document constituted formal notice).) The correspondence, further, informed Doe that he would be barred from being on campus for the duration of the investigation. (Pl.'s SSODMF ¶ 38; Def.'s RSSODMF ¶ 38.) Michelle Minter ("Minter")—Princeton's Title IX Coordinator—appointed the investigatory panel comprised of Joyce Chen Shueh, Randy Hubert ("Hubert"), and Ed White (collectively, "the Panel"). (Def.'s SOMF ¶ 25; Pl.'s RSOMF ¶ 25 (disputed to the extent of Crotty's involvement).)

During Doe's first interview with the Panel, Doe stated that Jane had acted violently towards him. (Def.'s SOMF ¶ 37; Pl.'s RSOMF ¶ 37.) Two days later, Crotty sent Doe an e-mail message to ask if he wished to pursue a Title IX investigation into those allegations. (Def.'s SOMF ¶ 38; Pl.'s RSOMF ¶ 38.) Crotty then sent Doe a follow-up e-mail message on December 3, 2019, indicating that Princeton would proceed with an initial assessment of Doe's counterclaims unless he notified her that he did not wish to proceed. (Def.'s SOMF ¶ 40; Pl.'s RSOMF ¶ 40.) On December 4, 2019, Doe confirmed that he wished to proceed with the investigation. (Def.'s SOMF ¶ 41; Pl.'s RSOMF ¶ 41; Pl.'s SSODMF ¶ 39; Def.'s RSSODMF ¶ 39.) On December 12, 2019, Doe and Jane each received written notices of the allegations, claims, and counterclaims against them. (Pl.'s SSODMF ¶ 41; Def.'s RSSODMF ¶ 41.)

In addition to interviewing Jane and Doe, the Panel interviewed sixteen people. (Def.'s SOMF ¶¶ 35, 48; Pl.'s RSOMF ¶¶ 35, 48.) Doe's mother was interviewed at his request. (Def.'s SOMF ¶ 49; Pl.'s RSOMF ¶ 49.) When considering Doe's request for his mother to be interviewed as a witness, Crotty stated, in an e-mail message to the Panel, that:

> [Princeton has] had other cases where a party requests an interview that goes to credibility rather than an allegation [of misconduct]. [Princeton] ha[s] the ability to say no, but since [the adjudication] looks like it may not go [Doe's] way and [because] he specifically requested it, it might be wise to [interview Doe's mother].

(Pl.'s SSODMF ¶ 40; Def.'s RSSODMF ¶ 40 (undisputed that statement was made but disputed as to demonstrating bias).) In addition to witness interviews, the Panel collected: (1) time-stamped photographs and videos of the parties' injuries (Def.'s SOMF ¶¶ 52-54; Pl.'s RSOMF ¶¶ 52-54); (2) evidence of the parties' heights (Pl.'s SSODMF ¶ 46; Def.'s RSSODMF ¶ 46); and (3) evidence of the parties' alcohol consumption during the events giving rise to the investigation (Pl.'s SSODMF ¶ 47; Def.'s RSSODMF ¶ 47).

On February 18, 2020, the Panel rendered a twenty-five-page, single spaced memorandum, unanimously finding Doe responsible for five of the six[3] claims of intimate relationship violence brought by Jane, and finding Jane not responsible for Doe's counterclaims of intimate relationship violence. (Def.'s SOMF ¶¶ 57, 60; Pl.'s RSOMF ¶¶ 57, 60.) When reaching its decision, the Panel reviewed "all of the evidence provided" and applied the preponderance of evidence standard. (Def.'s SOMF ¶¶ 61-62; Pl.'s RSOMF ¶¶ 61-62 (disputed); *see also* Pl.'s SSODMF ¶¶ 50-57 (contending that Panel: (1) disregarded Doe's evidence; (2) accepted Jane's evidence without scrutiny; (3) was intent on defending Jane against Doe's allegations; and (4) failed to investigate Jane's alcohol and drug use, and her motive).) The Panel found Jane and all of the witnesses credible, but it otherwise found Doe not credible. (Def.'s SOMF ¶¶ 66-77; Pl.'s RSOMF ¶¶ 66-77.) After the Panel found Doe responsible for acts of intimate relationship violence, Kathleen Deignan ("Deignan"), the Dean of the Undergraduate Students, and Cole M. Crittenden (together with Deignan, the "Deans"), the Deputy Dean for Academic Affairs of the Graduate School, jointly decided Doe's penalty, which was expulsion. (Def.'s SOMF ¶ 78; Pl.'s RSOMF ¶ 78; *accord* Pl.'s

[3] Doe was adjudicated not responsible for threatening suicide if Jane were to break up with him, as Jane had alleged in addition to instances of physical violence. (Def.'s SOMF ¶ 59; Pl.'s RSOMF ¶ 59.)

SSODMF ¶ 63; Def.'s RSSODMF ¶ 63; *but see* Pl.'s SSODMF ¶ 64 (contending Crotty participated in the decision); Def.'s RSSODMF ¶ 64 (disputing Crotty's involvement).)

On March 9, 2020, Doe filed an appeal of Princeton's decision to expel him under all three available grounds provided by the RRR. (Def.'s SOMF ¶ 88; Pl.'s RSOMF ¶ 88; Pl.'s SSODMF ¶ 67; Def.'s RSSODMF ¶ 67.) Doe first submitted new information for consideration—a social media post by Jane, posted a few days prior to the Panel's decision, that stated, "[W]orked out boy problems that were never real problems, just things I created for myself to sabotage because I am afraid of being happy." (Def.'s SOMF ¶¶ 89-90; Pl.'s RSOMF ¶ 89-90.) Doe also cited a social media post from Jane that was posted in July 2019—prior to the investigation—which said, "Okay, I really wasted [three] years of my time at Princeton with one man and we aren't even gonna get married if I am not one of the 70% that marry another Princeton grad . . . I ca[me] to this school for my money AND somebody else's[.]" (Def.'s SOMF ¶ 91; Pl.'s RSOMF ¶ 91.) Moreover, Doe challenged the severity of his penalty, asserting that expulsion was inappropriate due to his lack of disciplinary history and standing as a second semester senior. (Def.'s SOMF ¶ 95; Pl.'s RSOMF ¶ 95.) Doe also mounted a challenge as to procedural unfairness, arguing that the Panel did not utilize the preponderance of the evidence standard and took issue with the Panel's credibility determinations. (Def.'s SOMF ¶ 98; Pl.'s RSOMF ¶ 98.)

Professor Nolan McCarty chaired the panel that heard Doe's appeal ("the Appeal Panel") and testified that the Appeal Panel reviewed all of the new evidence it received. (Def.'s SOMF ¶ 92; Pl.'s RSOMF ¶ 92 (disputed); *see also* Pl.'s SSODMF ¶¶ 68-69 (contending Crotty participated in and instructed panel to disregard the new evidence submitted as irrelevant); Def.'s RSSODMF ¶¶ 68-69 (disputing Crotty's role in appeal).) The Appeal Panel found that the social media posts were neither substantial nor relevant, and those posts did not have the potential to

affect the outcome had the Appeal Panel returned the case to the Panel for further consideration. (Def.'s SOMF ¶¶ 93-94; Pl.'s RSOMF ¶¶ 93-94 (disputed to the extent that the new evidence was substantial or relevant to Jane's motive and credibility).) The Appeal Panel further rejected Doe's challenge as to the severity of his penalty, explaining that expulsion was warranted based on multiple incidents of violent conduct against Jane and that it was consistent with prior precedent. (Def.'s SOMF ¶¶ 96-97; Pl.'s RSOMF ¶¶ 96-97 (disputed).) Finally, the Appeal Panel found Doe's claim of procedural unfairness unmeritorious. (Def.'s SOMF ¶ 99; Pl.'s RSOMF ¶ 99 (disputed).) The Appeal Panel's decision to uphold Doe's expulsion was unanimous. (Def.'s SOMF ¶ 100; Pl.'s RSOMF ¶ 100; *but see* Pl.'s SSODMF ¶¶ 70-71 (contending that the Appeal Panel disregarded Doe's challenge in this regard as an unprecedented penalty and upheld expulsion due to Crotty's influence); Def.'s RSSODMF ¶¶ 70-71 (disputed to the extent the Appeal Panel did consider Doe's challenge as to procedural unfairness and denied as to Crotty's role in appeal).)

### B. Procedural History

On April 15, 2020, Doe initiated this action against Princeton and filed a complaint alleging violations of Title IX for erroneous outcome and selective enforcement (Counts One and Two, respectively); breach of contract (Count Three); breach of the implied covenant of good faith and fair dealing (Count Four); and violation of common law due process (Count Five). (*See* Compl., ECF No. *1.) That same day, Doe filed a Motion for a Temporary Restraining Order to "enjoin [Princeton] from enforcing its decision to expel [Doe], removing [Doe's] status as a full-time student, and preventing [Doe] from attending classes and sitting for his upcoming exams pending resolution of the underlying merits." (ECF No. *3.) On April 17, 2020, Princeton opposed Doe's Motion for a Temporary Restraining Order, and the Honorable Brian R. Martinotti, United States District Judge, conducted oral argument on Doe's application on April 21, 2020. (ECF Nos. *14,

19.) Judge Martinotti thereafter issued an opinion and entered an order denying Doe's Motion for a Temporary Restraining Order because he failed to demonstrate a likelihood of success on the merits and that he would suffer irreparable harm in the absence of an injunction. (ECF Nos. *20, *21.)

Princeton thereafter filed a Motion to Dismiss Doe's Complaint on May 20, 2020 (ECF Nos. *31-33), which Judge Martinotti granted on December 31, 2020, without prejudice, and provided Doe with the opportunity to amend his complaint (*see* ECF Nos. *54, 55). Doe filed correspondence indicating that he wished to stand on his Complaint as initially pled (ECF No. 57), and Judge Martinotti dismissed Doe's Complaint with prejudice on February 10, 2021 (ECF No. 58). Doe appealed (ECF No. 61), and the Third Circuit issued a mandate on March 23, 2022, vacating the dismissal order and remanding for further proceedings (ECF No. 63). The following day, this matter was reopened and reassigned to the Undersigned. (ECF No. 64.)

Since then, the parties have engaged in and completed discovery. On November 20, 2025, Princeton filed the instant Motion for Summary Judgment. (Def.'s Mot. for Summary J., ECF No. 211; Def.'s Moving Br., ECF No. *212.) Doe opposed on January 22, 2026 (Pl.'s Opp'n Br.. ECF No. *215), and Princeton filed a reply on February 19, 2026 (Def.'s Reply Br., ECF No. *216).

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a)[4] provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a summary judgment motion, a court must construe all facts and

[4] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-50. Credibility determinations are the province of the fact finder. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary

judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III. DISCUSSION

Princeton moves for summary judgment on Counts One, Two, Three, and Four of Doe's Complaint, and additionally seeks dismissal of Doe's claim for emotional damages. (*See generally* Def.'s Moving Br.) The Court addresses each claim in turn.

### A. Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).[5] "Because Title IX prohibits . . . subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline [when sex] is a motivating factor in the decision to discipline." *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) ("*USciences*") (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)).

Historically, courts have utilized several different doctrinal theories upon which plaintiffs may advance a Title IX claim. Those are: (1) erroneous outcome; (2) selective enforcement; (3) deliberate indifference; and (4) archaic assumptions. *USciences*, 961 F.3d at 209 (first citing *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994); then citing *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018)). Recently, however, the Third Circuit has made clear its "diverge[nce] from some of our sister circuits that apply [these] specific doctrinal tests . . . to analyze Title IX claims." *Doe v. Trs. of Princeton Univ.*, No. 25-2014, 2026 WL 2096642, at *7 n.6 (3d Cir. Jul. 21, 2026) (precedential). Given its deviation, the Third Circuit directs district courts to "look at the 'total mix

---

[5] No party disputes that Princeton is a federally funded university.

of information' supporting a plaintiff's claim," even though Title IX "plaintiffs are 'free to characterize their claims however they wish[.]'" *Id.* at *7 (first citing *USciences*, 961 F.3d at 209; then citing *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022)). Thus, at the motion to dismiss stage, the Third Circuit applies a straightforward test: do the alleged facts, taken as true, "support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex[?]" *Id.* (quoting *USciences*, 961 F.3d at 209). For those courts which have similarly declined to adhere to strict doctrinal tests, the operative inquiry at summary judgment is framed as: "could a jury presented with the record evidence, viewed in [Plaintiff]'s favor, reasonably find that [Defendant] discriminated against [Plaintiff] on the basis of sex?" *Abraham v. Thomas Jefferson Univ.*, No. 20-2967, 2024 WL 1120987, at *29 (E.D. Pa. Mar. 14, 2024), *appeal dismissed*, No. 24-1682, 2024 WL 4540996 (3d Cir. Apr. 30, 2024) (alterations in original); *Doe v. Rollins Coll.*, 77 F.4th 1340, 1352 (11th Cir. 2023); *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021).

Here, Doe characterizes his Title IX claims under the erroneous outcome and selective enforcement theories. The Court addresses each in turn, mindful to evaluate the "total mix of information" available in this record. *See Trs. of Princeton Univ.*, 2026 WL 2096642, at *7.

### *1. Erroneous Outcome (Count One)*

"To prevail on an erroneous outcome claim, a plaintiff must 'cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and . . . show 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *St. Joseph's*, 832 F. App'x at 773 (quoting *Yusuf*, 35 F.3d at 715). To impeach the disciplinary process, a plaintiff may point to evidence demonstrating either: (1) "particular evidentiary weaknesses behind the finding of an offense[,] such as a motive to lie on the part of a complainant or witnesses"; (2) "particularized strengths of the defense;" (3) "[an]other reason to doubt the

veracity of the charge"; or (4) "procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715. Additionally, evidence of "particular circumstances" giving rise to gender bias as a motivating factor might include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* Gender need not be the "but-for cause in the outcome of the disciplinary proceedings," but rather it must be a motivating factor. *Flor v. Bd. of Regents of Univ. of N.M.*, No. 20-027, 2025 WL 2597047, *9 (D. N.M. Sep. 8, 2025) (citing *Ruff v. Bd. of Regents of the Univ. of N.M.*, 272 F. Supp. 3d 1289, 1299 (D.N.M. 2017)).

Princeton argues that Doe cannot succeed on his Title IX erroneous outcome claim because there is no evidence demonstrating that he was expelled from Princeton because of his gender. (Def.'s Moving Br. 1, 17-34.) In opposition, Doe claims that there were procedural irregularities throughout the course of Princeton's investigation, and that those flaws were not mere isolated errors but are indicative of gender bias when taking into consideration the totality of: (1) the pressure Princeton faced to change its Title IX policies following the Department of Education's 2014 investigation and 2019 on-campus protests; (2) Princeton routinely crediting female complainants during Title IX investigations; (3) Crotty's involvement throughout the investigation; and (4) the Panel and Appeal Panel treating Doe with skepticism. (Def.'s Opp'n Br. at 21-24.)

Having reviewed the evidence in the light most favorable to Doe, the Court is satisfied that the "total mix of information" presented here creates a genuine dispute of material fact such that a reasonable juror could conclude that gender was a motivating factor for Doe's discipline.

*First*, Doe points to a specific statement made by Crotty early in the investigation, suggestive of a predetermined outcome. *See Trs. of Princeton*, 2026 WL 2096642, at *11 (noting

that "statements by pertinent university officials . . . can support an inference of gender bias" (quoting *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 939 (9th Cir. 2022)). When deliberating with the Panel about Doe's request to have his mother testify as a witness, Crotty stated in an e-mail message to the Panel that "[Princeton] ha[s] the ability to say no *but since this looks like it may not go [Doe's] way* and [because] he specifically requested it, it might be wise to just do it." (Pl.'s SSODMF ¶ 40 (emphasis added); Def.'s RSSODMF ¶ 40 (undisputed that statement was made but disputed as to demonstrating bias).)

*Second*, Doe submits documentary evidence showing that Crotty played a role at all stages of the investigation, penalty, and appeal. *See Columbia Univ.*, 831 F.3d at 58 (observing inference of gender bias where investigator did not sit on decision-making panel but had influence over decision-makers); *Trs. of Princeton Univ.*, 2026 WL 2096642, at *10 (finding inference of gender bias where the credibility determination favored female complainant over male respondent "notwithstanding the unresolved inconsistencies in the complainants' account"); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 951 (9th Cir. 2020) (finding inference of sex discrimination where university failed to follow up with witnesses and evidence offered in respondent's defense). Here, Doe cites to e-mail messages where Crotty: (1) shared her opinions on evidentiary submissions; (2) made suggestions to the Panel on how to ask questions during Doe's interviews; (3) participated in the drafting process of the outcome with the Deans; and (4) discussed the relevance and weight of Jane's social media posts submitted on appeal with Christine Gage ("Gage").[6] (Pl.'s SSODMF ¶¶ 43, 54, 64, 69; *see also* Crotty Dep. 19:22-25, 139:8-13, 175:4-177:6, 178:8-25, ECF No. *215-8 (testifying that she has acted as an investigator on

[6] Gage works in Princeton's Office of the President and served as an administrative member who communicated with the Appeal Panel members. (Crotty Dep. 168:2-13.)

occasion in the past, would regularly share her opinions, make suggestions, or be available to the Panel and Appeal Panel); *see also* Pl.'s Ex. 49, ECF No. *215-52 (Feb. 18, 2020, e-mail messages from Crotty stating to Deignan, "I am happy to help with the outcome [correspondence]," and from Deignan stating to Crotty, "I [will] be sure to run the draft by you. I agree, the more eyes on this the better!").)

*Third*, Doe adduces evidence that demonstrates a background motivation to pursue Title IX complaints in favor of female complainants. *See Trs. of Princeton Univ.*, 2026 WL 2096642, at *9-10 (explaining that background indicia of sex discrimination, including external or internal pressure on a university, "can provide the necessary 'causal connection' between the alleged procedural irregularities and the university's sex-motivated disciplinary outcome" (citation omitted)). In the spring of 2019, Princeton faced on-campus protests and experienced criticism by the student body over its handling of Title IX proceedings of which the complainants were overwhelmingly female. (Pl.'s SSODMF ¶¶ 14-18.) Specifically, these protests called for Crotty's resignation over her handling of these investigations—facts which Crotty's testimony confirmed. (Crotty Dep. 32:10-25 (Crotty confirming that protestors called for her resignation due to dissatisfaction over Title IX investigations)); *see Columbia Univ.*, 831 F.3d at 58 (explaining that gender-based motive could be inferred where investigator received personal criticism over role in prior cases in which Columbia University was not seen as taking female complainants seriously).

*Fourth*, Doe shows that all of the Title IX adjudications contemporaneous to Princeton's on-campus protests in 2019 resulted in an adverse finding against the male respondent. (Pl.'s SSODMF ¶ 17; *see generally* Def.'s Ex. 32, ECF No. *212-33 (Princeton's chart of Title IX complaints and outcomes)); *see Yusuf*, 35 F.3d at 715 (explaining patterns of decision-making can show gender-based motive). Based upon the "total mix of information" presented in the record

here, *see Trs. of Princeton Univ.*, 2026 WL 2096642, at *7, and viewed in the light most favorable to Doe, the Court concludes that a juror could reasonably find Doe's gender was a motivating factor for his expulsion under the erroneous outcome theory.

The Court accordingly denies Princeton's Motion for Summary Judgment on Count One.

### 2. *Selective Enforcement (Count Two)*

Selective enforcement occurs when "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the [Title IX] proceedings was affected by the student's gender." *St. Joseph's Univ.*, 832 F. App'x at 773 (citations omitted). To establish a claim of selective enforcement, a male plaintiff "must identify a similarly situated female student [who was] treated less harshly." *Id.* (citations omitted). At the summary judgment stage, Doe must "present sufficient evidence for a jury to find that the institution's treatment of similarly-situated male and female students was inconsistent." *Rollins Coll.*, 77 F.4th at 1352 (citing *Univ. of Denver*, 1 F.4th at 830).

Princeton argues that Doe's selective enforcement claim fails because Doe cannot present evidence to show that he and Jane were treated differently. (Def.'s Moving Br. 9-12.) In opposition, Doe contends that: (1) he alleged that Jane "engaged in the same conduct for which he was accused, yet Princeton discouraged Doe from initiating an investigation" into his counterclaim; (2) unlike his reprimand from Princeton, when Jane violated the no contact order, Princeton did not punish her in order "to avoid discouraging her from pursuing a Title IX complaint"; and (3) no female respondent between 2016 and 2020 was expelled for intimate relationship violence—only one was suspended for non-consensual sexual contact. (Pl.'s Opp'n Br. 25-26.) For the reasons that follow, the Court finds that Doe has not presented genuine disputes of material fact such that a reasonable factfinder could conclude that he and similarly situated females were treated inconsistently. *See Rollins Coll.*, 77 F.4th at 1352.

Here, the record belies Doe's assertion that Princeton failed to initiate a Title IX investigation as to Jane's conduct. While it is not disputed that Meggs did not immediately advise Doe to file a Title IX complaint against Jane, Meggs testified that Doe was relatively vague in his reporting about Jane's alleged harassment and that the conduct he described did not rise to the level of a Title IX violation. (*See* Meggs Dep. 20:4-14, ECF No. *215-23; *see also id.* 19:9 to 20:14 (stating that Meggs was a mandatory Title IX reporter and Doe did not share information rising to the level of a possible Title IX violation).) It is also undisputed that the first time Doe alleged a Title IX violation against Jane was during his first interview with the Panel, and then Crotty followed up with Doe two days later to determine if Doe wanted to pursue an investigation. (Def.'s SOMF ¶¶ 37-38; Pl.'s RSOMF ¶¶ 37-38.) It is further not disputed that unless Doe informed Crotty otherwise, Princeton would pursue an investigation into his allegations against Jane. (Def.'s SOMF ¶ 40; Pl.'s RSOMF ¶ 40.)

The record also does not support Doe's position that he and Jane received different treatment over their respective violations of the no contact order. Here, after Jane's first violation, Doe specifically requested that Princeton not punish her. (*See* Pl.'s Ex. 27, ECF No. *215-30.) Similarly, when Doe violated the no contact order for the first time, Princeton chose not to punish him. (Def.'s Ex. 44, ECF No. *216-9.) Finally, while Doe asserts that his expulsion was unduly harsh, the female respondent he points to is an inapposite comparator given that the allegations against her were for instances of non-consensual contact with two male complainants' buttocks. (*See generally* Def.'s Ex. 32 (Princeton's chart of Title IX complaints and outcomes).)

Because the undisputed facts do not establish that similarly situated male and female students were treated inconsistently by Princeton, *Rollins Coll.*, 77 F.4th at 1352, the Court grants

Princeton's Motion for Summary Judgment as to Count Two. Doe's selective enforcement claim is, accordingly, dismissed with prejudice.

**B. Breach of Contract (Count Three)**

Under New Jersey law, "courts do not describe 'the relationship between a private university and its students . . . in pure contract or associational terms.'" *Princeton Univ.*, 30 F.4th at 345-46) (quoting *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 696 (N.J. 1998)). Instead, the university is required to follow its own established procedures and ensure that those procedures are fundamentally fair. *Id.* at 346 (internal quotation marks and citations omitted). Additionally, there must be sufficient evidence to expel a student. *Id.* (citing *Hernandez v. Don Bosco Preparatory High*, 730 A.2d 365, 375 (N.J. 1999)).[7]

Princeton argues that it followed all of the relevant provisions in the RRR by: (1) providing an impartial investigation with impartial and unbiased panel members; (2) applying the preponderance of the evidence standard; (3) evaluating Doe's misconduct as compared to similar cases and determining his penalty to fall within the range of penalties for similar misconduct; and (4) affording Doe review on appeal by another panel. (Def.'s Moving Br. 35-36.) Doe contends, however, that Princeton did not. (Pl.'s Opp'n Br. 30-33.)

Here, viewing the evidence in the light most favorable to Doe, a reasonable juror could find that Princeton breached the RRR provision mandating an impartial and unbiased panel.[8] (*See* Def.'s Ex. 1 24, ECF No. *212-2.) As previously established, Doe has presented sufficient

---

[7] Neither party disputes that the RRR constitutes a contract; what is in dispute is whether Princeton followed its governing provisions.

[8] The Third Circuit has previously defined the terms "impartial" and "unbiased" under this RRR. *See Doe v. Princeton Univ.*, 30 F.4th 335, 347 (3d Cir. 2022). "Impartial" means "one who does *not* favor one side or the other[,]" and "unbiased" means "one *without* a prejudice or inclination in favor of one party. *Id.* (emphases in original).

evidence demonstrating Crotty's overall involvement in the investigation and decision-making process and the RRR is otherwise silent as to whether someone in her role could participate in such a manner. (*See* Pl.'s SSODMF ¶¶ 39-40, 43, 54, 69, 69; *see* Crotty Dep. 19:22-25, 139:8-13, 175:4-177:6, 178:8-25 (Crotty confirming she would often provide her opinions throughout investigation process); *but see* Def.'s Ex. 25 162:13-14, ECF No. *212-25 (Hubert testifying that the Panel would not make assessments of the evidence as the investigation progressed); *see* Deignan Dep. 63:1-9 (noting decision to expel Doe was made without consulting Crotty), ECF No. *215-12; *but see* Pl.'s Ex. 49 (Feb. 18, 2020, e-mail messages between Deignan and Crotty regarding draft of outcome correspondence); *see also* McCarty Dep. 43:3-25 (noting appearance of Crotty's involvement in drafting process of outcome correspondence), ECF No. *215-10; *but see* Def.'s Ex. 46 59:2-10, ECF No. *216-11 (portion of McCarty deposition transcript noting Title IX administrator should not have a role in appeal board meetings).)

Thus, whether the Panel and Appeal Panel fulfilled their duties impartially and without bias under the RRR—despite Crotty's overall involvement in the process—implicates questions about the Panel members' conduct, states of mind, and credibility for which reasonable jurors could differ. *See Capie v. Lobao*, No. 21-829, 2023 WL 5004048, at *4-5 (M.D. Pa. Aug. 4, 2023) (explaining that summary judgment is inappropriate "when resolution of the dispositive issue requires a determination of state of mind, for in such cases 'much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder.'" (quoting *Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988))). Because the weight of the evidence is so conflicting, summary judgment must be denied. *See Big Apple BMW*, 974 F.2d at 1363 (noting "a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations.").

The Court, therefore, denies Princeton's Motion for Summary Judgment as to Count Three.

**C. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Four)**

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Tripicchio v. UPS Store, Inc.*, No. 21-14512, 2023 WL 3182915, at *10 (D.N.J. Apr. 30, 2023) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001)). "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." *Id.* (quoting *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005)). A party "breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Wilson*, 773 A.2d at 1130. "Proof of bad motive or intention is vital to an action for breach of the covenant." *Brunswick Hills*, 864 A.2d at 396. "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." *Wilson*, 773 A.2d at 1130.

Princeton contends that summary judgment is warranted as to Doe's implied covenant of good faith and fair dealing claim because there is no evidence of bad faith in Princeton's performance under the RRR. (Def.'s Moving Br. 38.) Princeton, in addition, seeks dismissal of Doe's claim for emotional damages arising under this cause of action. (*Id.* at 39.) In response, Doe argues that Princeton exploited the discretion afforded to it under the RRR and "[w]hether such conduct constitutes bad faith is a factual question[.]" (Pl.'s Opp'n Br. 34 (citation omitted).) Furthermore, Doe submits Princeton's bad faith breach of the RRR caused him mental anguish such that he can pursue compensation for his emotional distress. (*Id.* at 35-36.)

Here, a reasonable juror, viewing the evidence in the light most favorable to Doe, could find that Princeton breached the implied covenant of good faith and fair dealing given that: (1) Crotty stated to the Panel that Doe's adjudication may not go his way; and (2) the Panel and Appeal Panel would consult or take suggestions from Crotty throughout the proceedings. (Pl.'s SSODMF ¶ 40; Def.'s RSSODMF ¶ 40; *see also* Crotty Dep. 19:22-25, 139:8-13, 175:4-177:6, 178:8-25 (stating she would regularly share opinions and make suggestions to the Panel).) Because Doe must prove that Princeton acted with "subjective, wrongful intent," *Buck Consultants, Inc. v. Glenpointe Assocs.*, 217 F. App'x 142, 152 (3d Cir. 2007), it is a dispute of fact "that should not be [decided] on a motion for summary judgment." *Gillman v. Waters, McPherson, McNeill, P.C.*, 271 F.3d 131, 140 (3d Cir. 2001) (citation omitted); *accord Lilliston Chrysler Plymouth Dodge Truck Jeep Eagle, Inc. v. Universal Underwriters Grp.*, 747 A.2d 815, 818 (N.J. Super. Ct. App. Div. 2000) ("A summary judgment motion should not ordinarily be granted when an action or defense requires determination of a state of mind or intent, such as . . . bad faith[.]").

Alternatively, Doe is not entitled to emotional distress damages for his breach of the implied covenant claim as a matter of law. *See Picogna v. Bd. of Educ. of Twp. of Cherry Hill*, 671 A.2d 1035, 1038 (N.J. 1996) (explaining that whether emotional distress can be found is a matter of law). Emotional distress damages are awarded upon a showing of "extreme emotional harm such that no reasonable [person] could be expected to endure [it]." *Granelli v. Chi. Title Ins. Co.*, No. 10-2582, 2012 WL 2072648, at *7 (D.N.J. June 8, 2012) (quoting Restatement (Second) of Torts § 46 cmt. d, (1965)). Emotional distress damages can only be awarded in contract actions when the breach: (1) involves conduct that is both outrageous and intentional; and (2) proximately causes severe, foreseeable emotional distress. *Id.* (citation omitted). Here, Doe has developed anxiety and a tremor as a result of his expulsion from Princeton. (Pl.'s SSODMF ¶ 73.) Although

those symptoms are unpleasant, Doe has not demonstrated that his emotional distress is so extreme that no reasonable person could be expected to endure it. Additionally, while not required to prove emotional distress, it is undisputed that Doe has not sought treatment for such emotional distress. (Def.'s SOMF ¶ 109; Pl.'s RSOMF ¶ 109 (not disputing lack of treatment from a mental health professional)); *see Granelli*, 2012 WL 2072648, at *8 (granting summary judgment in favor of defendant on claim for emotional distress damages where the plaintiffs experienced anxiety that failed to rise above a level of common inconvenience).

Because there is a genuine dispute of material fact as to Princeton's intent, the Court denies Princeton's Motion for Summary Judgment on Count Four. The Court, however, grants Princeton's Motion for Summary Judgment as to Doe's claim for emotional distress damages arising under Count Four. Doe's claim for emotional distress damages is dismissed with prejudice.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Princeton's Motion for Summary Judgment. The Court will issue an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: September 9, 2026